**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Chapter 11 |
| CII PARENT INC., | ) |
| | ) Case No. 22-11345 (LSS) |
| Debtor.[1] | ) |
| | ) |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER**
**<u>ENFORCING THE AUTOMATIC STAY AND GRANTING RELATED RELIEF</u>**

---

[1]    The last four digits of Debtor CII Parent, Inc.'s tax identification number are 4706.  The location of the Debtor's service address for purposes of this chapter 11 case is 21 Custom House Street, Boston, Massachusetts 02110.

The above-captioned debtor and debtor in possession ("CII" or the "Debtor"), by and through its undersigned counsel, hereby files this *Motion for Entry of an Order Enforcing the Automatic Stay and Granting Related Relief* (the "Motion").[2]  In support of the Motion, the Debtor respectfully states as follows:

## PRELIMINARY STATEMENT

This Motion arises from a bad faith, attempted hostile takeover of an operating business orchestrated by Twin Brook, the secured lender to the Debtor and its affiliates (collectively, "Frontsteps"), notwithstanding the strong, continuing, and constructive support of the Equity Sponsor (as defined below).

The parties were in restructuring negotiations for months to avoid a Chapter 11 filing.  Twin Brook required Frontsteps to conduct a sale process to avoid Chapter 11—which it did.  Although Frontsteps received a bid that satisfied Twin Brook's requirements, the sale process ultimately failed due to adverse market conditions.

On November 15, 2022 – the end of an agreed forbearance period – the parties were working intensively on an operational and financial restructuring, including a proposed capital infusion by the Equity Sponsor, that would pave the way for another sale process to commence when market conditions improved.  Frontsteps and the Equity Sponsor requested a forbearance extension soon thereafter.  Twin Brook's authorized representative assured them – both orally and in writing – that they did not need another forbearance because the parties were in active negotiations and that those discussions would continue.  Relying on these and other assurances from Twin Brook, Frontsteps and the Equity Sponsor continued to negotiate in good faith without the overhang of Twin Brook exercising remedies while these discussions were ongoing.

---

[2]    The Debtor submits contemporaneously herewith the supporting declaration of Thomas Radford (the "Radford Declaration").

Moreover, in reliance on Twin Brook's assurances, Frontsteps and the Equity Sponsor continued to allow Twin Brook access to management to facilitate these negotiations and the development of an agreed business plan.

The Forbearance Agreement (as defined below) was the only basis entitling Twin Brook to communicate directly with management.  Having received assurances that they did not need a further forbearance agreement (because Twin Brook essentially provided a *de facto* extension of the existing forbearance), Frontsteps and the Equity Sponsor allowed these communications with management to continue.  Frontsteps and the Equity Sponsor were deceived by Twin Brook and would never have allowed these communications if they knew either that Twin Brook was not being honest and actually intended to try to take over Frontsteps and/or that access to management was going to be subsequently used as a cudgel to allow Twin Brook to attempt to orchestrate a hostile takeover.[3]

But that is precisely what occurred.  While the parties were still negotiating and dispersing for the holidays, on December 21, 2022, Twin Brook purported to exercise a proxy to remove existing directors, amend operating agreements, and exercise other control rights over the Debtor's operating subsidiaries.  Moreover, while Twin Brook was afforded access to the Debtor's management, the Equity Sponsor's access to management apparently was terminated immediately after its purported takeover.

The Debtor filed this Chapter 11 case to regain control of its operating subsidiaries – the Debtor directly or indirectly still owns 100% of all equity interests in such subsidiaries – and to

---

[3]    Among other ramifications of this deceit and course of conduct, Twin Brook is vulnerable to lender liability claims for interfering with management and operations without appropriate Board or Equity Sponsor authorization.  The Debtor reserves the right to pursue any and all remedies, including lender liability, against Twin Brook for any damage it has caused the Debtor and the Applicable Subsidiaries by its precipitous actions.

facilitate a transparent process that maximizes value for all stakeholders.  Had Twin Brook not given Frontsteps and the Equity Sponsor these false assurances, Frontsteps would likely have filed this Chapter 11 case, as well as those of its subsidiaries, days, if not weeks, before the attempted coup occurred to provide it with the breathing room needed to effectuate a successful restructuring.  Indeed, that Twin Brook exercised these remedies on the eve of the Christmas holiday week is further evidence of Twin Brook's bad faith.

The Debtor has requested that Twin Brook rescind the actions that it wrongfully took.  Twin Brook, however, has refused, and the Debtor is left with no choice but to seek relief from this Court to undo such precipitous and bad faith actions.

Twin Brook's continuing attempts to exercise of control over the corporate governance of its operating subsidiaries violates the automatic stay because it is (i) an exercise of control over the Debtor's primary assets, (ii) an act to collect a debt and (iii) an act to enforce a lien.  Without the right to control its operating subsidiaries, the Debtor's and its affiliates' rights to use and control these subsidiaries are severely impaired, and the Debtor and its subsidiaries will suffer irreparable harm as a result.  Courts have repeatedly rebuffed such efforts to control stock and other estate assets, and this Court should do the same.

Alternatively, even if Twin Brook were somehow permitted to evade application of the automatic stay, Twin Brook should be equitably estopped based on this misconduct from having exercised remedies under the Credit Agreement against the Debtor.

Twin Brook's sole recourse during this Chapter 11 case should be adequate protection, but it should have no continuing right of enforcement of any other covenants or remedies under the operative financing agreements.  It should have no ability to control any of the Debtor's rights appurtenant to its equity interests in its subsidiaries.  To the extent that it has such rights, they are

subject to immediate turnover.

Finally, Twin Brook's exercise of the proxy failed to comply with the plain terms of the Collateral Agreement (as defined below) and the Irrevocable Proxy Coupled with Interest dated May 15, 2019 executed by the applicable Frontsteps entity in favor of Twin Brook (each, an "Irrevocable Proxy" and collectively, the "Irrevocable Proxies"), and therefore each of the Offending Actions should be deemed ineffective for that reason alone.

\* \* \* \* \*

A debtor's control over its wholly-owned subsidiaries and affiliates is a fundamental right. Depriving it of this control – particularly where, as here, such control was obtained through deception – would preclude a debtor from being truly "in possession" as the Bankruptcy Code regime permits and would severely impair its ability to pursue a value-maximizing holistic restructuring to which it is entitled.  Allowing secured creditors like Twin Brook to control debtors without having completed foreclosure proceedings simply by narrowly beating them to the punch also would operate as an illegal barrier to a company's right to file Chapter 11 cases for itself and its affiliates to obtain the full benefits of Chapter 11 to facilitate a global restructuring, rather than a process favoring a particular creditor's parochial interests.  The Court should not sanction such a dangerous precedent.

For all the reasons set forth herein, the Debtor respectfully requests that the Court enter an order, substantially in the form attached to this Motion as **Exhibit A**, (i) finding that Twin Brook's continuing exercise of control over the Debtor's corporate governance rights in the Applicable Subsidiaries (as defined below) violates the automatic stay, or, alternatively, that Twin Brook is equitably estopped from exercising remedies against the Debtor under the circumstances; (ii) directing Twin Brook to (a) formally rescind the amendments of the applicable bylaws, operating

agreements, and/or other corporate governance documents that purported to, among other things, remove certain directors and/or managers of the Applicable Subsidiaries, adjust the size of each board of directors and/or managers, as applicable, of each Applicable Subsidiary, and appoint replacement directors and/or managers for each Applicable Subsidiary, (b) cease exercising control over the Applicable Subsidiaries, and (c) immediately inform management of the foregoing; and (iii) granting such other relief as is appropriate under the circumstances.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C § 157.

2.      Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtor consents to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 362, 105, 541, and 542 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and Bankruptcy Rules 7065, 9013, and 9014.

## BACKGROUND

### A.    The Prepetition Capital Structure

5.    On December 27, 2022 (the "Petition Date"), the Debtor commenced with this Court a voluntary case under Chapter 11 of Title 11 of the Bankruptcy Code.

6.    Frontsteps is a leading provider of end-to-end management software for homeowners' associations and related entities. The Debtor is a holding company that conducts its business through its operating subsidiaries.

7.    As of the Petition Date, the Debtor's consolidated long-term debt obligations totaled approximately $71 million, consisting of a $63 million term loan (the "Term Loan") and an $8 million revolving credit facility (the "Revolving Loan" and, together with the Term Loan, the "Loan") arising under that certain Credit Agreement, dated May 15, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among the Debtor, Investors Acquisition Co. ("Investors Acquisition"), AssociationVoice LLC ("AssociationVoice"), CapSure Acquisition Co. ("CapSure"), Real Pro Holdings, Inc. ("Real Pro"), dwellingLIVE, Inc. ("dwellingLIVE"), iHomefinder Inc. ("iHomefinder"), AtHomeNet, Inc. ("AtHome"), as Borrowers, Community Investors, Inc. ("Community" and, together with Investors Acquisition, AssociationVoice, CapSure, Real Pro, dwellingLive, iHomefinder, and AtHome, the "Applicable Subsidiaries"), as Borrower and Borrower Representative, Twin Brook Capital Partners LLC ("Twin Brook Capital Partners") as Agent for all Lenders, and certain Twin Brook Capital Partners affiliated entities as Lenders (collectively, the "Lenders" and, together with Twin Brook Capital Partners, "Twin Brook").

8.    The Loan is secured by, among other things, the Debtor's and its direct subsidiary's equity interests in the Applicable Subsidiaries pursuant to the terms of that certain Guarantee and

Collateral Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "Collateral Agreement" and, together with the Credit Agreement and the other documents, instruments and agreements executed in connection therewith and as further defined in the Credit Agreement, the "Loan Documents"), dated May 15, 2019, by and among the Debtor, the Applicable Subsidiaries, and Twin Brook.

**B.      Events Leading Up to Twin Brook's Wrongful Exercise of Remedies**

9.      In the first quarter of 2020, Frontsteps breached certain covenants in the Credit Agreement and was expected to remain in breach over the next several quarters due to higher-than-expected churn, weak new logo growth, and general underperformance of the original projections on which the debt was underwritten.  Consequently, Frontsteps's equity sponsor at the time – CIP Capital Fund, L.P. ("CIP") – and Falcon provided an equity infusion to cure the default and provide operational runway through 2021 to give Frontsteps breathing room to explore potential deleveraging transactions.

10.      After a thorough evaluation of potential alternatives, Frontsteps determined that a going concern sale of the business would maximize value for all stakeholders.  Accordingly, in July 2021, Frontsteps retained GCA Advisors to run a sale process.[4]  An initially robust process, however, did not result in a sale of the business.  Frontsteps continued to pursue a sale until June 2022 through multiple further discussions that all proved unsuccessful.

11.      On the heels of the unsuccessful sale process, on July 27, 2022, CIP sold its controlling equity stake in Frontsteps to Falcon Structured Equity Partners, LP (the "Equity Sponsor"), for a nominal consideration.  This was a *de facto* restructuring as the Equity Sponsor's

---

[4]      Houlihan Lokey, Inc. acquired GCA Advisors in October 2021.

preferred stock became the controlling interest in the Debtor and its affiliates.  In conjunction with this acquisition, the Equity Sponsor negotiated a forbearance agreement, dated July 27, 2022 (the "Forbearance Agreement"), with Twin Brook through November 15, 2022, while Frontsteps developed a long-term operating plan now that the Equity Sponsor was in charge and a strategy to provide the business with additional capital.  The Equity Sponsor, moreover, committed to helping Frontsteps continue a value-maximizing sale process of its business including beyond the forbearance requirement of a sale process for only the profitable iHomefinder segment.  All parties recognized that these restructuring processes would take significant time, and the Equity Sponsor agreed to compensate Twin Brook for the time the Debtor needed.

12.    Accordingly, pursuant to terms of the Forbearance Agreement, Twin Brook (i) agreed to forbear from exercising default-related remedies under the Loan Documents until November 15, 2022 (the "Forbearance Period"), (ii) granted Frontsteps access to the $3 million of outstanding availability on the Revolving Loan, and (iii) provided a $1 million increase in the principal amount of the Revolving Loan commitment, subject to an agreement from the Equity Sponsor to guaranty the obligations under the Loan Documents in an aggregate amount not to exceed the principal amount of Revolving Loans outstanding under the Credit Agreement in excess of $4 million.

13.    The Credit Agreement, as amended pursuant to the terms of the Forbearance Agreement, required that Frontsteps (i) explore a sale of its iHomefinder business for a minimum enterprise value of $50 million and use the proceeds of the sale to pay down the Loan (Credit Agreement § 6.13) and (ii) make available members of management to provide updates to Twin Brook regarding Frontsteps's business (Credit Agreement §§ 6.1.14), including monthly calls with Twin Brook (*id.*).  The amended Credit Agreement explicitly stated that, in the event Twin Brook

or its advisors "requested a material meeting or call, whether in person, by phone or virtual, with the Borrowers or the other Loan Parties, [Twin Brook] or its advisors shall give [Equity Sponsor] at least 24 hours email or verbal prior notice of such meeting or call (including the Monthly Calls) and allow such representatives of the [Equity Sponsor] to participate in such meeting or call (including the Monthly Calls)."  Credit Agreement § 6.1.14.

14.     Twin Brook was not permitted this extensive access to management prior to the execution of the Forbearance Agreement.  Indeed, this access was only granted because Twin Brook had agreed to the forbearance, and the parties deemed this access to management to be important to the development of an agreed business plan for a financial restructuring of the enterprise.

15.     Consistent with the terms of the Forbearance Agreement, Frontsteps engaged GCA Advisors to sell the iHomefinder business via a targeted sale.  On August 8, 2022, Frontsteps received a letter of intent from a potential purchaser for $53 million.  Frontsteps kept Twin Brook continuously apprised on the sale process, and involved Twin Brook in strategy with regard to responses to the potential purchaser.  After further due diligence, however, the potential purchaser declined the transaction, citing market conditions and its own internal challenges.  Moreover, Frontsteps and the Equity Sponsor also took further initiative by entering into discussions with a potential buyer for one of Frontsteps's other business units, but this potential buyer ultimately declined the transaction as well.

16.     Concurrently with the iHomefinder sale process, Frontsteps undertook an operational restructuring to position the entire business for a sale once market conditions improved.  Among other things, Frontsteps (i) implemented various changes to the management team, including the promotion of Matt DeWolf (existing Chief Product Officer) to CEO; (ii)

formalized a growth plan with management outlining product enhancements, key hires, sales channel expansion, and product sunsetting; (iii) engaged turnaround and restructuring advisor AEG Partners to drive strategic buy-in, memorialize product strategy, support P&L informed decision making, and catalyze organizational change; (iv) solicited feedback from potential buyers who participated in the failed sale process and developed a plan of action to rectify identified issues; (v) conducted extensive market surveys to understand competitive positioning; (vi) developed several tools in support of the CFO function, including a new restated monthly reporting package, product level P&L, a robust, bottoms-up operating model, and a KPI reporting tool to better inform decision making for both external stakeholders as well as management; (vii) expanded existing reporting distribution, including a regular 13-week cash flow and liquidity certificate distribution to improve cash visibility; and (viii) engaged with strategic partners to explore a merger or investment in Frontsteps.

17.     By early November, it became clear that Frontsteps would be unable to raise capital through asset sales based on market conditions.  The Equity Sponsor thus initiated discussions with Twin Brook to negotiate a restructuring of Frontsteps's debt and a path for further investment from the Equity Sponsor, which strongly supports the business, to provide operational runway to weather the market downturn.  On November 1, 2022, the Equity Sponsor proposed three potential structures for a restructuring transaction.

18.     Twin Brook did not immediately react to the November 1 proposals.  On November 14, Twin Brook sent the Equity Sponsor two counterproposals.  The Equity Sponsor did not reject Twin Brook's counterproposals but, rather, indicated to Twin Brook that the terms needed to be fleshed out to confirm that the *pro forma* business would be viable.

19.     On November 16, 2022 (the day after the Forbearance Agreement expired), Twin

Brook delivered a reservation of rights letter to Frontsteps noting that Twin Brook was "*considering* options with respect to the Credit Agreement and the other Loan Documents" and that "*no decisions regarding these options* have been made to date" and reserving its right to "exercise any and all default-related rights and remedies under the Credit Agreement, the other Loan Documents, and/or applicable law." **Exhibit C** (emphasis added). Twin Brook did not signal that it had any intention to take immediate action to collect on the Loan or otherwise enforce any of its default-related remedies; just the opposite. The Equity Sponsor continued to cooperate with Twin Brook and its demands for information in the expectation that Twin Brook was continuing to negotiate with Frontsteps and the Equity Sponsor in good faith.

20.     Based on the assurances that Twin Brook provided to the Debtor and the Equity Sponsor after the documented forbearance ended (discussed *infra*), the Equity Sponsor continued to allow Twin Brook to conduct a multi-day on-site meeting with management, AEG Partners, and Twin Brook-affiliated third-party advisors to discuss the latest operating plan. Coming out of those meetings, Twin Brook requested extensive analysis from Frontsteps, including a three-year business roadmap across multiple operating goal posts. In parallel with its good faith negotiations with Twin Brook, the Equity Sponsor continued to execute business improvement projects alongside Frontsteps management and worked to include Twin Brook in various workstreams.

21.     Subsequently, on December 4, Thomas Radford, Managing Director of the Equity Sponsor, requested to confirm a formal 30-day forbearance via telephone with Twin Brook Director Tony Maggiore to facilitate ongoing negotiations. On December 5, Mr. Radford memorialized the formal forbearance request via email to Mr. Maggiore. Mr. Radford emphasized that the Equity Sponsor was "working hard to reach a negotiated outcome that works for Twin Brook as well as something that the board can live with" and explained that "[g]iven the various

requests from Twin Brook's end and the impact that will have on management's time, we believe a forbearance will enable everyone around the table to focus fully on a resolution of Frontsteps' capital structure and liquidity needs."

22.    On December 6, Mr. Maggiore assured Mr. Radford that he believed "negotiations should continue to proceed" but that "*a forbearance is not needed to continue to advance discussions*." (emphasis added).  Mr. Maggiore volunteered to have a call with Mr. Radford to "further explain our approach/perspective if needed."  Mr. Maggiore and Mr. Radford scheduled a call for December 7.

23.    On December 7, Mr. Radford and his colleague, Irene Whea-Wang Sherman, spoke with Mr. Maggiore and his colleague, Drew Guyette, regarding the Equity Sponsor's request for a formal 30-day forbearance.  Twin Brook indicated a willingness to formalize the forbearance and requested additional detail regarding the Equity Sponsor's request.  On December 8, Ms. Wang outlined the Equity Sponsor's rationale via email to Mr. Maggiore and Mr. Guyette, explaining that the Equity Sponsor was "requesting a forbearance in order to align everyone's expectations towards timing, and allow us to continue driving various initiatives and have management spend real time on [Twin Brook's] requests."  Ms. Wang listed several items the Equity Sponsor expected to accomplish over the next month, many of which "would not be possible" without a formal forbearance, including (i) a legal review and response to Twin Brook's November 14 term sheet, (ii) a response to Twin Brook's questions, (iii) Board meetings and legal discussions to reach approval on deal terms, (iv) finalizing the 2023 budget, and (v) continuing the implementation of multiple ongoing operational initiatives.

24.    Ms. Wang explained that a formal forbearance "would allow us and management to accomplish many of these initiatives and move forward together with a set timeline, but even

more critically, allow management some breathing room, as we're trying to be sensitive to the incremental work we're placing on the team that takes their time away from operating the business." The Equity Sponsor and Twin Brook scheduled a call for December 14 to discuss Ms. Wang's email.

25.     On December 14, Mr. Radford and Ms. Wang discussed the official 30-day forbearance with Mr. Maggiore and Mr. Guyette via telephone, on which call Twin Brook stated that it would be reviewing the request with its investment committee early the following week.

26.     This was a lie.  Twin Brook had no intention of granting the request for a forbearance.  Unbeknownst to the Equity Sponsor, Twin Brook had been actively plotting a hostile takeover since early December at the latest.[5]  *Evidencing Twin Brook's bad faith – while explicitly assuring the Equity Sponsor that "a forbearance agreement [was] not needed to continue to advance discussions" – Twin Brook was likely actively recruiting candidates to replace the board and having unauthorized conversations with Frontsteps's management behind the Equity Sponsor's back*.

27.     Had Twin Brook indicated its true intention to attempt take over the business or not responded at all, Frontsteps would likely have filed Chapter 11 immediately to preserve the value of the business, including the retention of management, which has not been supportive of Twin Brook's operating plan.

C.     **The Proxy Notice**

28.     By letter dated December 21, 2022 (the "Proxy Notice"), without any prior warning or discussion, Twin Brook underhandedly notified Frontsteps that it had exercised its purported

---

[5]     The Equity Sponsor was informed that Twin Brook had entered into engagement letters with replacement board candidates dated a week and half prior to Twin Brook's attempted takeover.

rights under the Collateral Agreement to (i) amend the applicable bylaws, operating agreements, and/or other corporate governance documents as necessary or desirable, to, among other things, remove certain directors and/or managers of the Applicable Subsidiaries; (ii) adjust the size of each board of directors and/or managers, as applicable, of each Applicable Subsidiary; and (iii) appoint replacement directors and/or managers for each Applicable Subsidiary (collectively, the "Offending Actions").  Twin Brook also brashly instructed management of the Applicable Subsidiaries that they were not permitted to communicate freely with the purportedly-removed directors and/or managers to the great detriment of the Debtor and the Applicable Subsidiaries.

29.    Thus, while Frontsteps and the Equity Sponsor allowed Twin Brook to have extensive access to management, after its hostile takeover, Twin Brook responded by cutting off the Equity Sponsor (and guarantor of certain debt) by cancelling all reoccurring calls with the Equity Sponsor and providing it with minimal information concerning management of the business.  This is the epitome of bad faith.

**D.    Twin Brook's Willful Violation of the Automatic Stay**

30.    Twin Brook's deceitful and improper actions have jeopardized the restructuring of Frontsteps, including Frontsteps's ability to execute refinancing transactions and explore potential going concern sales.  They have also harmed the underlying business as any change of control triggers an acceleration of millions of dollars in payables, thus negatively impacting Frontsteps's liquidity situation.  Other harms include the reputational damage Frontsteps suffered with its customers and suppliers, damage to Frontsteps's attempts to recruit candidates for management roles, and harm to Frontsteps's ability to bring in new business and continue its sale process.  Accordingly, on December 27, the Debtor filed Chapter 11 to seek protection from further injurious misconduct inflicted upon Frontsteps by Twin Brook, including its attempt to eliminate

the extensive guidance and knowledge of the Equity Sponsor in favor of parties with no prior experience with this business and perhaps none in the industry.

31.     By letter dated December 29 (the "<u>Automatic Stay Notice</u>"), the Debtor notified Twin Brook and its counsel that it had filed Chapter 11, which resulted in the immediate imposition of the automatic stay pursuant to Section 362(a) of the Bankruptcy Code.  The Automatic Stay Notice advised Twin Brook that the Debtor's direct and indirect equity interests in the Applicable Subsidiaries are property of the Debtor's estate.  As such, Twin Brook's continued exercise of control over the Applicable Subsidiaries to collect on the Loan constitutes a violation of the automatic stay.

32.     The Automatic Stay Notice requested that Twin Brook confirm that it would (i) formally rescind the Offending Actions, (ii) cease exercising control over the Applicable Subsidiaries, and (iii) immediately inform management of the foregoing so that the Debtor has assurances that Twin Brook is not violating the automatic stay.  As of the date of this filing, Twin Brook has not rescinded the Offending Actions, continues to exercise control over the Applicable Subsidiaries in clear and willful breach of the automatic stay, and gratuitously terminated the Debtor's D&O insurance policy.

**BASIS FOR RELIEF**

A.     <u>**Twin Brook's Actions Violate the Automatic Stay**</u>

33.     Twin Brook's continuing exercise of control over the Debtor's governance rights in the Applicable Subsidiaries violates the automatic stay in Section 362(a) of the Bankruptcy Code.

34.     The Debtor's interests in the Applicable Subsidiaries are its main assets; allowing Twin Brook to continue to control these assets means that the Debtor has no say in the disposition

of such assets, and allows Twin Brook to be the *de facto* debtor in possession in control of the bankruptcy.  The Court should not tolerate this, particularly because it resulted from Twin Brook's bad faith tactics to lull the Debtor and the Equity Sponsor into believing that they did not need a documented forbearance, and the result of an invalid exercise of contractual rights under the Loan Documents, as discussed below.

35.     The automatic stay operates as an injunction against "all entities" from, *inter alia*, any act to (i) "exercise control over property of the estate," (ii) "enforce any lien against property of the estate, and (iii) "collect … or recover a claim against the debtor that arose before the commencement of the case."  11 U.S.C. §§ 362(a)(3), (4) and (6).  A debtor's bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).  "The definition of property of the estate is interpreted broadly, and every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of Section 541."  *Geltzer v. Soshkin (In re Brizinova)*, 588 B.R. 311, 326 (Bankr. E.D.N.Y. 2018) (quoting *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008)) (brackets and quotation marks omitted).  It "includes all kinds of property, . . . tangible or intangible."  *In re Atl. Bus. & Cmty. Corp.*, 901 F.2d 325, 327 (3d Cir. 1990) (citations and quotation marks omitted).

36.     "The broad definition of property of the estate clearly encompasses a debtor's interest in another corporation's stock."  *In re Brizinova*, 588 B.R. at 326 (quotation and brackets omitted).  Likewise, corporate governance rights that are part and parcel with such equity interests fall under Section 541.  *See In re Lee,* 524 B.R. 798 (Bankr. S.D. Ind. 2014) (debtor's voting rights in LLC were property of the estate); *In re Cardinal Indus.*, 105 B.R. 834, 849-50 (Bankr. S.D. Ohio 1989), *supplemented*, 109 B.R. 743 (Bankr. S.D. Ohio 1989) (contractual management

16

interests of debtor managing general partner constituted property of his estate); *In re Plunkett*, 23 B.R. 392, 394 (Bankr. E.D. Wis. 1982) (reasoning that management agreement between debtor and other general partners constituted a contract and that any rights and benefits flowing therefrom constituted estate property).

37.     Courts have consistently held in several contexts that a creditor's attempt to exercise control over a debtor's subsidiaries – like Twin Brook has done here – through the exercise of corporate governance rights violates the automatic stay.

38.     In *In re Marvel Entm't Grp.*, the Court explained that bondholders and the indenture trustee in the debtor-holding companies' bankruptcy cases sought to vote the debtor-holding companies' pledged shares of stock as a result of the debtors' defaults under indentures. *See In re Marvel Entm't Grp.*, 209 B.R. 832 (D. Del. 1997). In that scenario, the *Marvel* court found that the bondholders and indenture trustee were rightly required to first obtain relief from the automatic stay. *See id.* at 839. ("Because the pledged shares were property of the Marvel Holding Companies' estates, appellants were required to seek . . . relief from the automatic stay in the Marvel Holding Companies case that prevented them from exercising control over those shares.").

39.     In *In re Texas Rangers Baseball Partners*, upon the occurrence of an event of default, pursuant to a pledge agreement, the lenders automatically acquired the right to right to exercise the voting and other governance rights of the debtor's general partner. *See In re Texas Rangers Baseball Partners*, 434 B.R. 393, 404 (Bankr. N.D. Tex. 2010). The lenders argued that because the loans were in default, the lenders (not the debtor) must authorize the sale of estate assets. *Id.* The bankruptcy court rejected the lenders' argument, holding that "given the pendency of the bankruptcy cases," "any effort on the part of [the lenders] to enforce its contractual right to control either entity or Debtor would amount to a violation of the automatic stay of Code § 362(a)."

*Id.*

40.      In *In re Bicoastal Corp.*, the bankruptcy court held that Section 362(a)(3) prevented a creditor and preferred shareholder of the debtor from exercising its right to elect a majority of the debtor's board of directors that accrued when the debtor failed to timely repay the creditor/preferred shareholder's loan.  *See In re Bicoastal Corp.*, 1989 WL 607352, at *5 (Bankr. M.D. Fla. Nov. 21, 1989).   The court noted that the creditor/preferred shareholder "is not a stockholder who desires to obtain control of the management of Bicoastal for the reason stockholders undertake such actions at all, but only to obtain control of the management in order to assure that this promissory note is repaid."  *Id.*   Thus, the court reasoned, what the creditor/preferred shareholder was "attempting to do is indirectly to force the repayment of the loan, which would be clearly prohibited by § 362(a)(1)."  *Id.*

41.      More recently, in *In re MTE Holdings LLC*, No. 19-12269 (KBO) (Bankr. D. Del Dec. 19, 2019), a creditor sought to lift the automatic stay to commence state court litigation to wrest control of the debtor's primary asset: its membership interest in its subsidiary.  Similar to the Debtor here, the debtor in *MTE* was a holding company of the membership interests of its operating subsidiaries.  The lenders argued that, as a result of the debtor's prepetition default, the lenders had a contractual right to exercise the debtor's voting rights and control the debtor's subsidiary.  The debtor objected, arguing that the debtor's membership interest in its subsidiary remained property of the estate and the automatic stay thus prohibited any lawsuit seeking to validate and enforce the creditor's prepetition action to seize control of the membership interests.

42.      Judge Owens sided with the debtor.  Citing the *Marvel*, *Texas Rangers* and *Bicoastal* precedents, Judge Owens held that "any post-petition attempt of [the creditor] to exercise its contractual right to exercise [the debtor's] voting rights is stayed under Section 362(a)(3) of the

Bankruptcy Code, as it would be an act to exercise control over property of these estates." *In re MTE Holdings LLC*, Dec. 13, 2019 Tr. at 64:8-14;[6] *In re Krueger*, 2014 WL 911857, at *7 (Bankr. N.D. Tex. Mar. 7, 2014), *aff'd sub nom. Krueger v. Torres*, 2014 WL 12584335 (N.D. Tex. Nov. 26, 2014), *aff'd sub nom. In re Krueger*, 812 F.3d 365 (5th Cir. 2016) (finding that chapter 7 debtor, by voting his shares in his company, "was exercising control over property of his bankruptcy estate" and that he "had no right to do this . . . . Section 362(a)(3) unambiguously precludes such control . . . and the facts of this case demonstrate why. [Debtor], by voting his shares and ultimately exercising control over [his company], caused it to dismiss all claims against him"); *In re Cardinal Indus.*, 105 B.R. at 849-50 (holding that creditor exercise of control over contractual management interests of debtor as managing general partner violated the stay).

43.     Additionally, just because some of the acts by which Twin Brook initially exercised control over the Applicable Subsidiaries took place prepetition does not render their continuing control over the Applicable Subsidiaries free from the violation of the automatic stay.  Each day that Twin Brook is exercising control over the Applicable Subsidiaries in derogation of the Debtor's rights in its property is a fresh violation of the automatic stay.  *See Chicago v. Fulton*, 141 S. Ct. 585, 590 (2021) (noting that the automatic stay prohibits "affirmative acts that would disturb the status quo of estate property as of the time when the bankruptcy petition was filed"); *In re THGH Liquidating LLC*, 2020 WL 5409002, at *4 (D. Del. Sept. 9, 2020) (holding that the government violated the automatic stay because it "did not merely retain the same possession and control over the Debtor's pre-petition property . . . [but] engaged in affirmative acts to exercise control over post-petition property of the estate in violation of the automatic stay").

44.     The automatic stay "is one of the fundamental debtor protections provided by the

---

[6]     A copy of the transcript is attached hereto as **Exhibit B**.

bankruptcy laws." *In re Atl. Bus. & Cmty. Corp.*, 901 F.2d at 327 (quotations and citations omitted).

It "gives the debtor a breathing spell from his creditors" by "stop[ping] all collection efforts, all

harassment, and all foreclosure actions." *Id.* (quotations and citations omitted).  A creditor cannot

deprive a debtor of this fundamental protection, particularly if it does so in bad faith through

deceptive tactics as Twin Brook has attempted to do here.  To hold otherwise would allow creditors

to deprive borrowers of their fundamental rights to seek relief under Chapter 11 to preserve value

for all stakeholders, rather than a creditor seeking to wrest control for its own parochial interests.

**B.  Twin Brook Must Turn Over All of the Debtor's Interests in the Applicable
Subsidiaries**

45.    Even assuming, arguendo, that the Court were to find that Twin Brook has not

violated the automatic stay by continuing to exercising control over the Debtor's governance rights

in the Applicable Subsidiaries, Twin Brook has an obligation to turn over such rights to the Debtor

under the particular circumstances.

46.    A secured creditor is not entitled to enforce covenants or other contractual

entitlements in credit or security documents during a Chapter 11 case.  Instead, it is entitled only

to adequate protection under Section 361 of the Bankruptcy Code to preserve the value of its

collateral *based on the debtor's use of that property*.  Here, Twin Brook has retained as its

collateral the Debtor's equity interests in the Applicable Subsidiaries, but it is not entitled to

enforce any contractual rights to control the Debtor's use of that equity.

47.    Accordingly, Section 542(a) of the Bankruptcy Code provides, in pertinent part,

that "an entity . . . in possession, custody, or control, during the case, of property that the trustee

may use, sell or lease . . . shall deliver to the trustee, and account for, such property[.]" 11 U.S.C.

§ 542(a).  *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 202-03 (1983) ("Section 542(a)

requires an entity in possession of property that the trustee may use, sell, or lease under § 363 to

deliver that property to the trustee.") (quotation marks omitted); *In re Denby-Peterson*, 941 F.3d 115, 127-28 (3d Cir. 2019) ("Under Section 542(a), creditors who are in possession of property of the estate must turn over such property to the debtor 'during the [Bankruptcy] case.'") (quoting 11 U.S.C. § 542(a)); *Braunstein v. McCabe*, 571 F.3d 108, 122 (1st Cir. 2009) ("A turnover action is not an action to recover damages for the taking of estate property but an action to recover possession of property belonging to the estate at the time of the filing.  It invokes the court's most basic equitable powers to gather and manage property of the estate.") (internal citation omitted).[7]

48.     Additionally, secured creditors are only entitled to adequate protection of their interests in any property constituting collateral that is turned over.  *See* 11 U.S.C. § 363(e).  *See also City of Chicago, Illinois v. Fulton*, 141 S. Ct. at 594 ("[Section] 542(a) maximizes value for all parties involved in a bankruptcy: The debtor is able to use her asset . . . and the debtor's secured creditor . . . receives adequate protection to replace the protection afforded by possession.  Secured creditors cannot opt out of this arrangement.") (Sotomayor, J., concurring) (internal edits and citation omitted); *Whiting Pools, Inc.*, 462 U.S. at 207 ("The Bankruptcy Code provides secured creditors various rights, including the right to adequate protection, and these rights replace the protection afforded by possession."); *In re Ayscue*, 123 B.R. 28, 31 (Bankr. E.D. Va. 1990) ("[A] secured creditor turning over possession of collateral may request adequate protection under § 363(e).").

49.     As noted above, the Debtor's equity interests and corporate governance rights in the Applicable Subsidiaries are plainly "legal or equitable interests" of the Debtor such that they

---

[7]    Section 542(a)'s mandate is limited to few exceptions not applicable here.  *See In re Corder*, 2021 WL 6124234, at *2 (Bankr. N.D. Ill. Sept. 15, 2021) ("The obligation to turn over property under § 542 is mandatory, unless the property is 'of inconsequential value or benefit to the estate.'") (quoting 11 U.S.C. § 542(a)); *In re Raymond*, 529 B.R. 455, 470 (Bankr. D. Mass. 2015) ("[W]hile § 541 defines the extent of property of the estate, § 542 requires an entity . . . to deliver the debtor's legal or equitable interests in property to the trustee.").

are part of the Debtor's bankruptcy estate.  11 U.S.C. § 541(a)(1).  These interests and rights are thus subject to immediate turnover to the Debtor.  *See e.g.*, *In re Garrison*, 462 B.R. 666, 687 (Bankr. W.D. Ark. 2011) (holding trustee entitled to turnover of stock held by bank); *In re Ayscue*, 123 B.R. at 30 (ordering turnover of pledged stock to trustee); *In re Corda*, 2021 WL 3669370, at *9 (Bankr. D. Mass. Aug. 18, 2021) (in summary judgment proceeding, finding contract rights could became property of bankruptcy estate under Section 541(a)(1) and thus subject to turnover).  Moreover, because the Loan is secured by, among other things, the Debtor's and its direct subsidiaries' equity interests in the Applicable Subsidiaries, Twin Brook is thus entitled at most to seek adequate protection for their turnover.  *See In re Taco Ed's, Inc.*, 63 B.R. 913, 929 (Bankr. N.D. Ohio 1986) ("[I]t is well established that an entity in possession of estate property which also has a security interest in that property is entitled to receive adequate protection as a precondition to any turnover which may be required under 11 U.S.C. § 542.").

50.    Accordingly, even if the Court were to find that Twin Brook has not violated or is continuing to violate the automatic stay, the Debtor's equity interests in the Applicable Subsidiaries should be turned over to the Debtor pursuant to Section 542(a).

## C.    Alternatively, Twin Brook Should Be Equitably Estopped from Exercising Remedies Under the Credit Agreement

51.    Twin Brook should be equitably estopped from exercising any remedies under the Credit Agreement.  In particular, Twin Brook should not be allowed to invoke Section 15-301 of New York General Obligations Law[8] and/or any anti-waiver, integration, or anti-modification

---

[8]    Under New York General Obligation Law Section 15-301, "[a] written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent."  N.Y. GEN. OBLIG. LAW § 15-301 (McKinney)

provision in the Forbearance Agreement[9] to assert that the Forbearance Period has expired and not amended by virtue of the parties' conduct and oral communications.

52.    Under New York law, the doctrine of equitable estoppel provides that "[o]nce a party to a written agreement has induced another's significant and substantial reliance on an oral modification, the first party may be estopped from invoking [GOL 15-301] to bar proof of that oral modification." *Rose v. Spa Realty Assocs.*, 42 N.Y.S.2d 338, 344 (1977); *see also Greenberg v. Frey*, 593 N.Y.S.2d 217, 218 (1st Dep't 1993) (application of GOL § 15-310 may be avoided by estoppel); *Indemnity Ins. Co. of N.A. v. Levine*, 563 N.Y.S.2d 811, 814 (1st Dep't 1990) ("[W]hen . . . a party's conduct induces another to substantially rely on the oral agreement to modify, that party may be estopped from disputing the modification."); *American Bag & Metal Co. v. Alcan Aluminum Corp.*, 497 N.Y.S.2d 787, 788 (4th Dep't 1985) (holding "a party may by its conduct and words be estopped from invoking the provisions in [GOL] § 15-301" despite contractual provision requiring waivers to be in writing); *U.S. West Fin. Servs., Inc. v. Marine Midland Realty Credit Corp.*, 810 F. Supp. 1393, 1405 (S.D.N.Y. 1993) (holding estoppel may permit oral modification despite contract provision requiring waivers to be in writing); *Westinghouse Elec. Corp. v. '21' In'l Holdings. Inc.*, 1992 WL 296397, at *4 (S.D.N.Y. Oct. 6, 1992) ("Where a party to a written agreement has induced another's reliance upon an oral modification, the first party may be estopped from invoking the statute to bar proof of that modification.").

53.    To establish the equitable estoppel exception, the plaintiff must show that: (1) "a party to a written agreement has induced another's significant and substantial reliance upon an oral

---

[9]    The Forbearance Agreement, which is governed by New York law, provides that "[a]ny agreement by Agent and Lenders to extend the Forbearance Period, if any, must be set forth in writing and signed by a duly authorized signatory of each of Agent and Lenders." *Forbearance Agreement and Sixth Amendment to Credit Agreement* § 4(c).

modification" and (2) the conduct on which the party relied must not be compatible with the written agreement. *Club Haven Inv. Co., LLC*, 160 F. Supp. 2d 590, 592 (S.D.N.Y. 2001) (quoting *Rose*, 42 N.Y.S.2d at 344-45).

54. The first element of equitable estoppel is satisfied here because, as described above, Twin Brook induced the Debtor's and the Equity Sponsor's significant and substantial reliance on Twin Brook's promise that an extension of the Forbearance Period was not necessary while the parties were negotiating. The second element is also satisfied because the Forbearance Period was originally set to expire on November 15, 2022 and Twin Brook, through its e-mails, promises, and conduct, agreed to modify and extend the Forbearance Period while the parties were negotiating. Twin Brook's conduct was thus wholly incompatible with the terms of the Forbearance Agreement as written.

55. *Club Haven*, 160 F. Supp. 2d 590, is instructive. There, the plaintiff and defendant entered into a loan commitment agreement, which provided that the agreement would "be of no further force and effect" if the loan did not close by July 13, 1998. *Id.* at 591. The agreement further provided that its provisions could not be modified or waived "unless such waiver or modification [was] in writing." *Id.* The parties, however, extended the closing date by oral agreement when defendant told defendant that "*no written extension agreement was required*" to keep the loan commitment in effect while the parties were continuing to work toward closing the loan. *Id.* (emphasis added). In reliance on the defendant's assurances that the loan commitment remained in effect, the plaintiff continued working to close the loan and incurred additional expenses. *Id*. at 591. Subsequently, however, the defendant informed the plaintiff that the loan commitment had expired in accordance with the written agreement and it was no longer obligated to close the loan. *Id.* at 591-92.

56.     The District Court denied the defendant's motion to dismiss the plaintiff's breach of contract claim, holding that the plaintiff had relied on the defendant's oral assurances by continuing to work toward closing the loan in several ways, including by performing numerous due diligence tasks.  *Id.* at 592-93.  "Such conduct," the court explained, "is wholly inconsistent with the . . . expiration of the Commitment and can be explained only by reference to the alleged oral extensions."  *Id.* at 593.

57.     The Debtor and the Equity Sponsor, just like the plaintiff in *Club Haven*, relied on Twin Brook's assurances that an extension of the Forbearance Period was not necessary, and continued to work and cooperate with Twin Brook and its demands for information in the expectation that Twin Brook was continuing to negotiate in good faith without exercising remedies under the Credit Agreement.  Twin Brook's conduct was wholly inconsistent with a purported expiration of the Forbearance Period on November 15, 2022.  *See Westinghouse Elec. Corp.*, 1992 WL 296397, at *4 ("The parties' continued negotiations well after the twenty-one day time period to submit such objection evidence conduct unequivocally referable to the oral modification.").

58.     Accordingly, *even if* Twin Brook's continuing attempts to control the Debtor's equity interests and corporate governance rights in the Applicable Subsidiaries did not otherwise violate the automatic stay, Twin Brook should be equitably estopped from exercising remedies under the Credit Agreement in reliance on the purported expiration of the Forbearance Period.

59.     Twin Brook should not be permitted to win the race to exercise remedies – and foreclose appropriate bankruptcy relief – based on its deception.

**D.     Alternatively, the Offending Actions Should Be Found to Be Invalid for Failure to Comply with the Loan Documents**

60.     Twin Brook cannot exercise control over the Applicable Subsidiaries because the Offending Actions failed to comply with the terms of the Loan Documents and applicable Delaware

law.  Such actions should be deemed null and void for at least three reasons.

61.    First, the Proxy Notice indicates that the Offending Actions were approved by written consent pursuant to the Irrevocable Proxies.  Under applicable Delaware case law, unless a proxy permits a written consent procedure, it cannot be used for purposes of a written consent.  *See Freeman v. Fabinaiak*, 1985 WL 11583 (Del. Ch. August 15, 1985).  Each of the Irrevocable Proxies states in part that the grantor "irrevocably designates and appoints [the Agent] to represent it at all annual and special meetings of the holders of Equity Interests…to vote any and all Equity Interests owned by the undersigned or standing in its name, and do all things which the undersigned might do if present and acting itself."  The foregoing quoted language solely contemplates that the Irrevocable Proxies shall be acted upon at a meeting of the shareholders and not by written consent.  Based on applicable Delaware case law, the Irrevocable Proxies do not permit Twin Brook to exercise voting rights by written consent, and the Irrevocable Proxies could only be acted upon at a meeting of the shareholders.  The Offending Actions were purportedly acted upon by written consent, and because Twin Brook was not authorized to use the Irrevocable Proxies to act by written consent, the Offending Actions should be found to be invalid and of no force and effect.

62.    Second, as a condition to exercising the proxy and related voting rights granted to Twin Brook, the Collateral Agreement requires Twin Brook to provide the Debtor and the Applicable Subsidiaries with "notice of its intent to exercise" voting rights.  Section 6.3(a) of the Collateral Agreement states that  the Debtor and the Applicable Subsidiaries have the right to exercise all voting and other rights unless an event of default shall have occurred and be continuing, and Twin Brook *"shall have given notice to the relevant Grantor of the Agent's intent to exercise its corresponding rights pursuant to Section 6.3(b)*."  (emphasis added).  But in purporting to exercise its rights under the Collateral Agreement, Twin Brook failed to provide the Debtor any

such notice.  The failure to provide the required prior notice to the Debtor and the Applicable Subsidiaries deprived the Debtor and the Applicable Subsidiaries of the opportunity to take steps to prevent Twin Brook from exercising control, including but not limited to the opportunity to obtain judicial relief through the filing of Chapter 11 cases.  Instead of providing the Debtor with its contractually-negotiated prior notice of Twin Brook's intent to exercise rights under the Collateral Agreement, Twin Brook purported to exercise its rights without notice as the so-called Proxy Notice states that the voting and consent rights are exclusively vested in Twin Brook "effective immediately and automatically upon the delivery of this Notice to" the Debtor and the Applicable Subsidiaries.

63.    Third, under Section 212(b) of the Delaware General Corporation Law (the "DGCL"), a proxy may not be acted upon after 3 years from its date, unless the proxy provides for a longer period.  Because Section 7.1 of the Collateral Agreement does not expressly provide for a longer period, the exercise of such proxy after May 25, 2022 with respect to each of the Frontsteps entities that are Delaware corporations is invalid.  Accordingly, the Offending Actions to the extent exercised on behalf of each of the Debtor and the Applicable Subsidiaries that are Delaware corporations are ineffective for this reason as well.

## CONCLUSION

For the reasons set forth above, the Debtor respectfully requests that the Court enter an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested and such other relief the Court deems appropriate.

*[Signature Page Follows]*

Dated: January 13, 2023
      Wilmington, Delaware

*/s/ Robert J. Dehney*      
Robert J. Dehney (No. 3578)
Daniel Butz (No. 4227)
Brian Loughnane (No. 6853)
**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: rdehney@morrisnichols.com
      dbutz@morrisnichols.com
      bloughnane@morrisnichols.com

- and -

Andrew K. Glenn (*pro hac vice* motion pending)
Kurt Mayr (*pro hac vice* motion pending)
Shai Schmidt (*pro hac vice* motion pending)
Agustina G. Berro (*pro hac vice* motion pending)
Richard Ramirez (*pro hac vice* motion pending)
Naznen Rahman (*pro hac vice* motion pending)
**GLENN AGRE BERGMAN & FUENTES LLP**
1185 Avenue of the Americas
22nd Floor
New York, New York 10036
Telephone: (212) 970-1600
Email: aglenn@glennagre.com
      kmayr@glennagre.com
      sschmidt@glennagre.com
      aberro@glennagre.com
      rramirez@glennagre.com
      nrahman@glennagre.com

*Proposed Counsel For Debtor and Debtor in Possession*