**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Chapter 11 |
| CII PARENT INC., | ) |
| | ) Case No. 22-11345 (LSS) |
| Debtor.[1] | ) |
| | ) |

**DECLARATION OF THOMAS RADFORD IN SUPPORT OF**
**DEBTOR'S MOTION FOR ENTRY OF AN ORDER ENFORCING**
**THE AUTOMATIC STAY AND GRANTING RELATED RELIEF**

I, Thomas Radford, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I submit this declaration (the "Declaration") in support of the *Debtor's Motion for Entry of an Order Enforcing the Automatic Stay and Granting Related Relief*, which is filed contemporaneously herewith (the "Motion").[2]

2.      I am a Managing Director at the investment firm Onex Falcon ("Falcon"), which has its principal office at 21 Custom House Street, 10th Floor, Boston, Massachusetts 02110.  I am authorized to execute this Declaration on behalf of Falcon.  Unless otherwise stated, all matters set forth in this Declaration are based on my personal knowledge, my review of relevant documents, information supplied to me by other professionals at Falcon, or my views, including as based upon my experience and knowledge of the business and financial condition of the debtor (the "Debtor") and its affiliates (together with the Debtor, "Frontsteps").

3.      If I were called to testify, I would testify competently to the facts discussed herein.

---

[1]    The last four digits of Debtor CII Parent, Inc.'s tax identification number are 4706.  The location of the Debtor's service address for purposes of this chapter 11 case is 21 Custom House Street, Boston, Massachusetts 02110.

[2]    Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

A.      **The Prepetition Capital Structure**

4.      On December 27, 2022 (the "Petition Date"), the Debtor commenced with this Court a voluntary case under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

5.      Frontsteps is a leading provider of end-to-end management software for homeowners' associations and related entities.  The Debtor is a holding company that conducts its business through its operating subsidiaries.

6.      As of the Petition Date, the Debtor's consolidated long-term debt obligations totaled approximately $71 million consisting of a $63 million term loan (the "Term Loan") and an $8 million revolving credit facility (the "Revolving Loan" and, together with the Term Loan, the "Loan") arising under that certain Credit Agreement, dated May 15, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among the Debtor, Investors Acquisition Co. ("Investors Acquisition"), AssociationVoice LLC ("AssociationVoice"), CapSure Acquisition Co. ("CapSure"), Real Pro Holdings, Inc. ("Real Pro"), dwellingLIVE, Inc. ("dwellingLIVE"), iHomefinder Inc. ("iHomefinder"), AtHomeNet, Inc. ("AtHome"), as Borrowers, Community Investors, Inc. (together with Investors Acquisition, AssociationVoice, CapSure, Real Pro, dwellingLive, iHomefinder, and AtHome, the "Applicable Subsidiaries"), as Borrower and Borrower Representative, Twin Brook Capital Partners LLC ("Twin Brook Capital Partners") as Agent for all Lenders, and certain Twin Brook Capital Partners affiliated entities as Lenders (together with Twin Brook Capital Partners, "Twin Brook").

7.      The Loan is secured by, among other things, the Debtor's and its direct subsidiary's equity interests in the Applicable Subsidiaries pursuant to the terms of that certain Guarantee and Collateral Agreement (as amended, restated, supplemented or otherwise modified from time to

time, the "Collateral Agreement" and, together with the Credit Agreement and the other documents, instruments and agreements executed in connection therewith and as further defined in the Credit Agreement, the "Loan Documents"), dated May 15, 2019, by and among the Debtor, the Applicable Subsidiaries, and Twin Brook.

**B.    Events Leading Up to Twin Brook's Wrongful Exercise of Remedies**

8.    In the first quarter of 2020, I understand Frontsteps breached certain covenants in the Credit Agreement and was expected to remain in breach over the next several quarters due to higher-than-expected churn, weak new logo growth, and general underperformance of the original projections on which the debt was underwritten.  Consequently, Frontsteps's equity sponsor at the time – CIP Capital Fund, L.P. ("CIP") – and Falcon provided an equity infusion to cure the default and provide operational runway through 2021 to give Frontsteps breathing room to explore potential deleveraging transactions.

9.    After a thorough evaluation of potential alternatives, I understand Frontsteps determined that a going concern sale of the business would maximize value for all stakeholders. Accordingly, in July 2021, Frontsteps retained GCA Advisors to run a sale process.[3]  An initially robust process, however, did not result in a sale of the business.  Frontsteps continued to pursue a sale until June 2022 through multiple further discussions that all proved unsuccessful.

10.    Falcon is a private credit and private equity asset manager.  One of Falcon's managed funds is Falcon Structured Equity Partners, LP.

11.    On the heels of the unsuccessful sale process, on July 27, 2022, CIP sold its controlling equity stake in Frontsteps to Falcon Structured Equity Partners, LP (the "Equity Sponsor") for a nominal consideration.  This was a *de facto* restructuring as the Equity Sponsor's

---

[3]    Houlihan Lokey, Inc. acquired GCA Advisors in October 2021.

preferred stock became the controlling interest in the Debtor and its affiliates.  In conjunction with this acquisition, the Equity Sponsor negotiated a forbearance agreement, dated July 27, 2022 (the "Forbearance Agreement"), with Twin Brook through November 15, 2022, while Frontsteps developed a long-term operating plan now that the Equity Sponsor was in charge and a strategy to provide the business with additional capital.  The Equity Sponsor, moreover, committed to helping Frontsteps continue a value-maximizing sale process of its business including beyond the forbearance requirement of a sale process for only the profitable iHomefinder business.  All parties recognized that these restructuring processes would take significant time, and the Equity Sponsor agreed to compensate Twin Brook for the time the Debtor needed.

12.     Accordingly, pursuant to terms of the Forbearance Agreement, Twin Brook (i) agreed to forbear from exercising default-related remedies under the Loan Documents until November 15, 2022, (ii) granted Frontsteps access to the $3 million of outstanding availability on the Revolving Loan, and (iii) provided a $1 million increase in the principal amount of the Revolving Loan commitment, subject to an agreement from the Equity Sponsor to guaranty the obligations under the Loan Documents in an aggregate amount not to exceed the principal amount of Revolving Loans outstanding under the Credit Agreement in excess of $4 million.

13.     I understand the Credit Agreement, as amended pursuant to the terms of the Forbearance Agreement, required that Frontsteps (i) explore a sale of its iHomefinder business for a minimum enterprise value of $50 million and use the proceeds of the sale to pay down the Loan (Credit Agreement § 6.13) and (ii) make available members of management to provide updates to Twin Brook regarding Frontsteps's business (Credit Agreement §§ 6.1.14), including monthly calls with Twin Brook (*id.*).  The amended Credit Agreement stated that, in the event Twin Brook or its advisors "requested a material meeting or call, whether in person, by phone or virtual, with

the Borrowers or the other Loan Parties, [Twin Brook] or its advisors shall give [Equity Sponsor] at least 24 hours email or verbal prior notice of such meeting or call (including the Monthly Calls) and allow such representatives of the [Equity Sponsor] to participate in such meeting or call (including the Monthly Calls)."  Credit Agreement § 6.1.14.

14.    I understand Twin Brook was not permitted this extensive access to management prior to the execution of the Forbearance Agreement.  I understand this access was only granted because Twin Brook had agreed to the forbearance, and the parties deemed this access to management to be important to the development of an agreed business plan for a financial restructuring of the enterprise.

15.    Consistent with the terms of the Forbearance Agreement, Frontsteps engaged GCA Advisors to sell the iHomefinder business via a targeted sale.  On August 8, 2022, Frontsteps received a letter of intent from a potential purchaser for $53 million.  Frontsteps kept Twin Brook continuously apprised on the sale process, and involved Twin Brook in strategy with regard to responses to the potential purchaser.  After further due diligence, however, the potential purchaser declined the transaction, citing market conditions and its own internal challenges.   I also understand Frontsteps and the Equity Sponsor took further initiative by entering into discussions with a potential buyer for one of Frontsteps's other business units, but this potential buyer ultimately declined the transaction as well.

16.    Concurrently with the iHomefinder sale process, I understand Frontsteps undertook an operational restructuring to position the entire business for a sale once market conditions improved.  Among other things, Frontsteps (i) implemented various changes to the management team, including the promotion of Matt DeWolf (existing Chief Product Officer) to CEO; (ii) formalized a growth plan with management outlining product enhancements, key hires, sales

channel expansion, and product sunsetting; (iii) engaged turnaround and restructuring advisor AEG Partners to drive strategic buy-in, memorialize product strategy, support P&L informed decision making, and catalyze organizational change; (iv) solicited feedback from potential buyers who participated in the failed sale process and developed a plan of action to rectify identified issues; (v) conducted extensive market surveys to understand competitive positioning; (vi) developed several tools in support of the CFO function, including a new restated monthly reporting package, product level P&L, a robust, bottoms-up operating model, and a KPI reporting tool to better inform decision making for both external stakeholders as well as management; (vii) expanded existing reporting distribution, including a regular 13-week cash flow and liquidity certificate distribution to improve cash visibility; and (viii) engaged with strategic partners to explore a merger or investment in Frontsteps.

17.    By early November, I understand it became clear that Frontsteps would be unable to raise capital through asset sales based on market conditions.  The Equity Sponsor thus initiated discussions with Twin Brook to negotiate a restructuring of Frontsteps's debt and a path for further investment from the Equity Sponsor, which strongly supports the business, to provide operational runway to weather the market downturn.  On November 1, 2022, the Equity Sponsor proposed three potential structures for a restructuring transaction.

18.    I understand Twin Brook did not immediately react to the November 1 proposals. On November 14, Twin Brook sent the Equity Sponsor two counterproposals.  I understand the Equity Sponsor did not reject Twin Brook's counterproposals out of hand but, rather, indicated to Twin Brook that the terms needed to be fleshed out to confirm that the *pro forma* business would be viable.

19.    On November 16, 2022 (the day after the Forbearance Agreement expired), I

understand Twin Brook delivered a reservation of rights letter to Frontsteps noting that Twin Brook was "considering options with respect to the Credit Agreement and the other Loan Documents" and that "no decisions regarding these options have been made to date" and reserving its right to "exercise any and all default-related rights and remedies under the Credit Agreement, the other Loan Documents, and/or applicable law." Motion, Ex. C. I understand Twin Brook did not signal that it had any intention to take immediate action to collect on the Loan or otherwise enforce any of its default-related remedies. I understand that the Equity Sponsor continued to cooperate with Twin Brook and its demands for information in the expectation that Twin Brook was continuing to negotiate with Frontsteps and the Equity Sponsor in good faith.

20. Based on the assurances that Twin Brook provided to the Debtor and the Equity Sponsor after the documented forbearance ended, I understand the Equity Sponsor continued to allow Twin Brook to conduct a multi-day on-site meeting with management, AEG Partners, and Twin Brook-affiliated third-party advisors to discuss the latest operating plan. Coming out of those meetings, I understand Twin Brook requested extensive analysis from Frontsteps, including a three-year business roadmap across multiple operating goal posts. In parallel with its good faith negotiations with Twin Brook, the Equity Sponsor continued to execute business improvement projects alongside Frontsteps management and worked to include Twin Brook in various workstreams.

21. Subsequently, on December 4, I as Managing Director of the Equity Sponsor, requested to confirm a formal 30-day forbearance via telephone with Twin Brook Director Tony Maggiore to facilitate ongoing negotiations. On December 5, I memorialized the formal forbearance request via email to Mr. Maggiore. I emphasized that the Equity Sponsor was "working hard to reach a negotiated outcome that works for Twin Brook as well as something that

the board can live with" and explained that "[g]iven the various requests from Twin Brook's end and the impact that will have on management's time, we believe a forbearance will enable everyone around the table to focus fully on a resolution of Frontsteps' capital structure and liquidity needs."

22.     On December 6, Mr. Maggiore assured me that he believed "negotiations should continue to proceed" but that "a forbearance is not needed to continue to advance discussions." Mr. Maggiore volunteered to have a call with me to "further explain our approach/perspective if needed." Mr. Maggiore and I scheduled a call for December 7.

23.     On December 7, my colleague Irene Whea-Wang Sherman and I spoke with Mr. Maggiore and his colleague, Drew Guyette, regarding the Equity Sponsor's request for a formal 30-day forbearance. Twin Brook indicated a willingness to provide the formal forbearance and requested additional detail regarding the Equity Sponsor's request. On December 8, Ms. Wang outlined the Equity Sponsor's rationale via email to Mr. Maggiore and Mr. Guyette, explaining that the Equity Sponsor was "requesting a forbearance in order to align everyone's expectations towards timing, and allow us to continue driving various initiatives and have management spend real time on [Twin Brook's] requests." Ms. Wang listed several items the Equity Sponsor expected to accomplish over the next month, many of which "would not be possible" without a formal forbearance, including (i) a legal review and response to Twin Brook's November 14 term sheet, (ii) a response to Twin Brook's questions, (iii) Board meetings and legal discussions to reach approval on deal terms, (iv) finalizing the 2023 budget, and (v) continuing the implementation of multiple ongoing operational initiatives.

24.     Ms. Wang explained that a formal forbearance "would allow us and management to accomplish many of these initiatives and move forward together with a set timeline, but even

more critically, allow management some breathing room, as we're trying to be sensitive to the incremental work we're placing on the team that takes their time away from operating the business." The Equity Sponsor and Twin Brook scheduled a call for December 14 to discuss Ms. Wang's email.

25.     On December 14, Ms. Wang and I discussed the official 30-day forbearance with Mr. Maggiore and Mr. Guyette via telephone, on which call Twin Brook stated that it would be reviewing the request with its investment committee early the following week.

26.     I believe Twin Brook had no intention of granting the request for a forbearance. Unbeknownst to the Equity Sponsor, I understand Twin Brook had been actively plotting a takeover since early December at the latest.[4] While explicitly assuring the Equity Sponsor that "a forbearance agreement [was] not needed to continue to advance discussions," I understand Twin Brook was likely actively recruiting candidates to replace the board and having unauthorized conversations with Frontsteps's management behind the Equity Sponsor's back.

27.     Had Twin Brook indicated its true intention to attempt take over the business or not responded at all, I understand Frontsteps would likely have filed Chapter 11 immediately to preserve the value of the business, including the retention of management, which has not been supportive of Twin Brook's operating plan.

C.      **The Proxy Notice**

28.     By letter dated December 21, 2022, without any prior warning or discussion, I understand Twin Brook notified Frontsteps that it had exercised its purported rights under the Collateral Agreement to (i) amend the applicable bylaws, operating agreements, and/or other

---

[4]     The Equity Sponsor was informed that Twin Brook had entered into engagement letters with replacement board candidates dated a week and half prior to Twin Brook's attempted takeover.

corporate governance documents as necessary or desirable, to, among other things, remove certain directors and/or managers of the Applicable Subsidiaries; (ii) adjust the size of each board of directors and/or managers, as applicable, of each Applicable Subsidiary; and (iii) appoint replacement directors and/or managers for each Applicable Subsidiary (collectively, the "Offending Actions").  I understand Twin Brook also instructed management of the Applicable Subsidiaries that they were not permitted to communicate freely with the purportedly-removed directors and/or managers to the great detriment of the Debtor and the Applicable Subsidiaries.

29.    Thus, while Frontsteps and the Equity Sponsor allowed Twin Brook to have extensive access to management, after its purported takeover, I understand Twin Brook responded by cutting off the Equity Sponsor (and guarantor of certain debt) by cancelling all reoccurring calls with the Equity Sponsor and providing it with minimal information concerning management of the business.

**D.    Twin Brook's Willful Violation of the Automatic Stay**

30.    I believe Twin Brook's actions have jeopardized the restructuring of Frontsteps, including Frontsteps's ability to execute refinancing transactions and explore potential going concern sales.  I believe they have also harmed the underlying business as any change of control triggers an acceleration of millions of dollars in payables, thus negatively impacting Frontsteps's liquidity situation.  I understand other harms include the reputational damage Frontsteps suffered with its customers and suppliers, damage to Frontsteps's attempts to recruit candidates for management roles, and harm to Frontsteps's ability to bring in new business and continue its sale process.  Accordingly, on December 27, the Debtor filed Chapter 11 to seek protection from further injurious misconduct inflicted upon Frontsteps by Twin Brook, including its attempt to eliminate the extensive guidance and knowledge of the Equity Sponsor in favor of parties with no prior

experience with this business and perhaps none in the industry.

31.     By letter dated December 29 (the "<u>Automatic Stay Notice</u>"), I understand the Debtor notified Twin Brook and its counsel that it had filed Chapter 11, which resulted in the immediate imposition of the automatic stay pursuant to Section 362(a) of the Bankruptcy Code.  I understand the Automatic Stay Notice advised Twin Brook that the Debtor's direct and indirect equity interests in the Applicable Subsidiaries are property of the Debtor's estate.

32.     I understand the Automatic Stay Notice requested that Twin Brook confirm that it would (i) formally rescind the Offending Actions, (ii) cease exercising control over the Applicable Subsidiaries, and (iii) immediately inform management of the foregoing so that the Debtor has assurances that Twin Brook is not violating the automatic stay.  As of the date of this filing, I understand Twin Brook has not rescinded the Offending Actions, continues to exercise control over the Applicable Subsidiaries, and gratuitously terminated the Debtor's D&O insurance policy.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*[Signature Page Follows]*

Dated: January 13, 2023
New York, New York

By: /s/

Thomas Radford
Managing Director
**ONEX FALCON**