**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Chapter 11 |
| CII PARENT, INC.,[1] | ) | |
| | ) | Case No. 22-11345-LSS |
| Debtor. | ) | |
| | ) | |

**MOTION OF TWIN BROOK CAPITAL PARTNERS, LLC, AS
AGENT, FOR AN ORDER DISMISSING OR ABSTAINING
FROM HEARING THE DEBTOR'S CHAPTER 11 CASE**

---

[1] The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is: CII Parent, Inc. (4706). The location of the Debtor's address is 21 Custom House Street, Boston, MA 02110.

## Table of Contents

INTRODUCTION........................................................................................................ 1

JURISDICTION AND VENUE.................................................................................. 3

FACTUAL BACKGROUND ...................................................................................... 4

    A.    The Debtor and Other Loan Parties Enter Into a Prepetition Credit Facility With the Lender Parties, Grant Liens on Their Assets and Grant Irrevocable Proxy Rights to Agent. .................................................................... 4

    B.    The Debtor is a "Shell" Holding Company With No Operations, One Creditor and No Assets Other than Legal Title to Community Investors Equity. ................................................................................................................ 7

    C.    Numerous Events of Default Exist Under the Credit Agreement and the Loan Parties Face Cash Flow and Operational Issues.......................................... 8

    D.    The Loan Parties and Lender Parties Enter Into the Forbearance Agreement to Provide Additional Liquidity to the Loan Parties and to Provide Time for the Loan Parties to Complete a Sale of iHomefinder. ..............10

    E.    The Loan Parties Have Failed to Consummate a Sale With Numerous Potential Buyers Following Sale Processes Run By the Loan Parties and Houlihan Lokey. ....................................................................................................12

    F.    The Lender Parties and Falcon Reach an Impasse In Restructuring Negotiations and Agent Exercises Proxy Rights to Appoint Independent, Non-Conflicted Boards at the Non-Debtor Loan Parties.....................................13

    G.    The Debtor Files This Chapter 11 Case With No Prior Notice To or Discussion With the Lender Parties..................................................................16

RELIEF REQUESTED..............................................................................................17

LEGAL STANDARDS ..............................................................................................18

    A.    Dismissal under 11 U.S.C. § 1112(b) .................................................................18

    B.    Dismissal or abstention under 11 U.S.C. § 305(a)(1) .........................................20

ARGUMENT ..............................................................................................................21

  I.    The Court should dismiss this case because the Debtor filed it in bad faith. ............21

    A.    A majority of the *Primestone* factors are present and support dismissal. .............22

B.      This is merely a two-party dispute, and Falcon caused the Debtor to file the Chapter 11 Case primarily as a litigation tactic in a vain attempt to use the automatic stay to undo Agent's pre-petition exercise of the Irrevocable Proxies against non-debtor parties......................................................................26

C.      The Chapter 11 Case serves no legitimate bankruptcy purpose...........................28

D.      Dismissal, rather than conversion to chapter 7, is appropriate here.....................29

II.      Alternatively, the Court should dismiss or abstain from hearing the Chapter 11 Case pursuant to 11 U.S.C. § 305(a)(1)...................................................................30

CONCLUSION............................................................................................................................32

# Table of Authorities

**Page(s)**

## Cases

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
    526 U.S. 434 (1999)........................................................................................29

*Daniel v. Hawkins*,
    Case No. 184, 2022, 2023 WL 115854 (Del. Jan. 6, 2023)........................... 24, 32

*In re 15375 Mem'l Corp.*,
    589 F.3d 605 (3d Cir. 2009) ..................................................................*passim*

*In re 3 RAM, Inc.*,
    343 B.R. 113 (Bankr. E.D. Pa. 2006) ............................................................28, 30

*In re AMC Inv'rs, LLC*,
    406 B.R. 478 (Bankr. D. Del. 2009) ..................................................................32

*In re Anderson Oaks (Phase I) Ltd. P'ship*,
    77 B.R. 108 (Bankr. W.D. Tex. 1987)..........................................................23, 28

*In re Bus. Info. Co., Inc.*,
    81 B.R. 382 (Bankr. W.D. Pa. 1988)..................................................................32

*In re Conference of African Union First Colored Methodist Protestant Church*,
    184 B.R. 207 (Bankr. D. Del. 1995)............................................................ 30, 31

*In re Derma Pen, LLC*,
    No. 14-11894 (KJC), 2014 WL 7269762 (Bankr. D. Del. Dec. 19, 2014) ...........18

*In re GVS Portfolio I B, LLC*,
    No. 21-10690 (CSS), 2021 WL 2285285 (Bankr. D. Del. June 4, 2021) ..............20

*In re JER/Jameson Mezz Borrower II, LLC*,
    461 B.R. 293 (Bankr. D. Del. 2011)..........................................................*passim*

*In re Northshore Mainland Servs., Inc.*,
    537 B.R. 192 (Bankr. D. Del. 2015)............................................................ 21, 22

*In re Primestone Inv. Partners, LLC*,
    272 B.R. 554 (D. Del. 2002)..........................................................20, 21, 22, 26

*In re Rent-A-Wreck of Am., Inc.*,
    580 B.R. 364 (Bankr. D. Del. 2018) (Silverstein, J.)...............................19, 20, 26

*In re RHTC Liquidating Co.*,
   424 B.R. 714 (Bankr. W.D. Pa. 2010) ................................................................22

*In re Scarborough-St. James Corp.*,
   No. 15-10625 (LSS), 2015 WL 5672628 (Bankr. D. Del. Sept. 24, 2015)
   (Silverstein, J.) ............................................................................................ 28, 30

*In re SGL Carbon Corp.*,
   200 F.3d 154 (3d Cir. 1999) ................................................................*passim*

*In re Stone Fox Capital LLC*,
   572 B.R. 582 (Bankr. W.D. Pa. 2017) ................................................................26

*In re Tamecki*,
   229 F.3d 205 (3d Cir. 2000) ................................................................19

*In re Team Sys. Int'l LLC*,
   640 B.R. 296 (Bankr. D. Del. 2022) ................................................................20

*Laurel Highlands Found., Inc. v. Frankenstein (In re Laurel Highlands Found.,*
   *Inc.)*,
   473 B.R. 641 (Bankr. W.D. Pa. 2012) ............................................................ 31, 32

*Little Creek Dev. Co. v. Commonwealth Mortg. Co. (In re Little Creek Dev. Co.)*,
   779 F.2d 1068 (5th Cir. 1986) ................................................................19

*Matter of Century City, Inc.*,
   8 B.R. 25 (Bankr. D.N.J. 1980) ................................................................30

*NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated*
   *Telecom Express, Inc.)*,
   384 F.3d 108 (3d Cir. 2004) ................................................................*passim*

**Statutes**

8 Del. C. § 212(e) ................................................................................ 24, 32

11 U.S.C. § 305(a)(1), and (ii) ................................................................32

11 U.S.C. § 1112(b)(1) ................................................................ 18, 30

28 U.S.C. §§ 157, 1334 ................................................................3

28 U.S.C. § 157(b)(2) ................................................................3

28 U.S.C. §§ 1408 and 1409 ................................................................3

§ 1112(b) of Title 11 of the United States Code ................................................................*passim*

§ 305 of the Bankruptcy Code ......................................................................... 3, 21, 31

§ 305(a)(1) of the Bankruptcy Code ..................................................................*passim*

§§ 1112(b) and 305(a)(1) of the Bankruptcy Code ......................................................4

UCC ...............................................................................................................................8

**Rules**

Local Rule 9013-1(f) ....................................................................................................3

Rule 1007-2(a) of the Local Rules ..............................................................................23

Twin Brook Capital Partners, LLC, in its capacity as agent ("Agent") for the lenders under the prepetition secured credit facility provided to the Debtor's subsidiaries (the "Lenders," and together with Agent, the "Lender Parties"), by its undersigned counsel, hereby submits this motion (this "Motion") for the entry of an order, substantially in the form of the proposed order attached hereto as **Exhibit A** (the "Proposed Order"), dismissing the above-captioned chapter 11 case (the "Chapter 11 Case") of CII Parent, Inc. (the "Debtor" or "Holdings") pursuant to section 1112(b) of title 11 of the United States Code (the "Bankruptcy Code") or, alternatively, abstaining from hearing this Chapter 11 Case pursuant to section 305(a)(1) of the Bankruptcy Code. In support of the Motion, Agent submits the *Declaration of Drew Guyette* attached hereto as **Exhibit B** (the "Guyette Declaration" or "Guyette Decl.") and the *Declaration of Anthony Maggiore* attached hereto as **Exhibit C** (the "Maggiore Declaration" or "Maggiore Decl."), and states:

## INTRODUCTION

1.      The Debtor filed the Chapter 11 Case in bad faith and without any legitimate reorganization purpose. After months of failed restructuring negotiations, growing liquidity concerns, increasing risks of key employee flight, and threats of an unnecessary bankruptcy made by the Debtor's indirect equity owners, Falcon Structured Equity Partners, LP ("Falcon"), Agent validly exercised proxy voting rights irrevocably granted in 2019 to appoint new, independent and non-conflicted boards of directors at the Debtor's lone direct subsidiary, Community Investors, Inc. ("Community Investors"), and certain of Community Investors' direct and indirect subsidiaries (collectively, the "Independent Boards"). This proxy exercise was properly commenced, and concluded, on December 21, 2022.

2.      A week *later*, on December 27, 2022 (the "Petition Date")—with no notice to or previous discussion with the Lender Parties or their advisors—the Debtor commenced this Chapter 11 Case as a transparent litigation tactic in the misplaced hope that Agent would agree to undo its

1

valid prepetition exercise of proxy rights and reinstitute the patently conflicted Falcon-controlled boards. The Debtor's first order of business post-petition was to threaten Agent, as well as Falcon's handpicked CEO, with violating the automatic stay as to Community Investors and its subsidiaries, **none of which is a debtor**. The Debtor has done nothing substantive since, apart from filing a motion seeking an unwarranted extension of time to file its Schedules and SOFA,[2] and most recently filing a motion seeking to inappropriately use the automatic stay as a weapon to interfere with the operations of its non-debtor subsidiaries and undo Agent's **prepetition** exercise of remedies.

3.    A debtor who files a chapter 11 case must do so in good faith, and section 1112(b) of the Bankruptcy Code authorizes bankruptcy courts to dismiss bankruptcy cases "for cause." Courts apply a multi-factor test to evaluate whether such cause exists to dismiss a bad faith filing, and a majority of such factors weigh heavily in favor of dismissal here. The Debtor is a mere shell with no operations, no employees and only one asset: bare legal title to the stock of Community Investors. The Debtor likewise has only one creditor—the Lender Parties—who currently hold a $73.9 million claim secured by all assets of the Debtor. The Debtor should have little or no cash, and has filed nothing demonstrating that it has the ability to finance this case, if it remains pending, or adequately protect the Lender Parties' interests. Falcon and the Debtor's sole director have admitted numerous times—including in the weeks just preceding the filing of this Chapter 11 Case—that the Debtor's equity interests in Community Investors have no value and that the Lender Parties' claims are materially undersecured. This Chapter 11 Case serves no legitimate reorganization purpose; instead, it appears that the Debtor filed it at the direction of Falcon

---

[2] (*Debtor's Motion for Entry of an Order Extending the Time to File (A) Schedules of Assets and Liabilities and (B) Statements of Income and Financial Affairs* [Dkt. No. 3] (the "Extension Motion").) Agent has filed an objection to the Extension Motion [Dkt. No. 7].

specifically in an attempt to extract from the Lender Parties unwarranted recovery on its admittedly out-of-the-money equity no matter the cost to the non-debtor subsidiaries. That is flatly contrary to the Debtor's duty to act in the interest of the Lender Parties, as the sole creditor of the Debtor's estate.

4.      On its face, this Chapter 11 Case is nothing more than a two-party dispute involving the Debtor, which Falcon is plainly using as a mere instrumentality, and the Lender Parties, the Debtor's sole creditor. On that score, Third Circuit precedent is clear: commencing a chapter 11 case primarily as a litigation tactic—such as to use the automatic stay to protect a debtor's non-debtor corporate affiliates from creditor action—evidences a lack of good faith meriting dismissal. That is exactly what is happening here.

5.      Accordingly, as discussed below, the Court should dismiss this Chapter 11 Case pursuant to section 1112(b) of the Bankruptcy Code for cause based on the Debtor's lack of good faith or, alternatively, dismiss or abstain from hearing this Chapter 11 Case pursuant to section 305 of the Bankruptcy Code.

## JURISDICTION AND VENUE

6.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157, 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Pursuant to Local Rule 9013-1(f), Agent consents to the entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3

8.      The statutory predicates for the relief requested herein are sections 1112(b) and 305(a)(1) of the Bankruptcy Code.

## FACTUAL BACKGROUND

**A.      The Debtor and Other Loan Parties Enter Into a Prepetition Credit Facility With the Lender Parties, Grant Liens on Their Assets and Grant Irrevocable Proxy Rights to Agent.**

9.      The Debtor is an intermediate "shell" holding company that directly owns 100 percent of the equity interests of its lone direct subsidiary, Community Investors. Community Investors, in turn, directly or indirectly owns 100 percent of various other subsidiaries. A copy of what Agent believes to be a current corporate organizational chart of the Debtor and its affiliates is attached to the Guyette Declaration as **Exhibit 1**. Neither Community Investors nor any of its direct or indirect subsidiaries is a debtor in this case or any other bankruptcy case.

10.     Pursuant to the Credit Agreement, dated as of May 15, 2019 (the "Credit Agreement," a true and correct copy of which is attached to the Guyette Declaration as **Exhibit 2**), the Lender Parties provided a senior secured credit facility (the "Prepetition Credit Facility") to Community Investors and its direct and indirect subsidiaries, Investors Acquisition Co., AssociationVoice, LLC, CapSure Acquisition Co., Real Pro Holdings, Inc., dwellingLIVE, Inc., iHomefinder, Inc. ("iHomefinder"), and Caliber Software, Inc., as co-borrowers (collectively, together with Community Investors, the "Non-Debtor Borrowers"). The Debtor unconditionally guaranteed the Prepetition Credit Facility, as did AtHomeNet, Inc. ("AtHomeNet," and together with the Non-Debtor Borrowers, the "Non-Debtor Loan Parties"), an indirect subsidiary of Community Investors, pursuant to the Guarantee and Collateral Agreement, dated as of May 15, 2019 (the "Collateral Agreement," a true and correct copy of which is attached to the Guyette Declaration as **Exhibit 3**). (Collateral Agreement, § 2.1.) As of the Petition Date, the Debtor and the Non-Debtor Loan Parties (collectively, the "Loan Parties") jointly and severally owed the

Lender Parties approximately $73.9 million in principal under the Prepetition Credit Facility, comprised of approximately $66.5 million in outstanding term loans and $7.4 million in outstanding revolving loans (collectively, the "Loans").[3] (Guyette Decl. ¶ 7.)

11.    Pursuant to the Collateral Agreement, the Loans and other obligations in respect of the Prepetition Credit Facility (collectively, the "Secured Obligations") are secured by first priority liens on all of the Debtor's assets (i.e., the stock of Community Investors) and substantially all assets of each Non-Debtor Loan Party. (Collateral Agreement, §§ 1.2, 3.) Agent's collateral includes, among other things, the Debtor's interests in the equity of Community Investors as well as the equity interests of each other Non-Debtor Loan Party.[4] (Collateral Agreement, § 1.2, Schedule 1.) Agent perfected its liens by, among things, (i) filing UCC-1 financing statements against each Loan Party in its state of incorporation (a true and correct copy of the UCC-1 financing statement against the Debtor is attached to the Guyette Declaration as **Exhibit 4**), and (ii) where applicable, obtaining possession of original stock certificates evidencing the pledged equity interests in the Non-Debtor Loan Parties (all such pledged equity interests, the "Pledged Equity"). (Guyette Decl. ¶ 8.)

12.    Pursuant to the Collateral Agreement, the Debtor and each other Loan Party granted to Agent an irrevocable proxy to, during the continuance of any Event of Default under the Credit Agreement, (i) "vote the [Pledged Equity] in any manner the Agent deems advisable for or against all matters submitted", (ii) "giv[e] or withhold[] written consents of stockholders, partners or

---

[3] The foregoing amounts do not include interest, fees, expenses and other amounts that are chargeable, payable or otherwise reimbursable under the Credit Agreement and the other Loan Documents, including costs and fees related to this Chapter 11 Case. (Guyette Decl. ¶ 7.)

[4] Pursuant to the Collateral Agreement, Agent has a lien on each Loan Party's "Investment Property" and "Pledged Equity." (Collateral Agreement, § 1.2 (Definitions of "Collateral" and "Investment Property").) "Pledged Equity" in turn, is defined to include all of the equity interests of the Loan Parties in their subsidiaries as listed on Schedule 1 to the Collateral Agreement. (Id. at § 1.2, Schedule 1.)

members, call[] special meetings of stockholders, partners or members and vot[e] at such meetings" of each applicable Non-Debtor Loan Party, and (iii) "exercise, or permit its nominee to exercise, all voting and other rights pertaining to such [Pledged Equity] as a holder of such [Pledged Equity], with full power of substitution to do so." (Collateral Agreement. at §§ 6.3(b), 7.1(a)(v)(1).) Section 7.1(a) of the Collateral Agreement expressly provides that such irrevocable proxies are "coupled with an interest and shall be valid and irrevocable until the Secured Obligations have been paid in full (as defined in the Credit Agreement) . . . notwithstanding any limitations to the contrary set forth set forth in . . . corporate or limited liability company law, as applicable, of the State of Delaware, the State of California, the State of Georgia, or any other state of organization of any [Loan Party]." (*Id*. at § 7.1(a).)

13.     In addition to the foregoing irrevocable proxies embedded in the Collateral Agreement, the Debtor and each other Loan Party (other than AtHome) also delivered to Agent an Irrevocable Proxy Coupled with Interest at the closing of the Credit Agreement in May 2019 (true and correct copies of which are attached to the Guyette Declaration as **Group Exhibit 5**) that, among other things, (i) "authorize[d] and empowere[d] Agent, to vote any and all Equity Interests owned" by the Debtor and each such other Loan Party. (Guyette Decl. Ex. 5.) These separate irrevocable proxies likewise expressly provided that they "shall continue in full force and effect until the Secured Obligations are Paid in Full notwithstanding any time limitations set forth in the bylaws or other organizational documents of the Company or the general corporation law" of any applicable state. (*Id*.)[5]

---

[5] *Debtor's Motion for Entry of an Order Enforcing the Automatic Stay and Granting Related Relief* [Dkt. No. 12] (the "Automatic Stay Motion"), filed by the Debtor on January 13, 2023, ignores this language and that contained in Section 7.1(a) of the Collateral Agreement when it asserts that the irrevocable proxies expired after three years pursuant to Section 212(b) of the DGCL. (Automatic Stay Mtn, ¶ 63.)

**B.    The Debtor is a "Shell" Holding Company With No Operations, One Creditor and No Assets Other than Legal Title to Community Investors Equity.**

14.    The Debtor is an intermediate "shell" holding company that owns only one asset–the equity interests of its lone direct subsidiary Community Investors–and is indirectly owned and controlled by its principal shareholder Falcon.[6] The Debtor conducts no business and should have no creditors other than the Lender Parties.

15.    The Debtor represented and warranted to the Lender Parties in Section 5.23 of the Credit Agreement that it "does not conduct any business other than related to the maintenance of its existence, its ownership of Equity Interests of [Community Investors] and its obligations under the Loan Documents and [certain related agreements]," and that it "does not own any material assets other than the Equity Interests of Community Investors." (Credit Agreement, § 5.23.) The Debtor reaffirmed this representation and warranty as recently as July 27, 2022 in the Forbearance Agreement and Sixth Amendment to Credit Agreement (the "Forbearance Agreement", a true and correct copy of which is attached to the Guyette Declaration as **Exhibit 6**), which is described in further detail below. (Forbearance Agreement, §§ 8.1(c), (e).)

16.    Relatedly, it is an immediate Event of Default (as defined in the Credit Agreement) under Section 8.1.11 of the Credit Agreement if the Debtor were to (i) "enter[] into any agreement…between itself and any other Person, other than the Loan Documents and [certain related agreements] to which it is a party (collectively, the 'Holdings Documents')," (ii) "conduct[] any business other than its ownership of Equity Interests of the Borrowers, issuances of its Equity Interests to its equity holders and the performance of its obligations under the Holdings

---

[6] The Loan Parties were, at the time of the execution of the Credit Agreement, indirectly controlled by then principal shareholder, CIP Capital Fund, L.P. ("CIP"). In connection with the Forbearance Agreement (as defined and described below), in July 2022, CIP ceded its equity interests to Falcon. However, Falcon began taking the lead on discussions with the Lender Parties and other matters with respect to the Loan Parties months before such formal change of ownership. (Maggiore Decl. ¶ 4.)

Documents," or (iii) "incur[] any Debt or liabilities other than Debt…expressly permitted under the Loan Documents and other liabilities incidental to the conduct of its business as a holding company." (Credit Agreement, § 8.1.11.)  As recently as July 27, 2022, the Debtor represented and warranted in the Forbearance Agreement that it had not breached this provision.  (Forbearance Agreement, § 8(e) and Annex A thereto (noting that no Events of Default other than those listed in such Annex A, which did not include any Event of Default under Section 8.1.11 of the Credit Agreement, existed as of July 27, 2022).)

17.    Although the Debtor has not yet filed its Schedules or SOFA, UCC lien searches conducted on January 12, 2023 (attached to the Guyette Declaration as **Exhibit 7**) reflected no other UCC filings other than those of Agent, and litigation searches conducted on January 17, 2023 (attached to the Guyette Declaration as **Exhibit 8**) revealed no pending litigation involving the Debtor (aside from this Chapter 11 Case).

18.    Most recently, in its Extension Motion, the Debtor also admitted that it is a "holding company that conducts its business through its operating subsidiaries."  (Extension Motion, ¶ 6.)

**C.    Numerous Events of Default Exist Under the Credit Agreement and the Loan Parties Face Cash Flow and Operational Issues.**

19.    Events of Default under the Credit Agreement began occurring in March 2020—less than a year after execution of the Credit Agreement—due to, among other things, the Loan Parties' failure to comply with various financial and other covenants thereunder. (Guyette Decl. ¶ 12.) Over the last two-plus years, the Lender Parties entered into six separate waivers, consents and amendments under the Credit Agreement with the Loan Parties to provide for, among other

things, more lenient financial covenants and the deferral of certain interest payments owed by the Non-Debtor Borrowers (collectively, the "Amendments").[7]

20.    Pursuant to the first three Amendments, the Lender Parties accommodated the Loan Parties by waiving certain covenant defaults and amending such financial covenants to provide the Loan Parties with additional flexibility. (Guyette Decl. ¶ 14.) Despite these and other good faith accommodations made by the Lender Parties to the Loan Parties pursuant to these three Amendments, additional Events of Default began occurring in October 2021. (*Id.* at ¶ 14.) Agent sent a Reservation of Rights Letter to the Loan Parties on February 25, 2022, providing notice of the Events of Default that began in October 2021 (a true and correct copy of which is attached to the Guyette Declaration as **Exhibit 14**).

21.    The Loan Parties continued to face significant cash flow and operational issues during the first half of 2022, but their then-current controlling equity owner, CIP, did not invest additional capital. (Maggiore Decl. ¶ 5.) However, pursuant to the Fourth Amendment and Fifth Amendment, as well as the Forbearance Agreement (discussed in detail below), the Lender Parties agreed to provide the Loan Parties with even further time and flexibility, and deferring further interest payments. The Lender Parties also allowed the Non-Debtor Borrowers to defer approximately $3.2 million in interest payments from April 2022 through November 15, 2022. (*Id.* at ¶ 6.)

---

[7] Specifically, the Lender Parties, the Debtor and the other Loan Parties entered into the following Amendments: (i) that certain Waiver, Consent and First Amendment to Credit Agreement dated June 5, 2020 (the "First Amendment", a true and correct copy of which is attached to the Guyette Declaration as **Exhibit 9**), (ii) that certain Waiver and Second Amendment to Credit Agreement dated October 23, 2020 (the "Second Amendment", a true and correct copy of which is attached to the Guyette Declaration as **Exhibit 10**), (iii) that certain Third Amendment to Credit Agreement dated May 25, 2021 (the "Third Amendment", a true and correct copy of which is attached to the Guyette Declaration as **Exhibit 11**), (iv) that certain Fourth Amendment to Credit Agreement dated July 1, 2022 (the "Fourth Amendment", a true and correct copy of which is attached to the Guyette Declaration as **Exhibit 12**), (v) that certain Fifth Amendment to Credit Agreement dated July 14, 2022 (the "Fifth Amendment", a true and correct copy of which is attached to the Guyette Declaration as **Exhibit 13**), and (vi) the Forbearance Agreement (discussed in further detail below).

**D.      The Loan Parties and Lender Parties Enter Into the Forbearance Agreement to Provide Additional Liquidity to the Loan Parties and to Provide Time for the Loan Parties to Complete a Sale of iHomefinder.**

22.      In an effort to address the continuance of numerous Events of Default under the Credit Agreement and the Loan Parties' increasing liquidity challenges, the Lender Parties and the Loan Parties (then controlled by Falcon) entered into the Forbearance Agreement on July 27, 2022, pursuant to which:

(a)      The Debtor and each of the other Loan Parties reaffirmed the representations and warranties set forth in the Credit Agreement, including the Debtor representations with respect its status as a non-operating holding company (Forbearance Agreement, § 8(c));

(b)      The Debtor and each of the other Loan Parties acknowledged the occurrence and continuance of numerous incurable Events of Default under the Credit Agreement and the Lender Parties' rights to exercise their default-related rights and remedies as a result thereof (*id*. at §§ 2(b)-(c));

(c)      The Lender Parties agreed to forbear from exercising certain of their default-related rights and remedies through no later than November 15, 2022[8] (such period, the "Forbearance Period") (*id*. at § 4) conditioned upon, among other things, Falcon entering into a "Sponsor Guaranty" for up to $4 million of the Secured Obligations (*id*. at § 7(f));[9] and

(d)      The Credit Agreement was amended to provide for, among other things, (1) a $1,000,000 increase in the Lender Parties' revolving loan commitments (*id*. at § 3(d); Annex B to Forbearance Agreement (the "Conformed Credit Agreement"), § 1.1 (Definition of "Revolving Loan Commitment")), (2) the deferral and payment-in-kind of certain payments of interest accruing and coming due under the Credit Agreement (Conformed Credit Agreement, § 2.7.2), and (3) certain sale-related covenants concerning the marketing and sale of iHomefinder (the "iHomefinder Sale Process") (*id*. at § 6.13).

---

[8] Pursuant to the Forbearance Agreement, the Forbearance Period would be extended to November 30, 2022 if the Loan Parties were in compliance with certain milestones, but the extension was not triggered. (*Id*. at § 4(a).)

[9] Pursuant to the Sponsor Guaranty, Agent required Falcon to guarantee up to $4 million of the Secured Obligations, which guaranty would be triggered upon, among other things, the filing of a bankruptcy case by Debtor. On December 30, 2022, Agent served upon Falcon a demand for payment under the Sponsor Guaranty, a true and correct copy of which is attached to the Guyette Declaration as **Exhibit 15**). However, Falcon has not made such payment. (Guyette Decl. ¶ 15.)

23.     The iHomefinder Sale Process ultimately failed to produce any binding purchase agreement and the Forbearance Period thus expired by its terms on November 15, 2022. (Maggiore Decl. ¶ 7.) Pursuant to the express terms of the Forbearance Agreement, the Debtor agreed that (i) following termination of the Forbearance Period, "any or all of Agent and Lenders may at any time thereafter proceed to exercise any and all of their respective rights and remedies under any or all of the Credit Agreement, any other Loan Document and/or applicable law . . .", and (ii) "[a]ny agreement by Agent and Lenders to extend the Forbearance Period, if any, must be set forth in writing and signed by a duly authorized signatory of each of Agent and Lenders". (Forbearance Agreement, §§ 4(b), 4(c).) The Debtor and other Loan Parties also acknowledged and agreed that the Lender Parties "have not made any assurances concerning . . . any possibility of an extension of the Forbearance Period . . . or any additional forbearance, waiver, restructuring or other accommodations." (*Id*. at § 4(d).)

24.     One day after the expiration of the forbearance period, on November 16, 2022, Agent provided written notice to the Debtor and the other Loan Parties of the expiration of the Forbearance Period and expressly reserved all of the Lender Parties' rights and remedies under the Credit Agreement, the other Loan Documents (including the Collateral Agreement and the irrevocable proxies) and applicable law (the "Forbearance Termination Notice," a true and correct copy of which is attached to the Guyette Declaration as **Exhibit 16**). The Forbearance Termination Notice further provided:

> This letter is not intended and shall not be deemed or construed to establish a custom or course of dealing and does not waive, limit or postpone any of the obligations of any Borrower or any other Loan Party under the Credit Agreement, the other Loan Documents or otherwise, or any other Person obligated thereunder, and any discussions (whether written or oral) that have occurred or may occur among the respective parties to the Credit Agreement and the other Loan Documents are not intended, and shall not be deemed or

> construed, to constitute, a waiver, limitation or postponement of any
> of the rights and remedies of Agent or any of the Lenders thereunder
> or under applicable law, all of which rights and remedies hereby are
> expressly reserved.

(Forbearance Termination Notice at 2 (emphasis added).)

25.     The Events of Default identified on **Exhibit 1** to the Maggiore Declaration (the "Current Defaults") are continuing under the Credit Agreement and the other Loan Documents. (Maggiore Decl. ¶ 10.) The Current Defaults include both payment Events of Default as well as Events of Default resulting from the Non-Debtor Borrowers' continuing failure to comply with various financial covenants set forth in the Credit Agreement. (*Id.*)

**E.     The Loan Parties Have Failed to Consummate a Sale With Numerous Potential Buyers Following Sale Processes Run By the Loan Parties and Houlihan Lokey.**

26.     The failure of the iHomefinder Sale Process was but the last of numerous failed attempts by the Loan Parties to sell all or portions of their businesses since 2021, as discussed below.

27.     In April 2021, the Loan Parties engaged GCA Advisors, LLC (later acquired by Houlihan Lokey ("Houlihan")) and at some point commenced a process to market and sell the Non-Debtor Borrowers' businesses. (Guyette Decl. ¶ 17.) The Lender Parties did not request or require that the Loan Parties pursue a sale at that time, and had no input regarding the choice of investment banker or the terms of its engagement. (*Id.*) Agent understood from CIP that the Loan Parties and Houlihan pursued transactions with at least three different potential buyers through May of 2022, but each buyer walked away before signing a binding sale agreement. (*Id.*)

28.     The Loan Parties reengaged Houlihan around April 2022 to pursue a sale of the iHomefinder Segment. (Maggiore Decl. ¶ 8.) After the Forbearance Agreement became effective, Houlihan and the Loan Parties pursued the iHomefinder Sale Process with the agreement of the

Lender Parties as part of the Forbearance Agreement; however, the Lender Parties did not conduct the sale process or negotiate with any potential buyers. (*Id*.) Ultimately, the iHomefinder Sale Process was also unsuccessful. (*Id*.)

29.     In November 2022, Agent learned from Falcon that the Loan Parties had been pursuing a sale of the HOA Segment with a potential buyer, but the potential HOA Segment sale was unsuccessful as well. (*Id*. at ¶ 9.) The Lender Parties neither requested nor mandated that the Loan Parties pursue a sale of the HOA Segment, and had no involvement in the negotiations with the potential buyer. (*Id*.) Thereafter, Falcon and the Loan Parties informed Agent that no other meaningful sale opportunities existed. (*Id*.)[10]

F.     **The Lender Parties and Falcon Reach an Impasse In Restructuring Negotiations and Agent Exercises Proxy Rights to Appoint Independent, Non-Conflicted Boards at the Non-Debtor Loan Parties.**

30.     In the weeks leading up to the November 15, 2022 expiration of the Forbearance Period and for more than a full month thereafter, the Lender Parties engaged in good faith negotiations with Falcon and the Loan Parties in an effort to address the existing Events of Default as well as increasing liquidity concerns highlighted by Falcon. (Maggiore Decl. ¶ 11.) During this period, the Lender Parties provided numerous proposals and detailed term sheets but Falcon did not accept any of them. (*Id*.) Moreover, as the negotiation process dragged on and the risk of a short-term liquidity crisis loomed large, Agent took Falcon at its word that it would not agree–or permit the Loan Parties to agree–to restructuring terms proposed by the Lender Parties and would not agree to facilitate a consensual turnover of ownership with the Lender Parties' financing the Loan Parties' go-forward capital needs. (*Id*. at ¶ 12.)

---

[10] Debtor admits in the Automatic Stay Motion that, by early November 2022, "it became clear that [it] would be unable to raise capital through asset sales[.]" (Automatic Stay Mtn, ¶ 17.)

31.     On multiple occasions during these restructuring discussions, representatives of Falcon and the Loan Parties advised Agent that the Secured Obligations materially exceeded the value of the Loan Parties. For example, during a call on November 1, 2022, Irene Wang, a Managing Director of Falcon and, at the time, a director of the Non-Debtor Borrowers, stated that the combined value of the Non-Debtor Loan Parties' businesses was $40-50 million. (Maggiore Decl. ¶ 13.) On a call on November 7, 2022, Ms. Wang stated that she estimated the Secured Obligations to be around 1.5 times the value of the Loan Parties. (*Id*.) During the same call on November 7, 2022, Thomas Radford, the sole director of the Debtor (and who authorized the filing of the Chapter 11 Case), also asserted that it would not be possible to "sell the company for the value of the debt today." (*Id*.) Additionally, during calls on November 14 and 18, 2022, Ms. Wang told Agent that Falcon would not be willing to agree to a proposal involving Falcon contributing additional capital to the Loan Parties if such additional capital would be subordinated to the Secured Obligations. (*Id*. at ¶ 14.) Again during a call on November 23, 2022 with Agent, Ms. Wang stated that the combined value of the Loan Parties' businesses was worth just $40-50 million. (*Id*. at ¶ 15.) Ms. Wang added that, if the Lender Parties would not agree to a deal involving the subordination of some portion of the Secured Obligations, Falcon would be just as well off filing the Loan Parties for bankruptcy. (*Id*.)

32.     In the face of several weeks of failed negotiations (in addition to the months and years of negotiations pre-dating the entry into the Forbearance Agreement), repeated admissions by Falcon and the Debtor that the Lender Parties were materially undersecured, a lack of any commitment regarding a capital infusion by Falcon or any other outside party, and veiled threats about using bankruptcy as a leverage tactic, the Lender Parties concluded that the parties had reached an impasse on a consensual restructuring and that there was an increasing risk that Falcon

may take action contrary to the best interests of the Loan Parties and their creditors in an effort to further leverage the Lender Parties. (*Id*. at ¶ 16.) The Lender Parties were also becoming increasingly concerned–in part due to statements made by Falcon and the Debtor–that the management of the Non-Debtor Loan Parties was growing anxious due to increasing liquidity concerns. (*Id*. at ¶ 17.)

33.     Based on the foregoing, the Lender Parties felt they had no choice but to act. Accordingly, on December 21, 2022, Agent delivered a written notice to each of the required notice parties under the Credit Agreement (the "Pledge Exercise Notice," a true and correct copy of which is attached to the Guyette Declaration as **Exhibit 17**), notifying such parties that (i) Agent, as duly authorized proxy and attorney-in-fact for the Debtor and applicable Non-Debtor Loan Parties, were effectuating written consents and resolutions (collectively, the "Written Consents") amending various bylaws, operating agreements, and other corporate governance documents to, among other things, replace the Falcon-controlled boards of directors of the Non-Debtor Loan Parties with the new, independent and non-conflicted Independent Boards; (ii) the Debtor and the other Non-Debtor Loan Parties were no longer entitled to exercise the voting and other rights in the Pledged Equity, and (iii) only Agent was thereafter entitled to exercise such rights.

34.     The Written Consents and related proxy rights described in the Pledge Exercise Notice became effective on December 21, 2022—almost a full week before the Petition Date. Since then, Agent understands that the Non-Debtor Loan Parties have continued to operate in the ordinary course of business subject to the governance of the Independent Boards. (Guyette Decl. ¶ 19.) The new Independent Boards appointed via proxy exercise on December 21, 2022 are comprised of four independent individuals who collectively have over 100 years of experience in

operating businesses and managing workouts. (*Id.* at ¶ 20.)[11] None of the members of the Independent Boards is affiliated with any of the Lender Parties, and none of the Lender Parties holds any corporate governance, management or other roles with the Debtor or any of the other Loan Parties. (*Id.* at ¶ 21.) The Non-Debtor Loan Parties, under the governance of the Independent Boards, have engaged separate legal counsel and, since the appointment of the Independent Boards, the Lender Parties have only interacted with the Non-Debtor Loan Parties on an arms-length basis consistent in all respects with a customary debtor-creditor relationship. (*Id.* at ¶ 22.) Likewise, the Lender Parties are not compensating the Independent Boards, and the members of the Independent Boards have not entered into any agreements with any of the Lender Parties regarding insurance, indemnification or any other matters related to their governance of the Non-Debtor Loan Parties. (*Id.* at ¶ 24.)

35.    Subsequent to the exercise of proxy rights on December 21, 2022, the Lender Parties have not exercised their rights as proxy and attorney-in-fact for the Debtor or any of the other Loan Parties, nor have the Lender Parties otherwise exercised any control over any of the Loan Parties. (*Id.* at ¶ 25.)

**G.    The Debtor Files This Chapter 11 Case With No Prior Notice To or Discussion With the Lender Parties.**

36.    On December 27, 2022, the Debtor filed the Chapter 11 Case with no warning or notice to the Lender Parties. (Maggiore Decl. ¶ 18.) The Chapter 11 Case was filed as a bare-bones Petition [Dkt. No. 1] (the "Petition") with no list of creditors, schedules, SOFA, motions or other filings whatsoever.

---

[11] Agent is aware that, following the appointment of the four independent directors on December 21, 2022, such directors appointed the Loan Parties' existing CEO as a fifth member of the Independent Boards. (Guyette Decl. ¶ 23.)

37.     Agent did not receive formal notice of the commencement of the Chapter 11 Case from the Debtor. (Maggiore Decl. ¶ 19.) Instead, Agent learned of the filing from a voicemail Tony Maggiore, of Agent, received from Peter Kaufman of Gordian Group, LLC ("Gordian"). Mr. Kaufman has since informed Mr. Maggiore that Gordian represents Falcon, not the Debtor. (*Id.*) During a call with Mr. Kaufman on December 28, 2022, Mr. Kaufman tellingly advised Mr. Maggiore and Drew Guyette, of Agent, that Falcon had caused the filing of the Chapter 11 Case in order to "put the genie back in the bottle" with respect to the Lender Parties' proxy exercise the week prior. (*Id.*; Guyette Decl. ¶ 26.)

38.     In the more than three weeks since the Petition Date, the docket has remained completely inactive other than the Extension Motion and the recently filed Automatic Stay Motion. To date, the Debtor has not filed a notice of commencement of the Chapter 11 Case or any evidence that the Debtor has provided formal notice of the filing to creditors (including to the Lender Parties), nor has the Debtor filed a single "first-day" or "second-day" motion requesting authority to do anything substantive other to purportedly enforce the automatic stay against non-Debtor entities. Importantly, the Debtor has filed nothing regarding how it intends to finance its administrative costs without any cash or funding commitments. The lack of activity in this case is a by-product of the Debtor having no business to operate or reorganize, no employees to pay, no creditors to take into account (aside from the Lender Parties) and no reorganization purpose. Indeed, the Lender Parties, as the Debtor's only creditor, believe this Chapter 11 Case is value-destructive. (Guyette Decl. ¶ 27.)

**RELIEF REQUESTED**

39.     The Court should grant the Motion and dismiss the Chapter 11 Case pursuant to 1112(b) of the Bankruptcy Code or, alternatively, dismiss or abstain from hearing it under section 305(a)(1) of the Bankruptcy Code.

## LEGAL STANDARDS

### A.    Dismissal under 11 U.S.C. § 1112(b)

40.    Section 1112(b) of the Bankruptcy Code governs dismissal of chapter 11 cases. It provides, in relevant part:

> [O]n request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or *dismiss a case under [chapter 11]*, whichever is in the best interests of creditors and the estate, *for cause* unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1) (emphasis added). Section 1112(b) further provides a non-exclusive list of factors that constitute "cause" warranting dismissal. *Id.* at § 1112(b)(4). Although lack of good faith is not expressly enumerated in section 1112(b)(4), the Third Circuit has held that "the absence of good faith constitutes 'cause' to dismiss a Chapter 11 petition under § 1112(b)." *In re SGL Carbon Corp.*, 200 F.3d 154, 159-62 (3d Cir. 1999); *In re Derma Pen, LLC*, No. 14-11894 (KJC), 2014 WL 7269762, at *9 (Bankr. D. Del. Dec. 19, 2014) (granting creditor's motion to dismiss based on debtor's bad faith filing).

41.    "Good faith is a predicate to the right to file a petition in bankruptcy, as only the honest but unfortunate debtor is eligible to avail itself of the protections afforded by the Bankruptcy Code." *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 297 (Bankr. D. Del. 2011) (cleaned up). The purpose of the good faith requirement is to "legitimize the delay and costs imposed upon parties to a bankruptcy" and deter debtors from abusing the equitable tools available in bankruptcy for the ulterior motive of "delay[ing] creditors without benefiting them in any way[.]" *SGL Carbon*, 200 F.3d at 161-62, 165-66 (quoting *Little Creek Dev. Co. v. Commonwealth Mortg. Co. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1072 (5th Cir. 1986)); *see also NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express,*

*Inc.)*, 384 F.3d 108, 119 (3d Cir. 2004) ("At its most fundamental level, the good faith requirement ensures that the Bankruptcy Code's careful balancing of interests is not undermined by petitioners whose aims are antithetical to the basic purpose of bankruptcy[.]").

42.     Third Circuit precedent leaves no doubt that "the burden is on the bankruptcy petitioner to establish that its petition has been filed in good faith." *Integrated Telecom*, 384 F.3d at 118 (citations omitted); *see also In re Tamecki*, 229 F.3d 205, 207 (3d Cir. 2000) ("Once a party calls into question a petitioner's good faith, the burden shifts to the petitioner to prove his good faith."); *In re Rent-A-Wreck of Am., Inc.*, 580 B.R. 364, 374 (Bankr. D. Del. 2018) (Silverstein, J.) ("When a motion to dismiss a bankruptcy case is filed, the burden is on the bankruptcy petitioner to establish that good faith exists."). Whether a debtor has met its burden is a fact-intensive inquiry whereby the Court must "examine the totality of the circumstances" to determine where the filing "falls along the spectrum ranging from the clearly acceptable to the patently abusive." *Rent-A-Wreck*, 580 B.R. at 374 (quoting *Integrated Telecom*, 384 F.3d at 118).

43.     Chapter 11 cases may be dismissed for lack of good faith where (i) the petition does not serve a valid bankruptcy purpose, and/or (ii) the petition was filed merely to obtain a tactical litigation advantage. *Integrated Telecom*, 384 F.3d at 119-20; *Rent-A-Wreck*, 580 B.R. at 374. The good faith inquiry is "based more on objective analysis of whether the debtor has sought to step outside the 'equitable limitations' of Chapter 11 than the subjective intent of the debtor." *In re 15375 Mem'l Corp.*, 589 F.3d 605, 618 n.8 (3d Cir. 2009) (quoting *SGL Carbon*, 200 F.3d at 165).

44.     Courts in the Third Circuit consider the following non-exhaustive list of "*Primestone*" factors to evaluate whether a chapter 11 case was filed in bad faith:

    a)     **Single asset case**;
    b)     **Few unsecured creditors**;
    c)     **No ongoing business or employees**;
    d)     **Petition filed on eve of foreclosure**;

| | |
|---|---|
| e) | **Two-party dispute which can be resolved in pending state court action**; |
| f) | **No cash or income**; |
| g) | **No pressure from non-moving creditors**; |
| h) | Previous bankruptcy petition; |
| i) | Prepetition conduct was improper; |
| j) | **No possibility of reorganization**; |
| k) | Debtor formed immediately prepetition; |
| l) | **Debtor filed solely to create automatic stay**; and |
| m) | **Subjective intent of the debtor**. |

*JER/Jameson*, 461 B.R. at 298-99 (citing *In re Primestone Inv. Partners, L.P.*, 272 B.R. 554, 557 (D. Del. 2002)) (emphasis added)[12]; *see also In re GVS Portfolio I B, LLC*, No. 21-10690 (CSS), 2021 WL 2285285, at *9 (Bankr. D. Del. June 4, 2021) (dismissing chapter 11 case based on existence of *Primestone* factors); *In re Team Sys. Int'l LLC*, 640 B.R. 296, 320 (Bankr. D. Del. 2022) (finding cause to convert case to chapter 7 based on *Primestone* factors). No single *Primestone* factor is determinative, as the "focus of the inquiry is whether the petitioner sought to achieve objectives outside the legitimate scope of the bankruptcy laws when filing for protection under Chapter 11." *Primestone*, 272 B.R. at 557-58 (citations and quotations omitted).

**B.    Dismissal or abstention under 11 U.S.C. § 305(a)(1)**

45.    Dismissing (or abstaining from hearing) a chapter 11 case is also governed by 11 U.S.C. § 305, which provides, in relevant part: "The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if…the interests of creditors and the debtor would be better served by such dismissal or suspension[.]" 11 U.S.C. § 305(a)(1). While dismissal or abstention under section 305(a)(1) "is a form of extraordinary relief," the decision to do so or not "is committed to the discretion of the bankruptcy

---

[12] As discussed below, the bolded *Primestone* factors weigh heavily in favor of dismissal in this Chapter 11 Case.

court[.]" *In re Northshore Mainland Servs., Inc.*, 537 B.R. 192, 203 (Bankr. D. Del. 2015) (quotations and citations omitted).

46.      Under the plain language of section 305(a)(1), the key inquiry is whether the interests of both the debtor and the creditors "would be better served" by abstention or dismissal. 11 U.S.C. § 305(a)(1). That decision is "determined based upon the totality of the circumstances," and guided by the following non-exclusive factors "to gauge the overall best interests" of the debtor and creditors:

a)      The economy and efficiency of administration;

b)      Whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court;

c)      Whether federal proceedings are necessary to reach a just and equitable solution;

d)      Whether there is an alternative means of achieving an equitable distribution of assets;

e)      Whether the debtor and creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;

f)      Whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and

g)      The purpose for which bankruptcy jurisdiction has been sought.

*Northshore Mainland Servs.*, 537 B.R. at 203-04 (citations omitted). The factors are not necessarily given equal weight, and the inquiry is "not merely the application of a balancing test[.]" *In re RHTC Liquidating Co.*, 424 B.R. 714, 720 (Bankr. W.D. Pa. 2010).

## ARGUMENT

**I.      The Court should dismiss this case because the Debtor filed it in bad faith.**

47.      There are at least three independent reasons to dismiss this case for cause under section 1112(b): (a) a majority of the *Primestone* factors are satisfied; (b) this is a two-party dispute between the Lender Parties, on the one hand, and the Debtor on the other (as a mere instrumentality

of Falcon); and (c) there is no legitimate reorganization purpose for this case. Agent addresses each point below.

### A.   A majority of the *Primestone* factors are present and support dismissal.

48.   Here, the majority of the *Primestone* factors are present, thus demonstrating that the Chapter 11 Case should be dismissed based on bad faith grounds:

(a)   <u>Single asset case</u>: The Debtor has no assets or operations aside from the ownership of its sole direct subsidiary, Community Investors. Indeed, the Debtor has specifically represented to this Court that it is simply a "holding company that conducts its business through its operating subsidiaries." (Extension Motion ¶ 6.) That statement is consistent with the numerous representations that the Debtor made to Agent and the Lenders regarding its status as a mere holding company with no operations and no meaningful assets aside from its equity interests in its subsidiaries, including as recently as July 2022 in the Forbearance Agreement. (Credit Agreement § 5.23; First Amendment § 6(c); Second Amendment § 7(c); Third Amendment § 5(c); Forbearance Agreement § 8(c).)

(b)   <u>Few unsecured creditors</u>: The Debtor has not filed a creditor list, which Rule 1007-2(a) of the Local Rules of this Court requires be filed with a petition, and the docket does not indicate that the Debtor has provided notice of the Chapter 11 Case to anyone. In fact, as referenced above, Agent learned of the Chapter 11 Case from a voicemail from Falcon's advisor, Gordian, and to date has not received formal notice of the filing from the Debtor. Additionally, the litigation searches conducted by Agent reveal no pending litigation against the Debtor. Finally, the Credit Agreement makes it an Event of Default for the Debtor to incur any debt or liabilities not expressly permitted thereunder. (Credit Agreement § 8.1.11.) Thus, it is evident the Debtor has no unsecured creditors other than the Lender Parties to the extent of any deficiency claim. *Cf. In re Anderson Oaks (Phase I) Ltd. P'ship*, 77 B.R. 108, 111-12 (Bankr. W.D. Tex. 1987) ("The Court

is not obligated to presume the existence of other creditors simply because this is a bankruptcy case.").

        (c)    <u>No ongoing business or employees</u>: Likewise, the Debtor has no operations or employees. Again, the Debtor has admitted in the Extension Motion that it lacks operations (Extension Motion ¶ 6), and has represented and warranted to Agent and the Lenders on numerous occasions that it does not conduct any business. The Debtor's lack of operations is further evidenced by the fact that it has not filed any first-day motions or other pleadings in the Chapter 11 Case seeking authority to take actions necessary to the operation of a business. *See JER/Jameson*, 461 B.R. at 300 (noting that debtor "filed a bare petition and…sought no additional relief in this Court since filing").

        (d)    <u>Petition filed on eve of foreclosure</u>: The Chapter 11 Case, though not technically filed on the "eve" of foreclosure, was a surprise, bare-bones filing commenced one week after Agent provided notice pursuant to the Pledge Exercise Notice of the valid and proper exercise of the Lender Parties' rights and remedies under the Collateral Agreement and the other Loan Documents. *See 15375 Mem'l*, 589 F.3d at 625-26 (timing of bankruptcy petitions supported dismissal for bad faith). Representatives of Falcon even admitted that the filing was a reaction to the Lender Parties' exercise of their secured creditors rights and remedies, in an attempt to put the "genie back in the bottle." (Maggiore Decl. ¶ 19; Guyette Decl. ¶ 26.)

        (e)    <u>Two-party dispute</u>: As Agent discusses in greater detail in <u>Part I.B</u> below, this is merely a two-party dispute. The Debtor has no creditors aside from the Lender Parties. One week prior to the filing of the Chapter 11 Case, when the Lender Parties and Falcon reached an impasse in their negotiations and Agent became concerned that Falcon's representatives sitting on the boards of the Debtor's direct and indirect subsidiaries would act only in the interests of Falcon

(rather than the Loan Parties), Agent exercised its bargained-for, secured creditor remedies with respect to such subsidiaries and replaced the boards thereof with the Independent Boards, in accordance with its rights pursuant to the Collateral Agreement, the other Loan Documents, and 8 Del. C. § 212(e) (confirming the validity of an irrevocable proxy "if it states that it is irrevocable and if . . . it is coupled with an interest").[13] It appears that Falcon caused the Debtor to file the Chapter 11 Case in an attempt to obtain leverage over Agent and the Lenders and force them to either recommence negotiations or reverse the placement of the Independent Boards. To that effect, it is clear that Falcon is improperly using the Debtor (and the Bankruptcy Code) as a mere instrumentality to gain leverage against the Lender Parties for its own benefit.

(f)    No cash or income: The Debtor likely has no cash or income given its status as a mere holding company with no assets or operations aside from the ownership of its non-debtor subsidiaries. Agent expects that the Debtor's Schedules and SOFA—when they are eventually filed—will confirm this.

(g)    No pressure from non-moving creditors: As discussed above, the Debtor cannot have received any pressure from non-moving creditors for the simple reason that the Debtor has no other creditors aside from the Lender Parties.

(h)    No possibility of reorganization: The Debtor has no unencumbered property or cash with which to fund a plan, and no business or operations to reorganize. Indeed, Thomas Radford, the sole director of the Debtor who authorized the filing of the Chapter 11 Case, recently told Agent that it would not be possible to "sell the company for the value of the debt today." (Maggiore Decl. ¶ 14). Debtor further admitted in the Automatic Stay Motion that, by early

---

[13] *See also Daniel v. Hawkins*, Case No. 184, 2022, 2023 WL 115854, at *12 n.71 (Del. Jan. 6, 2023) (discussing 8 Del. C. § 212(e)).

November 2022, "it became clear that [it] would be unable to raise capital through asset sales[.]" (Automatic Stay Mtn., ¶ 17.)

(i)    <u>The Debtor filed solely to create automatic stay</u>: Given the above, it is clear that there is no legitimate reason that Falcon caused the Debtor to file the Chapter 11 Case. The purpose instead was to attempt to gain some benefit from the automatic stay by exerting leverage against the Lender Parties, as the Automatic Stay Motion, filed on January 13, 2023, demonstrates. Moreover, Falcon's advisors at Gordian have even admitted that the Chapter 11 Case was filed in order to "put the genie back in the bottle." (Maggiore Decl. ¶ 19; Guyette Decl. ¶ 26.) Indeed, the Debtor's first order of business in its Chapter 11 Case was *not* to obtain the orders necessary to operate as a debtor in possession, provide the Court and constituencies in this case a picture of its assets and liabilities or comply with requirements under the Bankruptcy Code, but rather to improperly attempt to extend the automatic stay to non-debtors and non-estate property by seeking the reversal of the Lender Parties' valid, prepetition proxy exercise—all for the benefit of Falcon. That is revealing. *Cf. In re Stone Fox Capital LLC,* 572 B.R. 582, 591 (Bankr. W.D. Pa. 2017) ("Filing a bankruptcy case to obtain the protection of the automatic stay is not a valid purpose; rather, the stay is a benefit of a good faith filing.").

(j)    <u>Subjective intent of the Debtor</u>: Given that the Debtor has no business or operations to reorganize, no assets aside from its equity interests, and no creditors or liabilities aside from the Secured Obligations, and given that it has not filed any substantive motions or other filings, it is clear that the Debtor filed the Chapter 11 Case solely for the improper reasons discussed above.

49.    The above application of the *Primestone* factors to this case forcefully demonstrates that the Debtor's filing was "patently abusive." *Rent-A-Wreck*, 580 B.R. at 374, 388 (quoting

*Integrated Telecom*, 384 F.3d at 118). In filing the Chapter 11 Case, the Debtor—as a tool of the out-of-the-money equity—is deliberately seeking "to achieve objectives outside the legitimate scope of the bankruptcy laws." *Primestone*, 272 B.R. at 557 (citations and quotations omitted). Therefore, the Debtor will not be able to satisfy its burden to establish that the Chapter 11 Case was filed in good faith, and it should be dismissed.

**B.    This is merely a two-party dispute, and Falcon caused the Debtor to file the Chapter 11 Case primarily as a litigation tactic in a vain attempt to use the automatic stay to undo Agent's pre-petition exercise of the Irrevocable Proxies against non-debtor parties.**

50.    A court may dismiss a bankruptcy case for sole reason that it is a two-party dispute. *See, e.g., JER/Jameson*, 461 B.R. at 300 (finding that a debtor's purpose to obtain an advantage in a two-party dispute is sufficient to constitute bad faith). If the "primary, if not sole, purpose of [a chapter 11 filing] was a litigation tactic, the petition may be dismissed as not being filed in good faith." *15375 Mem'l*, 589 F.3d at 625. In *15375 Memorial*, the Third Circuit affirmed the dismissal of a chapter 11 case as a bad faith filing under circumstances analogous to those here.

51.    There, prior to the commencement of their chapter 11 cases, the debtors, Santa Fe Minerals and Memorial Corporation, as well as their parent companies, were defendants in state court litigation in which they were collectively accused of having contaminated certain realty as a result of oil and gas exploration activities. *Id.* at 609, 612. Discovery established that Santa Fe bore most of the liability for the contamination. *Id.* at 612. Shortly before trial—and particularly after the plaintiffs indicated that they would pursue the parent companies on an alter ego theory—Santa Fe and Memorial commenced chapter 11 cases. *Id.* at 612-13, 625. The alter ego claims presented

a serious problem for the debtors' parent companies because—like the Debtor here—Santa Fe and

Memorial were merely shell companies. *Id.* at 609.[14]

52.     After the bankruptcy filing, one of the plaintiffs filed a complaint in the state court

litigation against the debtors' parent companies under an alter ego theory, and the debtors

responded by accusing the plaintiff of violating the automatic stay, arguing that the alter ego claims

were property of the estate and thus could not be asserted by the plaintiff. *Id.* at 613-14. The

plaintiff moved to dismiss the bankruptcy case for lack of good faith, which the bankruptcy court

denied. *Id.* at 616. The district court, however, reversed, and the Third Circuit affirmed, concluding

Santa Fe and Memorial's bankruptcy cases were not filed in good faith as they "were used

primarily as a litigation tactic to protect the [d]ebtors and their parent companies from liability in

pending litigations." *Id.* at 609. The court reasoned:

> [T]he timing of the filing of the bankruptcy petitions shows that the
> debtors were not seeking Chapter 11 protection for a valid
> bankruptcy purpose, but instead were using the filings ***as a litigation
> tactic to…protect the [debtors' parent companies]***…The
> debtors…filed their bankruptcy petitions with the knowledge that
> doing so would result in their dismissal from the [state court
> litigation] and would shield the [parent companies] from
> litigation…***The debtors' bankruptcy filings protected the [parent
> companies] from liability for the damage to the [p]roperty…[as]
> the [d]ebtors continue to argue that any alter ego claims against
> the [parent companies] are part of their estates*** and cannot be
> asserted by [the plaintiff]….

*Id.* at 619, 625-26 (emphasis added; citations omitted; cleaned up).

53.     Just so here. Like the debtors in *15375 Memorial*, it is plainly apparent that Falcon

improperly caused the Debtor to file the Chapter 11 Case primarily—if not entirely—as a litigation

---

[14] Memorial was a holding company that had no employees and engaged in no business other than being Santa Fe's
sole shareholder, and Santa Fe had no officers, directors or employees, and engaged in no business, as all of its assets
had been upstreamed to its parent companies. *15375 Mem'l.*, 589 F.3d at 609.

tactic to attempt to protect its interests in, and control over, the Non-Debtor Loan Parties. This is not a proper purpose of chapter 11.

54.    Ultimately, the facts demonstrate that Falcon caused the Debtor to file the Chapter 11 Case to gain a tactical advantage in a two-party dispute against Agent and the Lenders. That alone warrants dismissal, as *15375 Memorial* and other cases demonstrate. *See, e.g., SGL Carbon*, 200 F.3d at 162 (chapter 11 case not filed in good faith where debtor was not in financial distress and filed solely to gain tactical advantage in litigation); *In re Scarborough-St. James Corp.*, No. 15-10625 (LSS), 2015 WL 5672628, at *2 (Bankr. D. Del. Sept. 24, 2015) (Silverstein, J.) (dismissing case that involved "two-party dispute" with few assets); *Anderson Oaks*, 77 B.R. at 112 (finding that bankruptcy was "an attempt by an investor group to use the Bankruptcy Code as a device with which to force its lender into renegotiating their loan," which was a two-party dispute that "simply [had] no place in bankruptcy" and "violate[d] the 'good faith' prerequisite to invoking the bankruptcy court's equitable jurisdiction"); *Integrated Telecom*, 384 F.3d at 128 ("[a] perceived need for the automatic stay, without more, cannot convert a bad faith filing to a good faith one") (citing *In re HBA E., Inc.*, 87 B.R. 248, 262 (Bankr. E.D.N.Y. 1988)); *In re 3 RAM, Inc.*, 343 B.R. 113 (Bankr. E.D. Pa. 2006) (dismissing case filed for sole purpose of preventing only creditor from exercising rights in debtor's one fully encumbered asset).

### C.    The Chapter 11 Case serves no legitimate bankruptcy purpose.

55.    Finally, the Court should dismiss the Chapter 11 Case because it literally cannot accomplish a valid reorganization purpose under chapter 11.

56.    If a debtor "has no need to rehabilitate or reorganize, its petition cannot serve the rehabilitative purpose for which Chapter 11 was designed." *SGL Carbon*, 200 F.3d at 166. The Supreme Court has identified two fundamental purposes of chapter 11 as "(1) preserving going concerns and (2) maximizing property available to satisfy creditors." *Integrated Telecom*, 384 F.3d

at 119 (quoting *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999)) (cleaned up); *15375 Mem'l*, 589 F.3d at 619 (same). Here, the Debtor cannot show that this Chapter 11 Case satisfies either purpose. It has no ongoing business to reorganize and no assets to maximize for creditors (and indeed its only creditor, the Lender Parties, believes this Chapter 11 Case is value-destructive). Relatedly, as described above, the Debtor will not be able to confirm a plan of reorganization.

57.     To prove otherwise, the Debtor would need to show that it is seeking to "create or preserve some value that would be lost—not merely distributed to a different shareholder—outside of bankruptcy." *Integrated Telecom*, 384 F.3d at 129; *see also 15735 Mem'l*, 589 F.3d at 620 (rejecting debtor's assertion that its chapter 11 case was designed to maximize value because "the purported benefits identified did not add or preserve value that would otherwise be unavailable to creditors outside of bankruptcy"). This the Debtor cannot do. There simply is no value to create or preserve here that would be lost outside the Chapter 11 Case. To the contrary, the value of the Debtor's estate will only continue to decrease as administrative and other expenses are incurred and the Lender Parties' secured claim continues to grow while the Chapter 11 Case is pending. The Chapter 11 Case should therefore be dismissed. *See, e.g., JER/Jameson*, 461 B.R. at 299-303 (dismissing case where debtors "presented no evidence that more value will be realized in bankruptcy than could have been realized without it"); *Integrated Telecom*, 384 F.3d at 126 (dismissal appropriate where debtor failed to identify bankruptcy-related efficiencies that could not have been realized under state law).

### D.    Dismissal, rather than conversion to chapter 7, is appropriate here.

58.     Section 1112(b) requires that a court either dismiss or convert a case to chapter 7 depending on "whichever is in the best interests of the creditors and the estate." 11 U.S.C. § 1112(b)(1). The Court also has an "inherent power to dismiss a Chapter 11 case when its

jurisdiction has been improperly invoked." *Matter of Century City, Inc.*, 8 B.R. 25, 30 (Bankr. D.N.J. 1980); *In re Conference of African Union First Colored Methodist Protestant Church*, 184 B.R. 207, 222 (Bankr. D. Del. 1995) (same).

59.    The Lender Parties are the only creditors in this case, and dismissal is in their best interest. Conversion to chapter 7 would serve no purpose, as (i) there are no assets for a chapter 7 trustee to administer, (ii) any hypothetical assets would be fully encumbered by Agent's liens and (iii) there is no potential benefit for unsecured creditors, since there are none. *See, e.g., 3 RAM, Inc.*, 343 B.R. at 119 (dismissal in best interest of sole creditor where debtor had only one asset which was fully encumbered); *Scarborough-St. James*, 2015 WL 5672628, at *2 (dismissal preferred over conversion where trustee would have "very little (if anything)" to administer and "conversion would increase the costs to the estate without any foreseeable benefit to the estate or creditors"); *SGL Carbon*, 200 F.3d at 159 (conversion "not an option" where bad-faith debtor does not belong in bankruptcy). Moreover, because the Chapter 11 Case is a two-party dispute with no legitimate bankruptcy purpose, dismissal is warranted.

## II.    Alternatively, the Court should dismiss or abstain from hearing the Chapter 11 Case pursuant to 11 U.S.C. § 305(a)(1).

60.    If the Court is not inclined to dismiss the Chapter 11 Case for cause under section 1112(b), then it should consider dismissing or abstaining from hearing it under section 305(a)(1). There are at least two reasons to do so.

61.    <u>First</u>, dismissal or abstention is appropriate because, as discussed above, the Debtor filed this case as a litigation tactic to improperly attempt to undo the prepetition appointment of the Independent Boards. The court in *Laurel Highlands Found., Inc. v. Frankenstein (In re Laurel Highlands Found., Inc.)*, 473 B.R. 641 (Bankr. W.D. Pa. 2012), dismissed a chapter 11 case pursuant to section 305(a)(1) under analogous circumstances.

62.     In *Laurel Highlands*, two nonprofit corporations engaged in a prepetition state court action after disputing whether the debtor corporation's board of directors had authorized an acquisition by the other corporation. *Id*. at 647. The control of the debtor corporation was central to the dispute because certain members of the debtor who supported the acquisition started taking action to replace certain board members and approve a new set of by-laws. *Id*. The debtor commenced its bankruptcy case in the midst of this struggle for corporate control over it. *Id*. at 647-48. In response, the parties vying for control over the debtor moved to dismiss under section 305(a)(1).

63.     The court granted the motion, reasoning that dismissal of the bankruptcy case was appropriate under section 305 because, among other things, (a) the bankruptcy provided no apparent benefit to creditors, considering the debtor acknowledged it had no unsecured creditors, (b) the bankruptcy would only benefit the management and board of directors, (c) the bankruptcy had no clear reorganization purpose and appeared only to increase litigation costs for the debtor and (d) an expeditious resolution of the pre-existing state court matter would be in the best interests of all parties. *Id*. at 654-55. Accordingly, the court concluded that the "filing of the bankruptcy case appears to be nothing more than an attempt by the current management of [the debtor] to remain in control," and filing the bankruptcy case "was a litigation tactic to avoid" losing control over the decision as a result of an imminent decision in the state court litigation. *Id*. at 655.

64.     This case is analogous, as Agent discussed in detail above. Just as in *Laurel Highlands*: (a) the Chapter 11 Case would provide no benefit to creditors, as the Debtor has no unsecured creditors; (b) the Chapter 11 Case could only conceivably benefit Falcon, as Falcon would prefer to be restored to control of Community Investors and its subsidiaries via its own appointees to those entities' respective boards of directors; and (c) this bankruptcy case has no

reorganization purpose, as the Debtor has no ongoing business to reorganize and no assets to maximize for creditors, and will not be able to confirm a plan of reorganization.

65.    Second, dismissal or abstention is also warranted because, as discussed in detail above, this is a two-party dispute. "Courts generally abstain in two-party disputes where relief is available in a non-bankruptcy forum." *In re AMC Inv'rs, LLC*, 406 B.R. 478, 488 (Bankr. D. Del. 2009); *see also In re Bus. Info. Co., Inc.*, 81 B.R. 382 (Bankr. W.D. Pa. 1988) (abstaining under section 305(a)(1) where bankruptcy was filed as litigation tactic in pre-existing two-party dispute, and bankruptcy case involved issue of unsettled law that would lead to inefficient and costly administration). Here, Agent validly exercised a remedy clearly provided under the Loan Documents and permitted by Delaware law. 8 Del. C. § 212(e); *Daniel*, 2023 WL 115854, at *12 n.71. To the extent the Debtor contests that, the Delaware Court of Chancery is obviously available to adjudicate that dispute.

## CONCLUSION

**WHEREFORE**, Agent respectfully requests that the Court (i) dismiss the Debtor's Chapter 11 Case under 11 U.S.C. § 1112(b), or, alternatively, dismiss or abstain from hearing it under 11 U.S.C. § 305(a)(1), and (ii) grant Agent such other relief as it deems just and proper.

Dated: January 20, 2023
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/Kara Hammond Coyle*
James P. Hughes, Jr., Esq. (No. 3102)
Michael R. Nestor, Esq. (No. 3526)
Kara Hammond Coyle, Esq. (No. 4410)
James M. Yoch, Jr., Esq. (No. 5251)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Email: jhughes@ycst.com
      mnestor@ycst.com
      kcoyle@ycst.com
      jyoch@ycst.com

-and-

**KATTEN MUCHIN ROSENMAN LLP**
Peter P. Knight, Esq. (admitted *pro hac vice*)
Terence G. Banich, Esq. (admitted *pro hac vice*)
Allison E. Yager, Esq. (admitted *pro hac vice*)
525 West Monroe Street
Chicago, IL 60661
Telephone: (312) 902-5200
Email: peter.knight@katten.com
        terence.banich@katten.com
        allison.yager@katten.com

*Counsel for Twin Brook Capital Partners, LLP, as Agent*