## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| | ) | |
| CII PARENT, INC.,[1] | ) | Case No. 22-11345-LSS |
| | ) | |
| Debtor. | ) | Re: Dkt. No. 12 |

### OBJECTION OF TWIN BROOK CAPITAL PARTNERS, LLC, AS AGENT, TO DEBTOR'S MOTION FOR ENTRY OF AN ORDER ENFORCING THE AUTOMATIC STAY AND GRANTING RELATED RELIEF

Twin Brook Capital Partners, LLC, in its capacity as agent ("Agent") for the lenders under a prepetition secured credit facility provided to the Debtor's direct and indirect subsidiaries (collectively, the "Lenders," and together with Agent, the "Lender Parties"), by its undersigned counsel, hereby submits this objection (the "Objection") to *Debtor's Motion for Entry of an Order Enforcing the Automatic Stay and Granting Related Relief* [Dkt. No. 12] (the "Motion" or "Mot."). In support of the Objection, Agent submits the *Supplemental Declaration of Drew Guyette*, attached hereto as **Exhibit A** (the "Supplemental Guyette Declaration" or "Supp. Guyette Decl."),[2] and the *Supplemental Declaration of Anthony Maggiore*, attached hereto as **Exhibit B** (the "Supplemental Maggiore Declaration" or "Supp. Maggiore Decl."),[3] and respectfully states as follows:

---

[1] The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is: CII Parent, Inc. (4706). The location of the Debtor's address is 21 Custom House Street, Boston, MA 02110.

[2] Agent also refers herein to the original *Declaration of Drew Guyette*, which was filed in support of and attached as Exhibit B to the *Motion of Twin Brook Capital Partners, LLC, as Agent, for an Order Dismissing or Abstaining from Hearing the Debtor's Chapter 11 Case* [Dkt. No. 30] (the "Motion to Dismiss") (such declaration, the "Guyette MTD Declaration" or "Guyette MTD Decl."). The numbered exhibits set forth in the Supplemental Guyette Declaration begin at Exhibit No. 18 to avoid overlap with the exhibits attached to the Guyette MTD Declaration (which included Exhibits 1 through 17 thereto).

[3] Agent also refers herein to the original *Declaration of Anthony Maggiore*, which was filed in support of and attached as Exhibit C to the Motion to Dismiss (such declaration, the "Maggiore MTD Declaration" or "Maggiore MTD Decl."). The numbered exhibits included in the Supplemental Maggiore Declaration begin at Exhibit No. 2 to avoid overlap with the exhibits attached to the Maggiore MTD Declaration (which included Exhibit 1 thereto).

## PRELIMINARY STATEMENT

1.      CII Parent, Inc. (the "Debtor") is a mere shell company that its ultimate equity owner, Falcon Structured Equity Partners LP ("Falcon"), is clearly using as a puppet and, in so doing, is blatantly abusing the bankruptcy process. Falcon caused the Debtor to file the Motion in an attempt to use the automatic stay as a weapon to take the Debtor's direct and indirect non-debtor operating subsidiaries hostage for the sole purpose of extracting unjustified return for its admittedly out-of-the-money equity. In seeking to unwind Agent's valid prepetition exercise of proxy voting rights irrevocably granted *more than three years prior to its bankruptcy filing*, the Debtor asks this Court to:

- Gloss over procedural infirmities of the Motion under Bankruptcy Rule 7001;

- Disregard the plain language of the undisputed and unambiguous loan documents;

- Ignore well-established (and controlling) Delaware corporate law;

- Upend the private company leveraged finance market that has long-relied on the enforceability of irrevocable proxies under precisely the circumstances at bar; and

- Extend the automatic stay to non-debtors and use it to unwind purely prepetition acts by the Lender Parties, without any legal basis whatsoever.

The Court should not grant such sweeping and unprecedented relief, as Agent discusses below.

2.      **First**, the Court should deny the Motion because it constitutes "a proceeding to recover money or property," "a proceeding to obtain an injunction or other equitable relief" and/or "a proceeding to obtain a declaratory judgment relating [thereto]," each of which requires the commencement of an adversary proceeding under Rules 7001(1), (7) and (9) of the Federal Rules of Bankruptcy Procedure (the "Rules"). Fed. R. Bankr. P. 7001(1), (7), (9).

3.      **Second**, the Motion should be denied on the merits as well. The Debtor's contention that Agent's exercise of proxy rights violated the automatic stay conveniently glosses over two uncontested, critical facts—all actions necessary to consummate the proxy exercise occurred entirely *prior to* the December 27, 2022 petition date (the "Petition Date"), and the Lender Parties have taken *no action at all* against the Debtor or its assets since the Petition Date. Likewise, the Debtor's stay argument completely ignores well-established Delaware corporate law holding that an irrevocable proxy *immediately* divests the grantor of the applicable voting interests. As a result, the irrevocable proxies at issue here completed the alienation of the Debtor's voting rights in its sole direct subsidiary to Agent ***prior to*** the Petition Date, so those rights never became property of the estate. And even if the Court concludes that Agent's proxy voting rights somehow became estate property, there is still no basis to enforce the stay against the Lender Parties. *In re Denby-Peterson*, 941 F.3d 115 (3d Cir. 2019)—which the Debtor itself cites—holds that mere retention of possession or control of property of the estate post-petition does *not* constitute an affirmative act to exercise control under 11 U.S.C. § 362(a)(3). Agent has, at most, merely retained the subject voting rights since the Petition Date, so *Denby-Peterson* is dispositive on this point.

4.      **Third**, the Court should refuse to grant the other "related relief" the Debtor seeks. Invoking 11 U.S.C § 542(a), the Debtor demands that Agent turn over its proxy voting rights, claiming they are estate property. There are several problems with that request. The subject proxy voting rights are *not* property of the estate under applicable Delaware law, and they are at the very least the subject of a bona fide dispute, rendering turnover improper in any event. Moreover, Agent's proxy rights are excepted from turnover because the Debtor and its equity owners admitted—on multiple recent occasions—that the Debtor's equity interests are of inconsequential value or benefit to the Debtor's estate. The Debtor's attempt to use equitable estoppel to unwind

Agent's prepetition proxy exercise is based on a blatant and unsupported misrepresentation that Agent agreed to a "de facto" forbearance extension, and in any event is devoid of any legal merit. Lastly, the Debtor's request that this Court effectively enter a declaratory judgment that Agent's exercise of proxy voting rights was invalid is conclusively refuted by express provisions in the irrevocable proxies themselves. To give its argument a degree of facial appeal, the Debtor resorted to omitting critical language from its quotations of the operative documents, including by liberally using ellipses, which borders on willful misrepresentations to the Court.

5.      In the absence of any legal or factual support for its Motion, the Debtor—under the control and direction of Falcon—is left with nothing but platitudes that the Lender Parties' prepetition exercise of proxy rights severely impaired the Debtor's ability to "pursue a value-maximizing holistic restructuring" and impeded a "global restructuring." (Mot. at 4.) In fact, the opposite is true. As the factual record will show, it is Falcon that is using the Debtor—and now the bankruptcy process meant for honest but unfortunate debtors—as a litigation tactic to further its prepetition goal of extracting recovery on its out-of-the-money equity through control of the non-debtor operating subsidiaries. The Lender Parties, in contrast, exercised proxy voting rights pre-bankruptcy, in accordance with their bargained-for contractual rights, to replace increasingly-conflicted Falcon-appointed boards with highly competent, five-member boards of independent directors that are charged under Delaware corporate law to act in the best interests of the companies they serve. The Motion should therefore be denied.

## FACTUAL BACKGROUND

### A.      May 15, 2019 Prepetition Credit Facility and the Debtor's Grant of Irrevocable Proxy Rights to Agent

6.      As detailed in Agent's Motion to Dismiss [Dkt. No. 30], the Debtor is an intermediate "shell" holding company that has only one direct subsidiary: non-debtor Community

Investors, Inc. ("Community Investors"). Community Investors, in turn, directly or indirectly owns 100 percent of various other non-debtor subsidiaries. (Supp. Guyette Decl. ¶ 5.) The Debtor is indirectly owned and controlled by affiliates of Falcon. (*Id.*) A copy of what Agent believes to be a current corporate organizational chart of the Debtor and its affiliates is attached to the Guyette MTD Declaration as **Exhibit 1** (the "Organizational Chart").

7.    Pursuant to a *Credit Agreement*, dated as of May 15, 2019 (the "Credit Agreement," a true and correct copy of which is attached to the Guyette MTD Declaration as **Exhibit 2**), the Lender Parties provided a senior secured credit facility (the "Prepetition Credit Facility") to non-debtor Community Investors and its direct non-debtor subsidiaries, Investors Acquisition Co., AssociationVoice, LLC, CapSure Acquisition Co., Real Pro Holdings, Inc., dwellingLIVE, Inc., iHomefinder, Inc. ("iHomefinder"), and Caliber Software, Inc. (collectively, together with Community Investors, the "Non-Debtor Borrowers"). The Debtor and AtHomeNet, Inc., an indirect non-debtor subsidiary of Community Investors ("AtHomeNet," and together with the Non-Debtor Borrowers, the "Non-Debtor Loan Parties"), each unconditionally guaranteed the loans and other obligations of the Non-Debtor Borrowers under the Prepetition Credit Facility (collectively, the "Secured Obligations") pursuant to a *Guarantee and Collateral Agreement*, dated as of May 15, 2019 (the "Collateral Agreement," a true and correct copy of which is attached to the Guyette MTD Declaration as **Exhibit 3**). (Collateral Agreement, § 2.1.) As of the Petition Date, the Debtor and the Non-Debtor Loan Parties (collectively, the "Loan Parties") jointly and severally owed the Lender Parties approximately $73.9 million in principal under the Prepetition Credit

Facility, comprised of approximately $66.5 million in outstanding term loans and $7.4 million in outstanding revolving loans.[4] (Guyette MTD Decl. ¶ 7.)

8.      The Secured Obligations are secured by first priority, perfected liens on all of the Debtor's assets (*i.e.*, the equity interests in Community Investors) and substantially all assets of each Non-Debtor Loan Party, including all equity interests in each of their respective direct subsidiaries (the equity interests in Community Investors and each other Non-Debtor Loan Party, collectively, the "Pledged Equity"). (Collateral Agreement, §§ 1.2, 3.) Agent perfected its liens by, among other things, (i) filing UCC-1 financing statements against each Loan Party in its state of incorporation (a true and correct copy of the UCC-1 financing statement against the Debtor is attached to the Guyette MTD Declaration as **Exhibit 4**), and (ii) obtaining possession of original stock certificates evidencing the Pledged Equity. (Supp. Guyette Decl. ¶ 9.)

9.      Also on May 15, 2019, pursuant to Section 7.1(a) of the Collateral Agreement, the Debtor and each other Loan Party "irrevocably constitute[d] and appoint[ed] the Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact and proxy with full irrevocable power and authority in the place and stead of such [Loan Party]" to "*without notice to or assent by such [Debtor or other Loan Party]* . . . vote the [Pledged Equity] in any manner the Agent deems advisable for or against all matters submitted or which may be submitted to a vote of shareholders, partners or members, as the case may be, . . . [and] vote any right or interest with respect to [the Pledged Equity]." (Collateral Agreement, § 7.1(a)(v)-(vi) (emphasis added).) Section 6.3(b)(a) of the Collateral Agreement makes clear that such proxy rights included "giving or withholding written consents of stockholders, partners or members,

---

[4] The foregoing amounts do not include accrued unpaid interest, fees, expenses and other amounts that are chargeable, payable or otherwise reimbursable under the Credit Agreement and the other Loan Documents, including costs and fees incurred by the respective Lender Parties in this chapter 11 case. (Guyette Supp. Decl. ¶ 8.)

calling special meetings of stockholders, partners or members and voting at such meetings[] and otherwise act[ing] with respect to the [Pledged Equity] as if Agent were the outright owner thereof[.]" (*Id.* § 6.3(b)(a)(ii).) The Collateral Agreement further states in Section 7.1(a) that such irrevocable proxies (collectively, the "Collateral Agreement Irrevocable Proxies") are:

> COUPLED WITH AN INTEREST *AND SHALL BE VALID AND IRREVOCABLE UNTIL THE SECURED OBLIGATIONS HAVE BEEN PAID IN FULL* (AS DEFINED IN THE CREDIT AGREEMENT) . . . *NOTWITHSTANDING ANY LIMITATIONS TO THE CONTRARY SET FORTH IN THE . . . ORGANIZATIONAL DOCUMENTS . . .OR CORPORATE OR LIMITED LIABILITY COMPANY LAW, AS APPLICABLE, OF THE STATE OF DELAWARE*, THE STATE OF CALIFORNIA, THE STATE OF GEORGIA, OR ANY OTHER STATE OF ORGANIZATION OF ANY [NON-DEBTOR LOAN PARTY].

(*Id.* at § 7.1(a)(vi) (all caps in original; emphasis added).)

10.     In addition to the Collateral Agreement Irrevocable Proxies, the Debtor and each other Non-Debtor Loan Party (other than AtHome) also delivered to Agent a standalone *Irrevocable Proxy Coupled with Interest*, each dated May 15, 2019 (collectively the "Standalone Proxies", true and correct copies of which are attached to the Guyette MTD Declaration as **Group Exhibit 5**), that, among other things, (i) "authorize[d] and empower[ed] Agent, to vote any and all Equity Interests owned" by the Debtor and each such other Non-Debtor Loan Party. (Standalone Proxies at 1.) Each Standalone Proxy likewise expressly provided that it "shall continue in full force and effect until the Secured Obligations are Paid in Full notwithstanding any time limitations set forth in the bylaws or other organizational documents of the Company or the general corporation law" of any applicable state. (*Id.*)

11.     As is customary, pursuant to the Collateral Agreement Irrevocable Proxies and the Standalone Proxies (together, the "Irrevocable Proxies"), Agent contractually agreed that (i) it would not exercise its irrevocable proxy rights unless an "Event of Default" under the Credit

Agreement (each, an <u>Event of Default</u>") had occurred and was continuing,  and (ii) the Debtor and other Loan Parties would be permitted to exercise Agent's voting rights in the Pledged Equity, subject to certain express limitations,[5]  "[u]nless an Event of Default shall have occurred and be continuing  and the Agent shall have given notice to the relevant [Loan Party] of the Agent's intent to exercise its corresponding  [proxy] rights[.]" (Collateral Agreement, § 6.3(a).)[6] The Debtor does not dispute in the Motion,  and explicitly  acknowledged and agreed in the Forbearance Agreement described below, that numerous  incurable  Events of Default were continuing  at the time Agent exercised its proxy voting rights on December 21, 2022. (Forbearance Agreement, § 2(b), Annex A.) These continuing  Events of Default have in some cases existed for over a year and include payment defaults  as well as numerous  financial  covenant  and reporting  defaults. (Forbearance Agreement, Annex A.)

**B.    July 27, 2022 Forbearance Agreement Between the Lender Parties and Loan Parties**

12.    In an effort to address the Loan Parties' default situation  as well as growing liquidity  concerns, the Lender Parties and the Loan Parties (at the direction  of Falcon) entered into a *Forbearance Agreement and Sixth Amendment  to Credit Agreement*, dated as of July 27, 2022 (the "<u>Forbearance Agreement</u>", a copy of which is attached to the Guyette MTD Declaration as <u>**Exhibit 6**</u>). The Forbearance Agreement included,  among other things:

---

[5] Section 6.3(a) of the Collateral Agreement prohibits the Loan Parties from ever exercising the voting rights granted to Agent via irrevocable proxy in a manner that "could impair the Collateral or which would be inconsistent with or result in any violation of any provision of the Credit Agreement, this [Collateral] Agreement or any other Loan Document." (Collateral Agreement, § 6.3(a).)

[6] Likewise, each Standalone Proxy provides: "This proxy is issued pursuant to the [Collateral Agreement] . . . and shall remain subject to the terms thereof and Agent shall not exercise any right or privileges granted therein or herein unless and until the occurrence of the events set forth in [the Collateral Agreement] which authorize Agent, to do so pursuant to this proxy." (Standalone Proxies at 1.)

(a)     An express acknowledgement and agreement by the Debtor and each other Loan Party that numerous Events of Default were continuing and were incurable (Forbearance Agreement, § 2(b));

(b)     An express acknowledgment and agreement by the Debtor and each other Loan Party that such continuing Events of Default permitted the Lender Parties to, among other things, "take any other enforcement action or otherwise exercise any and all rights and remedies provided for by any or all of the Existing Credit Agreement, the other Loan Documents or applicable law" (*id*. § 2(c));

(c)     An agreement by the Lender Parties to temporarily forbear from exercising certain default-related rights and remedies with respect to specified Events of Default until no later than November 15, 2022[7] (the "Forbearance Period") (*id*. § 4);

(d)     An agreement by the Lender Parties to increase their revolving loan commitments by $1 million subject to Falcon entering into a sponsor guaranty of up to $4 million of Secured Obligations[8] (*id*. § 3(d); Annex B to Forbearance Agreement (the "Conformed Credit Agreement"), § 1.1 (Definition of "Revolving Loan Commitment"));

(e)     An agreement by the Lender Parties to convert from cash pay to "payment-in-kind" certain payments of interest, and to defer certain term loan repayments[9] (Conformed Credit Agreement, §§ 2.7.2, 2.11.2); and

(f)     An agreement by the Lender Parties and the Loan Parties to include certain milestones and related covenants concerning a Loan Party-run process to market and sell Community Investors' subsidiary, iHomefinder[10] (*id*. § 6.13).[11]

---

[7] Pursuant to the Forbearance Agreement, the Forbearance Period could be extended if the Loan Parties complied with certain iHomefinder sale milestones, but such milestones were not satisfied and the extensions were not triggered. (*Id*. § 4(a).)

[8] Falcon's payment obligation under such guaranty was triggered upon the filing of the Debtor's bankruptcy case. On December 30, 2022, Agent delivered to Falcon a demand for payment due in full fifteen business days hence; however, to date, Falcon has not made any payment on its guaranty in direct violation of its terms. (Supp. Guyette Decl. ¶ 12.)

[9] The Non-Debtor Borrowers converted approximately $3.2 million in interest payments from cash pay to "payment-in-kind" from April 2022 through November 15, 2022. (Supp. Maggiore Decl. ¶ 5.)

[10] The iHomefinder segment of the Non-Debtor Loan Parties' business focuses on providing a real estate search and marketing platform. (Supp. Maggiore Decl. ¶ 6.)

[11] The Forbearance Agreement also included a sale proceeds sharing agreement, whereby the Lender Parties agreed that proceeds of an iHomefinder sale above $50 million to which the Lender Parties were otherwise entitled under the mandatory prepayment provisions of the Credit Agreement could be retained by the Loan Parties and used for operations. (Conformed Credit Agreement, § 2.10.2(a)(v).)

13.    The Debtor does not dispute that the Forbearance Period terminated on November 15, 2022. (Mot. ¶ 12 (acknowledging November 15, 2022 as Forbearance Period outside date); *id.* ¶ 19 (stating November 16, 2022 was "the day after the Forbearance Agreement expired.").) Pursuant to the express terms of the Forbearance Agreement, the Debtor and other Loan Parties agreed that (i) upon termination of the Forbearance Period, the Lender Parties could thereafter exercise any and all rights and remedies under the Credit Agreement, any other "Loan Documents" (as defined in the Credit Agreement) or applicable law, (ii) any agreement to extend the Forbearance Period must be set forth in a writing signed by the Loan Parties and Lender Parties, and (iii) the Lender Parties made no assurances concerning any extension of the Forbearance Period or "any additional forbearance, waiver, restructuring or other accommodations." (Forbearance Agreement, §§ 4(b)-(d).)

14.    Although not necessary, one day after the expiration of the Forbearance Period, on November 16, 2022, Agent provided written notice to the Debtor and the other Loan Parties of the expiration of the Forbearance Period and expressly reserved all of the Lender Parties' rights and remedies under the Credit Agreement, the other Loan Documents (including the Irrevocable Proxies) and applicable law (the "<u>Forbearance Termination Notice</u>", a true and correct copy of which is attached to the Guyette MTD Declaration as **Exhibit 16**). The Forbearance Termination Notice further admonished that:

> *any discussions (whether written or oral) that have occurred or may occur* among the respective parties to the Credit Agreement and the other Loan Documents are not intended, and shall not be deemed or construed, to constitute, a waiver, *limitation or postponement* of any of the rights and remedies of Agent or any of the Lenders thereunder or under applicable law, all of which rights and remedies hereby are expressly reserved.

(Forbearance Termination Notice at 2 (emphasis added).)

**C.    The Loan Parties' Many Failed Attempts to Sell Their Businesses Over the Past Fifteen Months**

15.    The iHomefinder sale process contemplated by the Forbearance Agreement failed, but such failure was but the last of numerous failed attempts by the Loan Parties to sell all or portions of their businesses since 2021.

16.    In April 2021, the Loan Parties engaged GCA Advisors, LLC (later acquired by Houlihan Lokey) ("Houlihan") to commence a process to market and sell all of the Non-Debtor Loan Parties' businesses together. (Supp. Guyette Decl. ¶ 14.) Agent understands that the Loan Parties and Houlihan pursued transactions with at least three different potential buyers through May 2022, but each buyer walked away from the deal before signing a binding sale agreement. (*Id.*) The Lender Parties did not request or require that the Loan Parties pursue a sale process at that time, had no input regarding the choice of investment banker or the terms of its engagement, and had no involvement in the negotiations with potential buyers or their decisions to walk away from the deal. (*Id.*)

17.    The Loan Parties, under the control of Falcon, re-engaged Houlihan around April 2022 to market and sell the iHomefinder business. (Mot. ¶ 15; Supp. Maggiore Decl. ¶ 6.) The iHomefinder sale process—like the Loan Parties' previous sale attempts—failed when no buyer was willing to enter into any binding agreement for such sale. (Supp. Maggiore Decl. ¶ 6.) Aside from monitoring compliance with the Forbearance Agreement and receiving reports of matters related to the status of the sale process, the Lender Parties had no meaningful involvement in the iHomefinder sale process and had no involvement in discussions or negotiations with potential buyers. (*Id.*)

18.     In November 2022, Agent learned from Falcon that the Loan Parties had also been pursuing a sale of their "HOA" business.[12] (*Id*. ¶ 7.) However, Falcon later informed Agent that a potential HOA transaction had also fallen through prior to the interested party completing diligence. (*Id*.) The Lender Parties neither requested nor mandated that the Loan Parties pursue a sale of the HOA business, and had no involvement in the discussions and negotiations with the potential buyer. (*Id*.) Thereafter, Falcon and the Loan Parties informed Agent that no other meaningful sale opportunities existed. (*Id*.) Debtor admits in the Motion that, by early November 2022, "it became clear that [it] would be unable to raise capital through asset sales[.]" (Mot. ¶ 17.)

**D.     The Lender Parties, Falcon and the Loan Parties Reach an Impasse In Restructuring Negotiations, and Agent Exercises Proxy Rights to Appoint Independent, Non-Conflicted Boards at the Non-Debtor Loan Parties.**

19.     In the weeks leading up to the November 15, 2022 expiration of the Forbearance Period, and for more than a full month thereafter, Agent engaged in good faith restructuring negotiations with Falcon and the Loan Parties in an effort to address the existing Events of Default and what Falcon repeatedly stated were increasing liquidity concerns at the company. (Supp. Maggiore Decl. ¶ 9.) During this period, the Lender Parties provided numerous proposals and detailed term sheets, but none were acceptable to Falcon. (*Id*.) Falcon, for itself and purportedly on behalf of the Loan Parties, also made multiple restructuring proposals that were not acceptable to the Lender Parties. (*Id*.)

20.     As the negotiation process dragged on for many weeks and the risk of a short-term liquidity crisis (at least according to Falcon) loomed large, Agent took Falcon at its word that it would not agree—or permit the Loan Parties to agree—to restructuring terms even close to those

---

[12] Agent understands that the HOA business relates to the provision of SaaS-based software products including portal management, accounting software, payment functionality, security services, and other ancillary products serving homeowners associations. (*Id*. ¶ 8.)

proposed by the Lender Parties or invest any further capital into the Loan Parties unless the Lender Parties agreed to subordinate or otherwise compromise their first-priority secured claims. (*Id*. ¶ 10.)

21.     On multiple occasions during these restructuring discussions, representatives of Falcon and the Debtor advised Agent that the Secured Obligations materially exceeded the value of the Loan Parties (and thus the Debtor's equity value in Community Investors). For example, during a call on November 1, 2022, Irene Wang, a Managing Director of Falcon and, at the time, a director of the Non-Debtor Borrowers, stated that the combined value of the Non-Debtor Loan Parties' businesses was $40-50 million. (*Id*. ¶ 11.) On a subsequent call on November 7, 2022, Ms. Wang stated that she estimated the Secured Obligations to be around 1.5 times the value of the Loan Parties. (*Id*.) During the same call on November 7, 2022, Thomas Radford, the sole director of the Debtor, also asserted that it would not be possible to "sell the company for the value of the debt today." (*Id*.) Ms. Wang later reiterated on a call with Agent on November 23, 2022 that the combined value of the Loan Parties' businesses was worth just $40-50 million. (*Id*. ¶ 12.) During this call, Ms. Wang added that if the Lender Parties would not agree to a deal involving the subordination of some portion of the Secured Obligations, Falcon would be just as well-off filing the Loan Parties for bankruptcy. (*Id*.)

22.     At various points during this time period, Falcon and the Debtor requested that the Lender Parties enter into a new 30-day forbearance; however, in each instance Agent refused to agree to any forbearance extension or agreement, but nevertheless expressed a willingness to continue good faith negotiations in the hope of reaching a consensual restructuring. (*Id*.) For example, on December 5, 2022, Mr. Radford sent an email (a copy of which is attached to the Supplemental Maggiore Declaration as **Exhibit 2**) to Anthony Maggiore, a director at Agent,

"formally requesting a 30-day forbearance[.]" In response, on December 6, 2022, Mr. Maggiore

memorialized Agent's initial rejection of the Debtor's forbearance requests:

> Happy to connect over the phone live, but similar to my initial reaction this weekend our view remains that a forbearance is not needed to continue to advance discussions as well as a view that those negotiations should continue to proceed (we are in agreement there). *Do not believe a forbearance would change that and this is not a situation where we typically provide a waiver or forbearance absent a specific framework that we were working towards (similar to our message earlier this year when we negotiated the last forbearance).*

(*Id*. (emphasis added).)

23.    The absence of any forbearance extension or agreement was corroborated by Mr.

Radford in a December 18, 2022 email to Drew Guyette, a Senior Partner and Chief Credit Officer

at Agent, and Mr. Maggiore (a copy of which email is attached to the Supplemental Maggiore

Declaration as **Exhibit 3** and the Supplemental Guyette Declaration as **Exhibit 18**), in which Mr.

Radford stated that "the team is scratching their heads about *why a forbearance is not forthcoming*

*. . . Please let us know if there's anything else we can do to help get this 30 day extension / renewal*

*in place*." (Supp. Maggiore Decl. ¶ 15, Ex. 3; Supp. Guyette Decl. ¶ 15, Ex. 18 (emphasis added).)

24.    In the face of numerous failed sale attempts, several weeks of failed negotiations,

repeated admissions by Falcon and the Debtor that the Lender Parties were materially

undersecured, increasing liquidity concerns coupled with a lack of any commitment regarding a

capital infusion by Falcon or any other outside party, and veiled threats about a needless

bankruptcy, the Lender Parties concluded that the parties had reached an impasse on a consensual

restructuring and that there was an increasing risk that Falcon could take action consistent with its

self-interest but contrary to the best interests of the Loan Parties. (Supp. Maggiore Decl. ¶ 18.)

Concerns also rose among the Lender Parties—in part due to statements made by Falcon and the

Debtor—that the management of the Non-Debtor Loan Parties was growing anxious due to increasing liquidity concerns. (*Id.*)

25.     Based on the foregoing, on December 21, 2022, Agent delivered a written notice to each of the required notice parties under the Credit Agreement (including Falcon and the Loan Parties) (the "Pledge Exercise Notice," a true and correct copy of which is attached to the Guyette MTD Declaration as **Exhibit 17**), notifying such parties that, pursuant to the Irrevocable Proxies, (i) Agent, as duly authorized proxy and attorney-in-fact for the Debtor and applicable Non-Debtor Loan Parties, was effectuating written consents and resolutions (collectively, the "Written Consents") amending various bylaws, operating agreements, and other corporate governance documents to, among other things, replace the Falcon-controlled boards of directors of the Non-Debtor Loan Parties with new, independent and non-conflicted boards (collectively, the "Independent Boards"); (ii) the agreement of Agent to permit the Debtor and the other Non-Debtor Loan Parties to exercise voting and other rights in the Pledged Equity was permanently revoked, and (iii) only Agent was thereafter entitled to exercise such voting rights via the express terms of the Irrevocable Proxies.

26.     The Written Consents and related proxy rights described in the Pledge Exercise Notice became effective on December 21, 2022—almost a full week before the Petition Date. Since then, Agent understands that the Non-Debtor Loan Parties have continued to operate in the ordinary course of business subject to the governance of the Independent Boards. (Supp. Guyette Decl. ¶ 18.) The Independent Boards are comprised of four professionals who collectively have

over 100 years of experience in operating businesses and managing workouts, plus the Loan Parties' Falcon-appointed CEO.[13] (*Id.* ¶ 19.)

27.    None of the members of the Independent Boards is affiliated with any of the Lender Parties, and none of the Lender Parties holds any corporate governance, management or other roles with the Debtor or any of the other Loan Parties. (*Id.*) The Non-Debtor Loan Parties, under the governance of the Independent Boards, have engaged separate legal counsel and, since the appointment of the Independent Boards, the Lender Parties have only interacted with the Non-Debtor Loan Parties and their advisors on an arms-length basis consistent in all respects with a customary debtor-creditor relationship. (*Id.* ¶ 20.) Likewise, the Lender Parties are not compensating the Independent Board members, and the members of the Independent Boards have not entered into any agreements with any of the Lender Parties regarding insurance, indemnification or any other matters related to their appointment as directors or the governance of the Non-Debtor Loan Parties. (*Id.* ¶ 22.)

28.    The Independent Boards, not Agent, have full control and management authority over the Non-Debtor Loan Parties. (*Id.* ¶ 20.) Moreover, since Agent's exercise of proxy rights a week prior to the Petition Date, the Lender Parties have neither exercised any further proxy rights with respect to any Non-Debtor Loan Party nor taken any act to exercise collateral remedies, collect on their secured claims, or exercise control over the Non-Debtor Loan Parties. (*Id.* ¶ 23.)[14]

---

[13] Agent is aware that the Independent Board appointed the Loan Parties' existing CEO as their fifth member on December 21, 2022. (Supp. Guyette Decl. ¶ 21.)

[14] On January 23, 2023, at the request of the Non-Debtor Loan Parties, the Lender Parties entered into a *Second Forbearance Agreement*, pursuant to which, among other things, the Lender Parties gave the Non-Debtor Loan Parties access to additional revolving loan capacity and deferred certain principal and interest payments. Notably, this forbearance agreement imposed no additional covenants on the Non-Debtor Loan Parties other than customary access and information rights with respect to any business assessments completed by the companies' financial advisor. (*Id.* ¶ 24.)

## ARGUMENT

### I.    Agent's Prepetition Exercise of Proxy Rights Fully Complied with the Loan Documents.

29.    The Debtor's arguments that Agent's prepetition exercise of proxy rights did not comply with the Loan Documents, which the Debtor tellingly buried at the back of its Motion, are wholly unsupportable and highly misleading. Each is refuted by express provisions in the Collateral Agreement and the Standalone Proxies that the Debtor intentionally omitted from the Motion.

#### A.    The Irrevocable Proxy Provisions Unequivocally Granted Agent the Right as Attorney-in-Fact and Proxy to Enter Into the Written Consents.

30.    First, the express proxy language in both the Collateral Agreement and each Standalone Proxy expressly grants Agent the irrevocable right to exercise all voting rights of the Debtor and each Non-Debtor Loan Party in respect of the Pledged Equity during the continuance of any of the numerous undisputed Events of Default.

31.    Section 6.3(b) of the Collateral Agreement provides, in pertinent part, that:

> [i]f an Event of Default shall occur and be continuing, (a) the Agent shall have the right to . . . (ii) exercise, or permit its nominee to exercise, . . . any other rights, privileges or options pertaining to such [Pledged Equity] as if it were the absolute owner thereof . . . *and including with respect to the Pledged Equity, giving or withholding written consents of stockholders, partners or members* . . ., and (b) the Agent shall have the right, substantially concurrently with notice to the applicable Grantor,[15] to . . . (ii) exercise, or permit its nominee to exercise, all voting and other rights pertaining to such [Pledged Equity] as a holder of such [Pledged Equity], with full power of substitution to do so.

(Collateral Agreement, § 6.3(b)) (emphasis added).) Section 7.1(a) of the Collateral Agreement further provides that the Debtor and each Non-Debtor Loan Party:

---

[15] "Grantor" is defined in the Collateral Agreement to include the Debtor and each other Non-Debtor Loan Party. (Collateral Agreement, § 1.2.)

> hereby irrevocably constitutes and appoints the Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact and proxy with full irrevocable power and authority in the place and stead of such Grantor . . . for the purpose of carrying out the terms of this [Collateral] Agreement, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this [Collateral] Agreement . . . and, without limiting the generality of the foregoing, each Grantor hereby gives Agent the power and right, on behalf of such Grantor, *without notice to or assent by such Grantor*, to . . . (v)(1) vote the [Pledged Equity] in any manner the Agent deems advisable for or against all matters submitted or which may be submitted to a vote of shareholders, partners or members, . . . (4) take all such other actions with respect to [the Pledged Equity] authorized under <u>Section 6.3</u> or <u>6.7</u> of this [Collateral] Agreement or otherwise authorized by this [Collateral] Agreement or the other Loan Documents; [and] (vi) . . . (8) vote any right or interest with respect to any [Pledged Equity] . . . The Agent, as proxy, will be empowered and may exercise the irrevocable proxy to vote the [Pledged Equity] at any and all times, including but not limited to, . . . *any action by written consen*t[.]

(*Id.* § 7.1(a) (emphasis added).)

32.    The Debtor completely ignores and does not cite these incontrovertible provisions of the Collateral Agreement in its Motion—and it is not hard to understand why: they eviscerate the Debtor's argument as to the validity of the proxy exercise. As do the terms of the Standalone Proxies, each of which provides:

> Subject in each case to the limitations set forth in the [Collateral Agreement] . . . (i) the undersigned [Debtor or Non-Debtor Loan Party, as applicable] hereby irrevocably designates and appoints [Agent] . . . to represent it at all annual and special meetings of the holders of the Equity Interests (as defined in the [Collateral Agreement]) of [the applicable Non-Debtor Loan Party], *and (ii)* the undersigned [Debtor or Non-Debtor Loan Party, as applicable] hereby authorizes and empowers Agent, *to vote any and all Equity Interests owned by the undersigned [Debtor or Non-Debtor Loan Party, as applicable] or standing in its name*, and do all things which the undersigned might do if present and acting itself.

(Standalone Proxies at 1 (emphasis added).) The Debtor's claim in the Motion that the above language "solely contemplates that the [Standalone Proxies] shall be acted upon at a meeting of the shareholders and not by written consent" is highly misleading, bordering on an intentional misrepresentation. (Mot. ¶ 61.) As is evident from the above-quoted language (as opposed to the selective recitations and hyperbole tendered by the Debtor), each Standalone Proxy went so far as to separate out into two distinctly labelled clauses the independent rights of Agent to (i) represent the Debtor and other holders of Pledged Equity at shareholder meetings *AND* (ii) vote any and all Pledged Equity owned by the Debtor or other Loan Parties, including by written consent.

33.     In what can only be a cynical attempt to mislead the Court, the Debtor does not quote the clause (i) reference above *and shockingly replaces the critically important "and (ii)" reference with ellipses* so that the quoted language appears as though it was part of one continuous sentence. *Cf. Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 226-27 (S.D.N.Y. 2007) (criticizing party's "deeply misleading selective quotation as the ellipses employed by [party] entirely distort[ed] the meaning of the original document"), *aff'd*, 354 F. App'x 496 (2d Cir. 2009). Setting aside the highly troubling nature of such deliberate misrepresentations to the Court, the plain language of the Collateral Agreement and Standalone Proxies quoted above conclusively granted Agent the irrevocable power as proxy and attorney-in-fact to execute the Written Consents. The Motion should be denied for this reason alone.

**B.     Agent Complied With All Notice Provisions in the Loan Documents Concerning the Exercise of Proxy Rights.**

34.     The Debtor's related argument that Agent failed to comply with applicable notice provisions in the Loan Documents concerning the exercise of proxy rights (or somehow "underhandedly" provided notice) is equally specious. (Mot. ¶ 28.) The proxy voting rights granted

in Section 6.3(b)(a)(ii) of the Collateral Agreement have _no_ notice requirement with respect to Agent's right to:

> exercise, or permit its nominee to exercise, . . . any other rights, privileges or options pertaining to such [Pledged Equity] as if it were the absolute owner thereof . . . *and including with respect to the Pledged Equity, giving or withholding written consents of stockholders, partners or members* . . . and otherwise act with respect to the [Pledged Equity] as if Agent were the outright owner thereof[.]

(Collateral Agreement, § 6.3(b)(a)(ii) (emphasis added).) Likewise, Section 7.1(a) of the Collateral Agreement separately grants Agent irrevocable proxy rights to "vote the [Pledged Equity] in any manner the Agent deems advisable for or against all matters submitted or which may be submitted to a vote of shareholders, partners or members, as the case may be, . . . [and] vote any right or interest with respect to the [Pledged Equity]." (*Id*. § 7.1(a).) Section 7.1(a) also makes clear that Agent has the irrevocable right to exercise such proxy voting rights "*without notice to or assent by*" the Debtor or other Loan Parties. (*Id*.) None of the Standalone Proxies contains any separate and distinct notice requirements either; rather, such proxies simply incorporate by reference the "limitations set forth in the [Collateral] Agreement." (Standalone Proxies at 1.)

35.    Indeed, only redundant proxy rights language set forth in a different subsection of the Collateral Agreement, Section 6.3(b)(b), contemplates any notice at all be given to the Loan Parties, and that notice need only be given "substantially concurrently" with the corresponding proxy exercise pursuant to that Section. (Collateral Agreement, § 6.3(b)(b).) Given the expansive and unequivocal proxy rights granted to Agent pursuant to Sections 6.3(b)(a) and 7.1(a) of the Collateral Agreement and the Standalone Proxies, Agent need not rely on Section 6.3(b)(b) of the Collateral Agreement for the Written Consents to be effective. Indeed, if the proxy rights granted pursuant to Section 6.3(b)(b) never existed, the Written Consents would still be effective. However, while not required, Agent nevertheless did provide written notice to the Loan Parties'

designated notice parties "substantially concurrently" with the proxy exercise via the Proxy Exercise Notice.

36.     The Debtor's argument that Agent failed to comply with all applicable notice provisions relies exclusively on a separate section of the Collateral Agreement, Section 6.3*(a)*, which has nothing whatsoever to do with the exercise of proxy rights to appoint the Independent Boards and amend various Non-Debtor Loan Party bylaws and operating agreements. (Mot. ¶ 62.) Rather, that provision, which merely sets forth the conditions under which Agent agreed that the Debtor and other applicable holders of Pledged Equity—*not Agent*—were permitted to receive distributions and exercise voting rights, states in pertinent part:

> Unless an Event of Default shall have occurred and be continuing and the Agent shall have given notice to the relevant Grantor of the Agent's intent to exercise its corresponding rights pursuant to Section 6.3(b), each *Grantor* shall be permitted to receive all cash dividends and distributions paid in respect of the Pledged Equity. . . and to exercise all voting and other rights with respect to the [Pledged Equity] . . . .

(Collateral Agreement, § 6.3(a) (emphasis added).) None of Agent's irrevocable proxy rights is addressed by or contained in Section 6.3(a). In any event, while irrelevant to the disputed issues, Agent did in fact provide written notice to the Loan Parties of its intent to exercise proxy rights via the Proxy Exercise Notice almost a full week prior to the Debtor's bankruptcy filing. As such, there can be no legitimate dispute that as of the Petition Date, even the Agent's agreement to permit limited voting rights and distribution rights of the Debtor and other Loan Parties under Section 6.3(a) of the Collateral Agreement had been permanently revoked. (*Id.*)

**C.      Agent's Proxy Rights Are Irrevocable By Their Terms Until the Secured Obligations Are Repaid in Full, and Thus, Did Not Expire on May 25, 2022 Under DGCL Section 212(b) as Claimed by the Debtor.**

21

37.     The Debtor's final argument—the Irrevocable Proxies expired by their terms on May 25, 2022 under Section 212(b) of the Delaware General Corporation Law ("DGCL")—again shows the lengths the Debtor will go to mislead the Court in its Motion. Section 212(b) provides that a stockholder may authorize another person to act by proxy, "but no such proxy shall be voted or acted upon after 3 years from its date, *unless the proxy provides for a longer period*." 8 Del. C. 212(b) (emphasis added).

38.     The Debtor asserts in the Motion that "Section 7.1 of the Collateral Agreement does not expressly provide for a longer period" than the three-year presumptive proxy right term specified in Section 212(b) of the DGCL. This is patently false. The third-to-last paragraph of Section 7.1—which is literally in all capital letters—expressly provides:

> THE POWER-OF-ATTORNEY AND PROXY GRANTED HEREBY IS COUPLED WITH AN INTEREST *AND SHALL BE VALID AND IRREVOCABLE UNTIL THE SECURED OBLIGATIONS HAVE BEEN PAID IN FULL* (AS DEFINED IN THE CREDIT AGREEMENT) IN ACCORDANCE WITH THE PROVISIONS OF THE CREDIT AGREEMENT, THE OTHER LOAN DOCUMENTS OR OTHER GOVERNING DOCUMENTATION, AS APPLICABLE. . . . SUCH APPOINTMENT OF THE AGENT AS PROXY AND ATTORNEY-IN-FACT SHALL BE VALID AND IRREVOCABLE AS PROVIDED HEREIN *NOTWITHSTANDING ANY LIMITATIONS TO THE CONTRARY SET FORTH IN THE . . . ORGANIZATIONAL DOCUMENTS OF ANY GRANTOR OR ISSUER OR CORPORATE OR LIMITED LIABILITY COMPANY LAW, AS APPLICABLE, OF THE STATE OF DELAWARE,* THE STATE OF CALIFORNIA, THE STATE OF GEORGIA, OR ANY OTHER STATE OF ORGANIZATION OF ANY [NON-DEBTOR LOAN PARTY].

(Collateral Agreement, § 7.1(a) (emphasis added).) The Standalone Proxies also expressly provide that they "shall continue in full force and effect until the Secured Obligations are Paid in Full notwithstanding any time limitations set forth in the bylaws or other organizational documents of the [applicable Non-Debtor Loan Parties] or the general corporation law" of the applicable state. (Standalone Proxies at 1.)

39.     The foregoing provisions plainly extend the default three-year proxy term set forth in Section 212(b) of the DGCL. 8 Del C. § 212(b); *Hawkins v. Daniel*, 273 A.3d 792, 816-17 (Del. Ch. 2022) (recognizing that, although Section 212(b)'s default is three years, "a grantor thus can create a proxy with a longer or shorter duration"), *judgment entered*, (Del. Ch. 2022), *aff'd*, No. 184, 2022, 2023 WL 115854. The Irrevocable Proxies plainly did not expire in May 2022, despite the Debtor's unsupported assertions to the contrary.

**II.     The Relief Sought by the Debtor with Respect to the Automatic Stay is Procedurally Improper, and Agent and the Other Lender Parties Have Not, and Are Not, Violating the Automatic Stay.**

**A.     The Relief Sought in the Motion Requires an Adversary Proceeding.**

40.     The Debtor's automatic stay arguments initially fail as a procedural matter due to the Debtor's failure to file an adversary proceeding. It is beyond dispute that Debtor's equity interests in the Non-Debtor Loan Parties are limited to one single entity, Community Investors. (Organizational Chart; Collateral Agreement at Schedule 1.) Yet, the Debtor requests that the Court apply the automatic stay to all of the "Applicable Subsidiaries", *i.e.*, all of the Non-Debtor Loan Parties. (*See*, *e.g.*, Mot. at 5 (requesting Court order Agent to "cease exercising control over the Applicable Subsidiaries"); *id*. ¶ 31 (referring to Agent's purported "exercise of control over the Applicable Subsidiaries" as a stay violation); *id*. ¶ 43 (alleging that "[e]ach day that [Agent] is exercising control over the Applicable Subsidiaries in derogation of the Debtor's rights in its property is a fresh violation of the automatic stay.")

41.     Rule 7001(7) requires an adversary proceeding "to obtain an injunction or other equitable relief[.]" Fed. R. Bankr. P. 7001(7). A request to extend the automatic stay to non-debtors constitutes a request for such an injunction. *See*, *e.g.*, *In re Ream Props., LLC*, No. 1:15-bk-02980 MDF, 2017 WL 122985, at *2 (Bankr. M.D. Pa. Jan. 9, 2017) ("[F]or a third party to obtain the protection of the automatic stay, the party must file an adversary complaint requesting an

injunction[.]”);  *In re Hart*, 530 B.R. 293, 308-09 (Bankr. E.D. Pa. 2015) (litigation against non-debtor not stayed where debtor failed to “affirmatively request such relief by filing an adversary complaint seeking an injunction under § 105(a) to extend the automatic stay”).[16]

42.    Although the Debtor misleadingly titles the Motion as a request to “enforce” the automatic stay, it clearly seeks an extension of the automatic stay to non-debtors. The Court should not elevate the title of the Motion over the substance of the relief requested. Accordingly, the Motion should be denied on this procedural basis alone.

**B.    Agent Is Not in Violation of the Automatic Stay Because the Proxy Voting Rights Are Not Property of the Estate.**

43.    The Debtor bears the burden of proof to establish a violation of the automatic stay. *In re Marcus Hook Dev. Park, Inc.*, 143 B.R. 648, 658 (Bankr. W.D. Pa. 1992). The Debtor alleges that Agent’s purported “continuing attempts to exercise of [sic] control over the corporate governance of its operating subsidiaries violates the automatic stay because it is (i) an exercise of control over the Debtor’s primary assets, (ii) an act to collect a debt and (iii) an act to enforce a lien.” (Mot. at 3.) Here, the Debtor’s assertion that Agent has violated the automatic stay falters out of the gate because the voting rights at issue are not property of the estate under 11 U.S.C. § 541(a)(1) and applicable Delaware law.[17]

---

[16] Additionally, it is beyond dispute that the automatic stay does not apply to a debtor’s subsidiaries. *See, e.g.*, *In re Carr*, 645 B.R. 790, 804 (Bankr. E.D. Pa. 2022) (“bankruptcy protections are intended for debtors and not third-party entities, even wholly owned third parties”) (citations omitted); *In re Panther Mountain Land Dev., LLC*, 686 F.3d 916, 923 (8th Cir. 2012) (“the automatic stay does not, in general, apply to actions against parties who enjoy factual or legal relationships with a debtor, such as a debtor’s wholly owned subsidiaries”); *In re Slabicki*, 466 B.R. 572, 580 (B.A.P. 1st Cir. 2012) (automatic stay “does not extend to separate legal entities such as corporate affiliates”) (quotations and citations omitted); *In re Calvert*, 135 B.R. 398, 402 (Bankr. S.D. Cal. 1991) (nondebtor subsidiary is “a separate legal entity entitled to act through its duly constituted board and officers, even though those actions may have an effect on the value of shares of stock held by the estate of debtors.”).

[17] As an initial matter, as noted above, the Debtor has *never* had any voting or other governance rights—even prior to Agent’s proxy exercise—with respect to any of the “Applicable Subsidiaries” (*i.e.*, the Non-Debtor Loan Parties) aside from Community Investors, the Debtor’s sole direct subsidiary. (Organizational Chart; Collateral Agreement at Schedule 1.) Community Investors, and not the Debtor, is the direct or indirect shareholder of the other Non-Debtor Loan Parties. (*Id.*) Thus, Agent assumes that the Debtor’s references in the Motion to the voting and governance rights

44.    A violation of the automatic stay pursuant to sections 362(a)(3) and (a)(4) necessarily requires an act against "property of the estate." 11 U.S.C. § 362(a)(3) (prohibiting "any act to obtain possession of property *of the estate* or of property *from the estate* or to exercise control over *property of the estate*") (emphasis added); 11 U.S.C. § 362(a)(4) (prohibiting "any act to create, perfect, or enforce a lien against property *of the estate*") (emphasis added). Accordingly, a debtor's claim for violation of the automatic stay necessarily requires the property at issue to be property of the estate, as defined by 11 U.S.C. § 541. *See, e.g., In re Majestic Star Casino, LLC*, 716 F.3d 736, 748 (3d Cir. 2013) (debtor's efforts to pursue claims under section 362 are "dependent upon Code § 541, which provides that a bankruptcy estate succeeds only to 'legal or equitable interests of the debtor . . . as of the commencement of the case'") (quoting 11 U.S.C. § 541(a)(1)).

45.    Property of the estate is limited to the debtor's interests *as of the commencement of the case*. 11 U.S.C. § 541(a)(1); *see, e.g., In re Cybergenics Corp.*, 226 F.3d 237, 246 n.16 (3d Cir. 2000) ("the bankruptcy estate contains only the interests of the *debtor* in property as of the time of the bankruptcy filing, no more, no less") (original emphasis; internal quotations and citations omitted). A debtor's estate "cannot possess anything more than the debtor itself did outside bankruptcy," so "[w]hatever limitations on the debtor's property apply outside of bankruptcy apply inside of bankruptcy as well. A debtor's property does not shrink by happenstance of bankruptcy, but it does not expand, either." *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1663 (2019) (internal quotations and citations omitted; cleaned up); *see, e.g., Majestic Star*, 716 F.3d at 748 ("It is a given that the trustee or debtor in possession can assert no greater rights than

---

with respect to the "Applicable Subsidiaries" were intended to reference only such voting and governance rights in Community Investors.

the debtor himself had on the date the bankruptcy case was commenced.") (internal quotations and citations omitted; cleaned up); *In re Messina*, 687 F.3d 74, 82 (3d Cir. 2012) ("Filing for bankruptcy does not create new property rights or value where there previously were none."). Accordingly, the estate only includes property interests held by the debtor as of the petition date.

46.     Bankruptcy courts look to state law to determine the extent of a debtor's interest in property for purposes of section 541. *See, e.g., Butner v. United States*, 440 U.S. 48, 54 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law."); *Westmoreland Human Opportunities, Inc. v. Walsh*, 246 F.3d 233, 241 (3d Cir. 2001) ("[I]t is well-established that federal courts typically must look to state law in ascertaining the existence and scope of the debtor's 'legal or equitable interests' for purposes of § 541(a)(1)."); *Majestic Star*, 716 F.3d at 751. It is also well-settled that the filing of a bankruptcy case does not modify corporate governance rights as they existed prior to the petition date. *See, e.g., In re Indianapolis Downs, LLC*, 486 B.R. 286, 302 (Bankr. D. Del. 2013) ("It is axiomatic that the commencement of a Chapter 11 case does not suspend or displace non-bankruptcy law and contractual rights regarding corporate governance.") (citations omitted); *see also, e.g., In re K.G. IM, LLC*, 620 B.R. 469, 482 (Bankr. S.D.N.Y. 2020) ("Absent appointment of a chapter 11 trustee, [a debtor's] state law governance rights with respect to a Delaware LLC persist[.]"); *Tominaga v. Sherwood Invs. [Overseas] Ltd. (In re Tominaga)*, 325 B.R. 653 (Bankr. M.D. Fla. 2005) (lender, rather than debtor, retained voting rights in debtor's subsidiaries post-petition where proxies had been granted and exercised prepetition). Accordingly, the Debtor's bankruptcy filing did not somehow cause the voting rights in Community Investors to automatically re-vest with the Debtor.

47.     The governing law of the state in which a corporation is incorporated generally controls matters related to the internal corporate affairs of such corporation. *See, e.g., In re PA Co-Man, Inc.*, 644 B.R. 553, 584 (Bankr. W.D. Pa. 2022) (applying Delaware state law to conflict involving Delaware corporation, as "the law of an entity's state of incorporation applies to claims relating to the internal affairs of that corporation"). Likewise, disputes regarding proxy rights are governed by the state of incorporation of the corporation at issue. *See, e.g., Hawkins*, 273 A.3d at 810 n.21 ("To determine the law that governs a proxy arrangement, a court ordinarily looks to the law of the state of incorporation of the corporation whose shares are the subject of the arrangement.") Here, the Debtor and its sole direct subsidiary whose voting interests are at issue, Community Investors, are both Delaware corporations. Thus, Delaware law governs whether the voting interests in Community Investors were property of the estate as of the Petition Date. The Debtor appears to agree that Delaware law applies to these issues. (Mot. ¶¶ 61, 63 (discussing Delaware law and DGCL regarding the validity of the Irrevocable Proxies).)

48.     The principle that voting rights are transferred through an irrevocable proxy is fundamental under Delaware law. Pursuant to Section 212(b) of the DGCL, stockholders are explicitly entitled to "authorize another person or persons to act for such stockholder by proxy[.]" 8. Del. C. § 212(b). The DGCL further provides for the irrevocability of a voting proxy "if it states that it is irrevocable and if, and only as long as, it is coupled with an interest[.]" *Id.* § 212(e). [18] Here, as discussed below, the Collateral Agreement and Standalone Proxies clearly satisfy Section 212(b) of the DGCL.

---

[18] A lender's security interest in the stock underlying the voting rights transferred pursuant to an irrevocable proxy constitutes an interest for purposes of Section 212(e) of the DGCL. *Haft v. Haft*, 671 A.2d 413, 416 (Del. Ch. 1995) ("Under Section 212(e) of the Delaware General Corporation Law,…[t]he obvious first candidate for an 'interest' that would support the irrevocability of the proxy in this instance would be a security interest in the stock protecting [X's] right to be paid the principal amount of the Note, plus interest. The parties agree that a security interest in the stock itself would be sufficient to support an irrevocable proxy.") (internal quotations omitted).

49.     A Delaware court has very recently held that an irrevocable proxy *immediately* divests the grantor of the applicable voting interests. In *Hawkins*, the Delaware Court of Chancery had the opportunity to address the basic law underlying irrevocable proxies. The Chancery Court stated that a stockholder's grant of an irrevocable proxy was an "immediate transfer of voting power." 273 A.3d at 800; *see also id.* at 813 (noting that under the irrevocable proxy, the grantor "immediately gave up his voting power"). [19] Upon granting a proxy, "the principal gives up the power to terminate the agency relationship for the duration of the arrangement." *Id.* at 809. In affirming the ruling of the Chancery Court, the Delaware Supreme Court agreed that an "immediate transfer of voting power" occurred pursuant to the irrevocable proxy, which "free[d] the holder from the unilateral control of the grantor." *Daniel v. Hawkins*, No. 184, 2022, 2023 WL 115854, at *4, 13 (Del. Jan. 6, 2023) (internal quotations omitted). [20]

50.     Just so here. The prepetition grant of the irrevocable proxy rights pursuant to the Irrevocable Proxies *immediately* alienated the Debtor's voting rights in Community Investors as of the date they were granted (*i.e.*, May 15, 2019). Indeed, as discussed above, pursuant to the Collateral Agreement and the Standalone Proxies, the Debtor and each other Loan Party irrevocably appointed Agent as its attorney-in-fact and proxy to vote the Pledged Equity on May

---

[19] In *Hawkins*, the proxy language provided:

> The Stockholder hereby constitutes and appoints each Holder, during the term of this Irrevocable Proxy, as the Stockholder's true and lawful proxy and attorney-in-fact, with full power of substitution, to vote all of the Shares plus any additional Shares which Stockholder may own or hold as of the date of any such vote (and any all [sic] securities issued or issuable in respect thereof) which Stockholder is entitled to vote (collectively, the "Proxy Shares"), for and in the name, place and stead of the Stockholder, at any annual, special or other meeting of the stockholders of the Company, and at any adjournment or postponement thereof, or pursuant to any consent in lieu of a meeting or otherwise.

*Id.* at 814. This language is very similar to the language contained in the Collateral Agreement and the Standalone Proxies. (Collateral Agreement, §§ 6.3(b), 7.1(a); Standalone Proxies at 1.)

[20] Delaware courts have even explicitly recognized a lender's right to replace the board of directors of a company via irrevocable proxy pursuant to Section 212(b). *See, e.g.*, *Kirkland v. Int'l Comm. Corp.*, Case No. 7577, 1984 WL 8231 (Del. Ch. July 13, 1984).

15, 2019. (*Supra* ¶¶ 25, 31; Collateral Agreement, §§ 6.3(b), 7.1(a); Standalone Proxies at 1.) As is customary, Agent contractually agreed in the Collateral Agreement and each Standalone Proxy that Debtor and the other Loan Parties would be authorized to exercise the voting and other rights in the Pledged Equity, subject to certain limitations, and Agent would not exercise its irrevocable proxy rights, unless and until an Event of Default was then continuing and Agent had given notice to the applicable Loan Party of its intent to exercise such irrevocable proxy rights. (*Supra* ¶¶ 31-36; Collateral Agreement, § 6.3(a); Standalone Proxies at 1.) Accordingly, upon the delivery of the Pledge Exercise Notice a week before the Petition Date, the Agent's agreement to permit the Debtor's limited exercise of voting rights in Community Investors was permanently revoked and only Agent was thereafter authorized to exercise such voting rights. Because the Debtor no longer possessed authority to exercise voting rights in Community Investors as of the Petition Date, it had no interest in those voting rights, and they did not become estate property.

51.     It appears that only one court has considered the precise issue of whether voting rights in a debtor's non-debtor subsidiaries constitute property of the estate when such voting rights are subject to an irrevocable proxy in favor of a secured prepetition lender. However, that court held, in a case with strikingly similar facts, that such voting rights do *not* revert back to the estate as the result of a bankruptcy filing. In *Tominaga v. Sherwood Invs. [Overseas] Ltd. (In re Tominaga)*, 325 B.R. 653 (Bankr. M.D. Fla. 2005), the debtor had pledged his interest in the stock of several non-debtor corporations to a lender to secure a prepetition loan. Following events of default, the lender exercised its irrevocable proxies to replace the boards of directors of the non-debtor subsidiaries. *Id.* at 655-57. Eleven days later, the debtor filed a bankruptcy case and, thereafter, commenced an adversary proceeding seeking to "resume control" of the non-debtor corporations. *Id.* at 657-58. The Court found that the debtor was not entitled to such relief. *Id.* at

658. The prepetition transfer of the voting rights to the lender and the lender's exercise of those voting rights were valid under state law, and the debtor was not entitled to their return. *Id.* at 659-60. Moreover, "since the[] events occurred before [debtor] filed [the] bankruptcy case, the protection of the automatic stay did not apply." *Id.* at 660; *see also In re E. Bancorporation*, 23 B.R. 474, 482 (Bankr. E.D. Pa. 1982) (declining to "deny [lender] the rights it validly contracted for" to exercise rights to replace board prepetition).

52.    Similarly here, Agent validly and properly exercised its bargained-for, contractual, secured creditor remedies by exercising the Irrevocable Proxies almost a full week prior to the Petition Date. The grant of the Irrevocable Proxies, the occurrence of the Events of Default identified under the Pledge Exercise Notice, and the exercise of Agent's rights and remedies all occurred prepetition, and the Debtor did not have an interest in the voting rights in Community Investors as of the Petition Date. Accordingly, such voting rights are not—and have never been—property of the Debtor's estate.[21]

53.    The Debtor cites several cases attempting to establish that the voting rights in Community Investors constitute property of the estate despite the prepetition grant and exercise of the Irrevocable Proxies. (Mot. ¶ 36.) Each of those cases is inapposite. None involves—or even references—irrevocable proxies or the prepetition transfer of voting rights pursuant thereto. *See, e.g., In re Lee*, 524 B.R. 798, 805 (Bankr. S.D. Ind. 2014) (debtor's voting rights in LLC were property of estate, and other members' *post-petition* termination of such voting rights violated the

---

[21] At most, similar to *Tominaga*, the Debtor has a reversionary interest in the voting rights whereby, following payment in full of the Secured Obligations, the voting rights would be released to the Debtor. However, as noted in *Tominaga*, even despite any such limited reversionary interest, while the existing Events of Default continue and until the Secured Obligations are paid in full, Agent is the rightful holder of the voting interests. *Tominaga*, 325 B.R. at 660. Indeed, in *Tominaga*, the court went so far as to say that the lender could rightfully "control the operations" of the non-debtor subsidiaries during the bankruptcy case. Here, Agent has not exercised, and is not seeking to exercise *any* control over the Non-Debtor Loan Parties (let alone the Debtor); instead, the Non-Debtor Loan Parties are under the control only of the Independent Boards.

automatic stay); *In re Cardinal Indus.*, 105 B.R. 834, 850 (Bankr. S.D. Ohio 1989) (debtor's interest in partnership was property of the estate, though partnership itself was not protected by automatic stay); *In re Plunkett*, 23 B.R. 392, 394 (Bankr. E.D. Wis. 1982) (debtor's contractual right to manage partnership property was property of the estate and *post-petition* attempt to terminate such right violated stay). The burden is on the Debtor to establish a violation of the automatic stay, *but it has not cited a single case* holding that voting rights validly transferred prepetition to a secured lender pursuant to an irrevocable proxy become property of the estate.

54.    For these reasons, the Debtor has not demonstrated that Agent or any of the other Lender Parties have violated sections 362(a)(3) or (a)(4) of the Bankruptcy Code, because it has not established that the voting interests in Community Investors (or, obviously, any of the other Non-Debtor Loan Parties which are not wholly-owned by the Debtor) are property of the estate.

### C.    Agent Has Not Violated the Automatic Stay Because It Has Not Taken Any Post-Petition, Affirmative Acts Against the Debtor or Its Estate Property.

55.    The Debtor also has not satisfied its burden to establish a violation of the automatic stay because it has not established, or even alleged, the occurrence of any post-petition, affirmative acts by Agent or any of the Lender Parties. Only *post-petition* "acts" against the Debtor or its estate are enjoined. 11 U.S.C. §§ 362(a)(3) (prohibiting "any act" to "exercise control over property of the estate"), (a)(4) (prohibiting "any act" to "enforce any lien against property of the estate"), (a)(6) (prohibiting "any act to collect, assess, or recover a claim against the debtor").

56.    Moreover, the Third Circuit clearly requires the post-petition conduct to be an "*affirmative* act." *Denby-Peterson*, 941 F.3d at 125-26 (emphasis added); *see also*, *e.g.*, *Pardo v. Nylcare Health Plans, Inc. (In re APF Co.)*, 274 B.R. 408, 416 (Bankr. D. Del. 2001) ("automatic stay applies by its terms only to affirmative post-petition acts"); *In re Margavitch*, Adv. No. 5:20-00014-MJC, 2021 WL 4597760, at *6 (Bankr. M.D. Pa. Oct. 6, 2021) (§§ 362(a)(3)-(6) "all begin

with the phrase: 'any act to….' Therefore, it logically follows that an *affirmative post-petition 'act'* is necessary to constitute a violation of those subsections.") (emphasis added). Because an affirmative, post-petition act is a critical element of an automatic stay violation, a prepetition action "cannot of itself violate the automatic stay." *APF Co.*, 274 B.R. at 416-17. As discussed above, *all* of the actions necessary to consummate the exercise of the pledged voting rights took place prepetition.

57.     The Motion, to be sure, *does not identify a single post-petition or affirmative action taken by Agent or any of the Lender Parties*. In fact, the Debtor expressly concedes that the complained-of actions occurred *prepetition*. (Mot. at 2 (acknowledging proxy exercise occurred "December 21, 2022"); *id*. ¶ 28 (same).) Agent's exercise of the pledged voting rights to replace the boards of Community Investors and the other Non-Debtor Loan Parties with the Independent Boards both began and ended on December 21, 2022, almost a full week *prior* to the Petition Date. Since that date, Agent and the other Lender Parties have not taken <u>any</u> actions against Community Investors or the other Non-Debtor Loan Parties, and have only interacted with them on an arms-length basis consistent in all respects with a customary debtor-creditor relationship. (Supp. Guyette Decl. ¶ 23.) Moreover, any implication that Agent "controls" Community Investors or the Non-Debtor Loan Parties themselves is simply factually inaccurate. The Independent Boards, and not Agent, have full control and management authority of the Non-Debtor Loan Parties. (*Id*. ¶ 20.)

58.     In addition, even if the voting interests were deemed property of the estate (which they are not), Agent has not violated the automatic stay because, in accordance with binding Third Circuit precedent, the mere "retention of possession" of estate property *cannot* form the basis for a violation of the automatic stay. *Denby-Peterson*, 941 F.3d at 126. In *Denby-Peterson*—which

the debtor misleadingly contends provides support for its own flawed position[22]—a secured creditor had repossessed a vehicle prepetition. *Id.* at 119. The debtor claimed that the creditor's failure to return the vehicle to the estate following commencement of his bankruptcy case constituted a violation of the automatic stay as an act to exercise control over property of the estate. *Id.* at 123-24. Recognizing that "one of the automatic stay's primary purposes is *to maintain the status quo* between the debtor and [his] creditors," the Third Circuit held that a violation of the automatic stay not only requires a "post-petition" act, but also an "affirmative" act. *Id.* at 125-26 (original emphasis; internal quotations and citations omitted). The statutory language of section 362 "is prospective in nature . . . the *exercise* of control is not stayed, but the *act* to exercise control is stayed." *Id.* at 125 (original emphasis; internal quotations and citations omitted). Accordingly, the Third Circuit held:

> [P]ost-bankruptcy petition, the creditors merely passively retained that same possession and control. Although the creditors exercised control over the [vehicle] by keeping it in their possession after learning of the bankruptcy filing, the requisite post-petition affirmative 'act ... to exercise control over' the [vehicle] is not present[.]

*Id.* (quoting 11 U.S.C. § 362(a)(3)). Other courts are in accord. *See, e.g., Welded Constr., L.P. v. Williams Cos., Inc. (In re Welded Constr., L.P.)*, 609 B.R. 101, 127 (Bankr. D. Del. 2019) ("To violate the automatic stay, a post-petition act must be affirmative rather than merely passive."); *Margavitch*, 2021 WL 4597760, at *6 (finding no stay violation where defendants "took no post-petition affirmative actions" but merely "maintain[ed] the status quo as of the petition date").

59.     The Debtor deals with *Denby-Peterson* by ignoring it. It instead misleadingly tells the Court that "[e]ach day that [Agent] is exercising control over the Applicable Subsidiaries . . . is a fresh violation of the automatic stay." (Mot. ¶ 43.) *Denby-Peterson* makes that argument

---

[22] (Mot. ¶ 47.)

frivolous. Neither of the two cases the Debtor cites helps its cause. *City of Chicago, Ill. v. Fulton*, 141 S. Ct. 585 (2021), actually supports Agent's position, as it held that "mere retention of property" does not violate § 362(a)(3), which "prohibits affirmative acts that would disturb the status quo of estate property as of the time when the bankruptcy petition was filed." *Id*. at 589-90. The district court's decision in *In re THGH Liquidating LLC*, No. 19-2215-RGA, 2020 WL 5409002 (D. Del. Sept. 9, 2020), is similarly unhelpful to the Debtor. The court considered whether the government violated the stay by withholding from the debtor Medicare payments for *post-petition* services. *Id*. at *3-4. Distinguishing *Denby-Peterson*, the Court held that the government's refusal to provide payment for services performed by the Debtor *post-petition* did not equate to a retention of possession of the debtor's prepetition property—which is permitted under *Denby-Peterson*—but instead constituted an affirmative act over estate property. *Id*. at *5. *THGH* does not resemble this case.

60.    For these reasons, the Debtor has failed to demonstrate that either Agent or any of the other Lender Parties has violated the automatic stay in any respect, including under sections 362(a)(3), (4) or (6) of the Bankruptcy Code.

**D.    Additional Authority Cited by the Debtor Does Not Control—or Even Apply to—the Issues Raised in the Motion with Respect to the Automatic Stay.**

61.    The Debtor confidently asserts that courts have "consistently held in several contexts" that conduct similar to Agent's violates the automatic stay (Mot. ¶ 37), but fails to cite a single case involving a secured creditor's valid prepetition exercise of an irrevocable proxy. Instead, the Debtor cherry-picks quotes taken completely out of context from cases involving only *post-petition* actions, and then describes those cases in utterly misleading ways. One such example is Debtor's discussion of *In re Marvel Entm't Grp.*, 209 B.R. 832 (D. Del. 1997). The Debtor asserts that, in *Marvel*, bondholders and an indenture trustee were required to obtain relief from

the stay to exercise voting rights in the debtor's subsidiaries. (Mot. ¶ 38.) But that is far from the whole story.

62.     *Marvel* did not involve the *prepetition* exercise of proxy voting rights in non-debtors. Instead, the case involved a committee of bondholders whose claims were secured by a pledge by the debtor's holding companies (who were also debtors) of stock in the debtor. The bondholders had not exercised their voting rights in the stock prepetition, but instead sought and obtained relief from the stay to foreclose on and vote the stock *post-petition*. *Marvel*, 209 B.R. at 834. After the bondholders obtained relief from the stay, they notified the debtor of their intent to replace its board of directors. *Id.* at 835. The debtor commenced an adversary proceeding seeking to enjoin the proposed action. *Id.* The bankruptcy court held that the bondholders needed to obtain further relief from the stay to prior to a post-petition exercise of the voting rights to replace the board of directors, but the district court disagreed. *Id.* at 838-40.

63.     In reversing the bankruptcy court, the district court held that "the automatic stay provisions of the Bankruptcy Code are not implicated by the exercise of shareholders' corporate governance rights" and held that, although the bondholders could not exercise their voting rights in order to "effect a recovery" on their claims, "it would be inappropriate to apply the automatic stay merely because of speculation that a new board elected by the bondholders might take some action that would violate the automatic stay. Should [the] new board…attempt to take any action that would run afoul of § 362(a), they can be enjoined from doing so." *Id.* Thus, not only did the district court in *Marvel not* prohibit the bondholders from exercising their voting rights, it actually recognized the bondholders' authority (without obtaining any further relief from the stay) to vote the stock post-petition (an action much more extreme than what the Debtor has alleged of Agent). So, the Debtor's characterization of *Marvel* is highly misleading.

64.    So, too, is the Debtor's gloss on *In re Texas Rangers Baseball Partners*, 434 B.R. 393 (Bankr. N.D. Tex. 2010), as it again omits critical details about the case that clearly distinguish it from the facts here. In that case, the debtor's equity holders had executed a pledge agreement with JPMorgan Chase Bank, N.A. ("Chase") pursuant to which, upon default, Chase could control the equity holder's interests in the debtor, as well as sale approval rights as to the Rangers baseball team, which the debtor owned and operated. *Id*. at 399. The debtor proposed a plan entailing a sale of the Rangers, and Chase objected, arguing that it controlled the voting rights of the equity holders and was required to approve a sale. *Id*. at 399-400.

65.    *Texas Rangers* did not involve the prepetition exercise of remedies or even touch on the valid prepetition exercise of an irrevocable proxy. Instead, the case involved a *postpetition* attempt by a lender to exercise its pledge rights *against a debtor*. Further, the court found that the lender had effectively sat on its hands during the proceedings by allowing the debtor's equity holders to run an entire sale process, failing to dispute the equity holder's authority to cause the commencement of the debtor's case, and filing involuntary cases against the equity holders (rather than voluntary cases pursuant to their own asserted authority to control such equity). *Id*. at 404. The facts of *Texas Rangers* are simply not analogous to the case at hand.

66.    The Debtor's reliance on *In re Bicoastal Corp.*, No. 89-8191-8P1, 1989 WL 607352 (Bankr. M.D. Fla. Nov. 21, 1989), is also misplaced. There, the debtor's lender—who had not exercised remedies prepetition—requested relief from the automatic stay to replace the board *of the debtor post-petition*, such that the creditor would control the operation of the debtor "to assure that [its] promissory note [was] repaid." *Id*. at *5. The court noted this would violate the automatic stay. *Id*. *Bicoastal* could not be more different than this case. Unlike in *Bicoastal*, Agent only

exercised its voting rights prepetition, and has not attempted to take any action against the Debtor post-petition. Moreover, the Independent Boards are not under Agent's control as a factual matter.

67.    The Debtor's citation to *In re MTE Holdings LLC*, No. 19-12269 (KBO) (Bankr. D. Del. Dec. 19, 2019), is similarly unhelpful. There, the lender had attempted prepetition to exercise its proxy rights granted by the debtor to replace the board of directors of the debtor's subsidiary. (*MTE Holdings*, Transcript of December 13, 2019 Omnibus Hearing [Dkt. No. 12-3], a copy of which is attached to Motion as Exhibit B.) However, the court found that the prepetition proxy exercise had not complied with the underlying loan documents, and therefore the debtor had not been "divested" of its voting interests in its subsidiary as of the time of its bankruptcy filing. *Id*. at 60-62. Given that the lender in *MTE* had never actually obtained the right to vote the equity, the voting rights in that instance were property of the estate, and any post-petition attempt to exercise such voting rights would violate the automatic stay. *Id*. at 63-64 (specifying that the debtor was able to exercise its voting rights "*until* the lender could validly exercise its contractual rights" under the pledge agreement, which it had failed to do as of the petition date) (emphasis added). *MTE* is fully distinguishable from this case. Here, there is no doubt (as discussed above) that the Debtor was "divested" prepetition from its voting rights. Thus, the voting rights are not property of the estate. Even if they were, Agent has not attempted to exercise the voting rights post-petition.

68.    In short, the Debtor can neither evade the controlling holding of *Denby-Peterson* nor shoehorn this case into the facts of *Marvel*, *Texas Rangers*, *Bicoastal* and *MTE* by way of misleading legal argument and misdirection on the incontrovertible facts. There is no automatic stay violation here.

**III.    The Debtor's Request for Turnover under 11 U.S.C. § 542(a) Is Procedurally Improper and Should Be Denied on the Merits in Any Event.**

**A.    A Request for Turnover Pursuant to Section 524(a) Requires an Adversary Proceeding.**

69.    The Debtor next asks this Court to order turnover of the "corporate governance rights" in the Non-Debtor Loan Parties[23] pursuant to 11 U.S.C. § 542(a). (Mot. ¶¶ 45-50.) The Court should deny this relief on both procedural and substantive grounds.

70.    Before even reaching the merits of the Debtor's argument, the requested turnover relief is procedurally infirm because it can only be sought via an adversary proceeding, as discussed above. Rule 7001(1) explicitly defines "adversary proceedings" to include "a proceeding to recover money or property, other than a proceeding to compel the debtor to deliver property to the trustee, or a proceeding under § 554(b) or § 725 of the Code, Rule 2017, or Rule 6002." Fed. R. Bankr. P. 7001(1).

71.    The Third Circuit in *Denby-Peterson* confirmed that a request for turnover of property to the estate pursuant to section 542(a) falls squarely within the scope of this Rule. In *Denby-Peterson* (which the Debtor itself cites in support of its turnover argument), the Third Circuit held that the "turnover provision *requires* the debtor to bring an adversary proceeding in Bankruptcy Court in order to give the Court the opportunity to determine whether the property is subject to turnover under Section 542(a)." 941 F.3d at 128 (emphasis added). Thus, in accordance with Rule 7001(1), the debtor can only initiate a turnover proceeding by "(1) filing a complaint in the Bankruptcy Court and (2) serving a creditor with a copy of the complaint." *Id*. at 129. Given

---

[23] Again, even if the Court were to ultimately rule that the voting rights with respect to the Debtor's lone direct subsidiary, Community Investors, are property of the estate and must be turned over to the Debtor under Section 542(a), no legal basis exists (and the Debtor cited none in the Motion) for the turnover of the voting rights of the other Non-Debtor Subsidiaries, each of which is a direct or indirect subsidiary of *non-debtor Community Investors*, not the Debtor. Accordingly, the Debtor's requested turnover of the voting rights of such Non-Debtor Loan Parties should be denied in any event, as the Debtor has never had any interest in such voting rights.

the foregoing, it is no surprise that all of the actual turnover cases the Debtor cites in the Motion were filed as adversary proceedings. (Mot. ¶¶ 47-49.) Accordingly, the Debtor's request for turnover should be denied on this procedural ground alone.

**B.    Legal Standard for Turnover Requests.**

72.    The Debtor's request for turnover should also be denied on the merits. To be entitled to a turnover of property under section 542(a), it is the debtor's burden to establish that (i) the property of the estate at issue "can be used in accordance with section 363 of the Bankruptcy Code," (ii) such property is in the "possession, custody, or control" of the party from whom turnover is sought, and (iii) such property is not of "inconsequential value or benefit to the Debtor's estate." *Zazzali v. Minert (In re DBSI, Inc.)*, 468 B.R. 663, 669 (Bankr. D. Del. 2011).

73.    Although section 542(a) does not explicitly use the term "property of the estate," courts in the Third Circuit and around the country have confirmed that "[t]he essential element of a turnover action is that the property sought . . . is, in fact, property of the estate." *Seitz v. 6130 W., LLC (In re Joey's Steakhouse, LLC)*, 474 B.R. 167, 188 (Bankr. E.D. Pa. 2012); *see also Denby-Peterson*, 941 F.3d at 129 ("the turnover provision explicitly limits the right to turnover to estate property"); *Shuman v. Kashkashian (In re Shuman)*, 277 B.R. 638, 654 n.8 (Bankr. E.D. Pa. 2001) ("[o]nly property in which the debtor has an interest that properly becomes part of the bankruptcy estate can be made the subject of an order for turnover under section 542(a)") (cleaned up)); *LaMonica v. CEVA Grp. PLC (In re CIL Ltd.)*, 582 B.R. 46, 116 (Bankr. S.D.N.Y. 2018), *amended on reconsideration*, Adv. Proc. No. 14–02442–JLG, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018) ("A turnover action under section 542 of the Bankruptcy Code applies only to property that belongs to the estate.").

**C.    The Debtor Cannot Establish an Entitlement to Turnover of the Proxy Rights Under 11 U.S.C. § 542.**

74.     The Debtor cannot carry its burden under Section 542(a) for at least three independent reasons. *First*, the voting rights in Community Investors were not property of the Debtor's estate as of the Petition Date. As discussed above, whether certain assets are property of the estate in this case is governed by state law (here, Delaware law). (*Supra* ¶¶ 46-48.) *See also Westmoreland*, 246 F.3d at 241. More than three years ago at the time of the closing of the Prepetition Credit facility, the Debtor irrevocably transferred to Agent, pursuant to the Collateral Agreement and Standalone Proxies, all of its voting rights with respect to the equity of Community Investors. (Collateral Agreement, §§ 6.3(a)-(b), 7.1(a); Standalone Proxies at 1.) Under Delaware law, stockholders are explicitly entitled to "authorize another person or persons to act for such stockholder by proxy[.]" 8. Del. C. § 212(b). As discussed above, the DGCL further provides for the irrevocability of a proxy if it is (i) irrevocable and (ii) coupled with an interest. *Id*. § 212(e). The Irrevocable Proxies here easily satisfy both statutory requirements because all proxies were prominently labeled as irrevocable on their face (Collateral Agreement, §§ 6.3(b), 7.1(a); Standalone Proxies) and were coupled with an interest in the form of the Secured Obligations and the Agent's security interest in the Pledged Equity securing repayment thereof. (Collateral Agreement, § 3.) *See also Haft*, 671 A.2d at 416 (confirming security interest in stock is sufficient to create the "interest" necessitated to make a proxy irrevocable); *Zlotnick v. Acad. Sys. Mgmt. Corp.*, No. 3344, 1971 WL 1716, at *3 (Del. Ch. Oct. 5, 1971) (irrevocable proxy given as security pursuant to agreement created in proxy holder "a sufficient interest to support the power and to make the proxy irrevocable").

75.     Consistent with Section 212 of the DGCL, Delaware courts have long recognized that voting rights can be fully alienated from the stock. *See, e.g., Haft*, 671 A.2d at 421-22 (discussing purpose of strict requirements for irrevocable proxies given that proxies "split the

power to vote from the residual ownership claim of the stockholder" and free the holder "from the unilateral control of the grantor"). Indeed, as further discussed above, Delaware courts have recently confirmed that irrevocable proxies divest the grantor of the applicable voting interests at the time of the granting such rights. *Hawkins*, 273 A.3d at 800 (stockholder's grant of an irrevocable proxy was an "immediate transfer of voting power"); *Daniel*, 2023 WL 115854, at *4, 13 (Delaware Supreme Court confirming that "immediate transfer of control" occurred pursuant to the irrevocable proxy, which "frees the holder from the unilateral control of the grantor"). Relying on these tenets of corporate law, the bankruptcy court in *Tominaga* held that voting rights that have been transferred by the debtor prepetition, including via irrevocable proxy, do not constitute property of the debtor's estate. *Tominaga*, 325 B.R. at 660 (debtor "failed to demonstrate any basis for turnover" where lender validly exercised voting rights prepetition pursuant to irrevocable proxy).

76.    *Second*, the mere existence of a bona fide dispute concerning whether the voting rights at issue are property of the estate requires denial of the Debtor's requested turnover. Courts in the Third Circuit have consistently held that "[a]n action for turnover is not appropriate where there is a legitimate dispute about the ownership of property the movant seeks to recover." *Welded Constr.* 609 B.R. at 125 (dismissing turnover action where ownership of funds in question was subject of bona fide dispute); *see also Miller v. Greenwich Cap. Fin. Prods., Inc. (In re Am. Bus. Fin. Servs., Inc.)*, 361 B.R. 747, 761 (Bankr. D. Del. 2007) (dismissing "premature" turnover claims under section 542 where title to property was in dispute and depended on validity of other pending claims); *The Official Comm. of Unsecured Creditors of Champion Enter., Inc. v. Credit Suisse (In re Champion Enter., Inc.)*, No. 09-14014 (KG), 2010 WL 3522132, at *23 n.24 (Bankr. D. Del. Sept. 1, 2010) ("[a]n action for turnover must be based on a debtor's undisputed ownership

interest"); *Joey's Steakhouse*, 474 B.R. at 188 (turnover action "not proper where a bona fide dispute exists"). As discussed herein, Agent vehemently maintains that the Debtor's voting rights at issue belonged to it, rather than the Debtor, as of the Petition Date. Thus, because there is *at the very least* a bona fide dispute concerning whether the voting rights constituted property of the Debtor's estate as of the Petition Date, the Court must deny the Debtor's request for turnover.

77.     *Third*, even if the Court were to determine that the voting rights in Community Investors are property of the estate, such rights are still not subject to turnover under section 542(a) because the Debtor cannot establish (and has not even alleged) that they have anything more than "inconsequential value or benefit" to the estate. 11 U.S.C. § 542(a); *see also DBSI*, 468 B.R. at 669 (dismissing turnover claim where debtor failed to make factual allegations that property sought had "*any* proposed use, benefit or value") (original emphasis). As discussed above, representatives of both the Debtor and its indirect equity owner Falcon repeatedly admitted that the value of the Pledged Equity was unquestionably zero. (Supp. Maggiore Decl. ¶¶ 11-12.) For example, as recently as just a few weeks prior to the Petition Date, Ms. Wang, then Non-Debtor Loan Party director and Falcon representative, admitted to Agent that the combined value of the Non-Debtor Loan Parties was $40-$50 million dollars compared to $74 million of Secured Obligations (and growing) owed to the Lender Parties. (*Id.* ¶ 11.) Mr. Radford, the Debtor's sole director, concurred with Ms. Wang, admitting that it would be impossible to sell the Loan Parties for the value of their debt at that time. (*Id.*) Indeed, based on the foregoing admissions, the equity value of the Non-Debtor Loan Parties would need to increase by tens of millions of dollars for the Debtor's equity interests in Community Investors to rise past "inconsequential value." In the face of these recent admissions regarding the value of the Non-Debtor Loan Parties' entire business enterprise, the Debtor (or Falcon) should not be permitted to now assert that the Debtor's equity interest in its

sole direct subsidiary, Community Investors, is now miraculously worth more than "inconsequential value."[24] The fact that the Debtor and the other Non-Debtor Loan Parties, with the assistance of Houlihan, have tried, but failed, to sell their businesses on multiple occasions over the past fifteen months only reinforces the admissions of Falcon and the Debtor that the Debtor's equity interests in Community Investors currently have no value at all. (*Id.* ¶¶ 6-7.)

78.    Each of the cases cited by the Debtor in support of its request for turnover—none of which addresses proxy voting rights at all—is highly distinguishable from the present case (and in some cases even support Agent's positions herein), and thus does not move the needle. (Mot. ¶¶ 47-49.) *See*, *e.g.*, *Denby-Peterson*, 941 F.3d at 129-30 (simply confirming that turnover provision must be brought through adversary proceeding); *In re Ayscue*, 123 B.R. 28 (Bankr. E.D. Va. 1990) (compelling creditor to turn over share certificates it possessed purely for purposes of perfecting its prepetition interest in the shares); *In re Garrison*, 462 B.R. 666 (Bankr. W.D. Ark. 2011) (ordering turnover of stock certificate by bank where its lien had not existed as of the petition date); *In re Corda*, No. 16-13645-FJB, 2021 WL 3669370 (Bankr. D. Mass. Aug. 18, 2021) (dealing with post-petition transfer of contract rights).[25] Indeed, none of these cases required turnover or even has any bearing on whether the turnover of Agent's irrevocable proxy voting rights is warranted.

79.    Based on the foregoing, Agent respectfully submits that all turnover relief requested by the Debtor should be denied.

---

[24] Since the Debtor's estate is comprised of one creditor, the Lender Parties (which hold a $74 million secured claim against no net asset value), the turnover of Agent's proxy voting rights would also, by definition, not otherwise benefit the Debtor's estate.

[25] The Debtor also cites Justice Sotomayor's concurring opinion from *Fulton*, 141 S. Ct. 585. (Mot. ¶ 48.) A discussion of that case is not warranted since the majority opinion—not the concurring opinion cited by the Debtor—expressly stated that "we need not decide how the turnover obligation in § 542 operates." *Fulton*, 141 S. Ct. at 592.

**IV.    The Equitable Estoppel Doctrine Cannot Unwind Agent's Prepetition Exercise of Proxy Rights, and N.Y. Gen. Oblig. Law § 15-301 Precludes the Debtor From Arguing Any "De Facto" Forbearance Agreement Exists.**

80.    The Debtor next contends in the alternative that Agent should be "equitably estopped" from exercising any remedies under the Credit Agreement. (Mot. ¶¶ 51-59.) The Debtor cites no case, statute or other law to support such a sweeping retroactive application of the equitable estoppel doctrine, nor does any such legal support exist. Equitable estoppel is a defense doctrine that was developed to "preclude a person from asserting a right after having led another to form the *reasonable* belief that the right would not be asserted, and loss or prejudice to the other would result if the right were asserted." *Matter of Shondel J. v. Mark D.*, 7 N.Y.3d 320, 326 (2006) (emphasis added); *see also Nassau Tr. Co. v. Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175, 184 (1982) (stating that courts apply the equitable estoppel defense "to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought") (citations omitted).[26] Thus, the Debtor cannot use equitable estoppel to unwind Agent's *prepetition* exercise of proxy rights because such defense can only be invoked to prevent *future* assertions of rights. *Vill. of Ossining v. Lakin*, 160 N.Y.S.2d 1012, 1014 (1957).

81.    Furthermore, the Debtor has not alleged facts sufficient to justify equitable relief from the Court in any form, and utterly fails to carry its burden either that Agent agreed to a "de facto" forbearance extension or that the Debtor somehow justifiably relied on any such purported unwritten forbearance agreement. *Club Haven Inv. Co., LLC v. Capital Co. of Am., LLC*, 160 F. Supp. 2d 590, 592 (S.D.N.Y. 2001) ("party seeking to invoke equitable estoppel must show

---

[26] The Credit Agreement and the Forbearance Agreement are both governed by New York law. (Credit Agreement, § 10.16; Forbearance Agreement, § 15.)

conduct that is not compatible with the underlying written agreement"). In the absence of any formal written forbearance extension signed by the Lender Parties and Loan Parties, the Debtor is left to employ the oft-used litigation tactic that Agent implicitly agreed to a "de facto" forbearance extension "by virtue of the parties' conduct and oral communications." (Mot. ¶ 51.) As evidence of this purported forbearance agreement, the Debtor proffers quoted language from a December 6, 2022 Agent email stating that "a forbearance is not needed to continue to advance discussions" regarding a restructuring. (*Id.* ¶¶ 22, 26.)

82.     The undisputed facts of record not only directly contradict the Debtor's claim, but in fact conclusively establish that Agent made no such "de facto" forbearance agreement. In a recurring theme, the Debtor attempts to mislead the Court by quoting only a partial snippet of the aforementioned December 6, 2022 email in its Motion. The full text of such email to the Debtor's sole director, Thomas Radford, reveals beyond a doubt that Agent made no such agreement:

> Tom: We did connect today to discuss [the requested 30-day forbearance agreement]. Happy to connect over the phone live, but similar to my initial reaction this weekend our view remains that a forbearance is not needed to continue to advance discussions as well as a view that those negotiations should continue to proceed (we are in agreement there). *Do not believe a forbearance would change that and this is not a situation where we typically provide a waiver or forbearance absent a specific framework that we were working towards (similar to our message earlier this year when we negotiated the last forbearance).* Let me know if you'd like to connect live and I can ring you this afternoon to further explain our approach / perspective if needed.

(Supp. Maggiore Decl., Ex. 2 (emphasis added).)[27] More damning, the Debtor admits in the Motion that representatives of the Debtor and Falcon again reiterated their request for a 30-day forbearance

---

[27] Even the precise words quoted by the Debtor in isolation provide no evidence of any "de facto" forbearance extension. Rather, those words merely state the simple truth that the absence of a forbearance did not preclude the parties from continuing to negotiate over potential restructuring terms. Lenders, borrowers and sponsors routinely negotiate all manner of terms and transactions while actionable events of default exist. A suggestion that the parties could continue to negotiate an amendment or restructuring after expiration of the Forbearance Period in this case is

in a telephone call with Agent over a week later on December 14, 2022, and that Agent responded by stating "that it would be *reviewing the request with its investment committee early the following week [of December 19-24]*." (Mot. ¶ 25.) Then again, at 8:05 p.m. Central time on December 18, 2022, Mr. Radford sent an email to Agent once more confirming the absence of any forbearance agreement, which stated, in pertinent part:

> Just thought I'd shoot one more email to you ahead of your IC [i.e., Investment Committee] discussion regarding our request for a 30 day forbearance renewal / extension to keep it top of mind. . . . Further distracting management and spending resources on sponsoring the company without the good faith step of a forbearance is becoming untenable. . . . Candidly, the team is also scratching their heads about *why a forbearance is not forthcoming*, and operating in this gray zone is extremely stressful for them (and us)*. . . . Please let us know if there's anything else we can do to help get this 30 day extension / renewal in place.*

(Supp. Guyette Decl. ¶ 15, Ex. 18 (emphasis added).) These admissions conclusively establish that no verbal, informal or other "de facto" forbearance agreement ever existed at the time Agent exercised proxy rights on December 21, 2022, and that the Debtor's claims to the contrary are pure and deliberate fabrication.

      83.    Likewise, neither the Debtor nor Falcon could have "significant[ly] and substantial[ly]" relied on any verbal statements or course of dealing as constituting an enforceable forbearance extension. (Mot. ¶¶ 52-53.) In addition to the dispositive admissions noted above, express anti-modification and anti-course of dealing provisions in the Forbearance Agreement and subsequent written correspondence rendered any reliance, let alone "significant and substantial" reliance, on any implicit forbearance extension impossible.

---

wholly unremarkable, and certainly cannot be reasonably construed as an affirmative undertaking to continue to forbear even in isolation. (Supp. Guyette Decl. ¶ 16; Supp. Maggiore Decl. ¶ 16.)

84.    Rather than rely upon and recite to the Court the express provisions of the underlying agreements and the parties' rights and obligations with respect thereto, the Debtor seeks to impose extra-contractual requirements not otherwise required by the contracts or applicable law. Pursuant to Section 4(b) of the Forbearance Agreement, the Debtor and other Loan Parties expressly acknowledged and agreed that following expiration of the Forbearance Period on November 15, 2022:

> the agreement of Agent and Lenders hereunder to forbear from exercising their respective default-related rights and remedies shall immediately terminate [and] . . . any or all of the Agent and Lenders may at any time thereafter proceed to exercise any and all of their respective rights and remedies under any or all of the Credit Agreement, any other Loan Document and/or applicable law, including, without limitation, their respective rights and remedies with respect to the [then existing Events of Default].

(Forbearance Agreement, § 4(b).) Section 4(c) of the Forbearance Agreement goes even further, confirming that "[a]ny agreement by the Agent and Lenders to extend the Forbearance Period, if any, must be set forth in writing and signed by a duly authorized signatory of each of Agent and Lenders." *(Id.* § 4(c).) Section 20 of the Forbearance Agreement is similarly direct when it states that "[t]here are no oral agreements among the parties hereto." *(Id.* § 20.)

85.    But it gets worse for the Debtor and Falcon. The very next day following the expiration of the Forbearance Period on November 16, 2022, Agent delivered the Forbearance Termination Notice that stated, in pertinent part:

> This letter also serves to notify you that, pursuant to the terms of the Forbearance Agreement, the Forbearance Period (as defined in the Forbearance Agreement) expired as of November 15, 2022 (the "Forbearance Termination Date"). As a result of the occurrence of the Forbearance Termination Date, the Agent's and Lenders' agreements pursuant to Section 4 of the Forbearance Agreement to forbear from exercising certain of their rights and remedies have automatically terminated. . . .

> Although Agent and the Lenders are currently considering options with respect to the Credit Agreement and the other Loan Documents, no decisions regarding these options have been made to date. *Accordingly, as a result of the Designated Defaults, as well as any other Defaults or Events or Default that may exist, Agent and the Lenders are entitled to exercise any and all default-related rights and remedies under the Credit Agreement, the other Loan Documents, and/or applicable law, all of which rights, remedies and related claims available to Agent and the Lenders are hereby expressly reserved in their entirety, any of which may be exercised or otherwise pursued at any time in the sole and absolute discretion of Agent and the Lenders* in accordance with the respective terms and provisions of the Credit Agreement, the other Loan Documents and applicable law.

(Guyette MTD Decl. Ex. 16 (emphasis added).) The Forbearance Termination Notice also explicitly confirmed to the Loan Parties and Falcon that "*any discussions (whether written or oral) that have occurred or that may occur* among the respective parties to the Credit Agreement and the other Loan Parties are not intended, and shall not be deemed or construed, to constitute, a waiver, limitation or postponement of any of the rights and remedies of the Agent or any of the Lenders thereunder or under applicable law. . . ." (*Id.* (emphasis added).) One can hardly envision a clearer record that no forbearance agreement or extension existed—or could exist outside of a formal written forbearance signed by the Lender Parties—at the time Agent exercised its proxy rights.[28]

---

[28] While not referenced in the Debtor's argument section, the fact section of the Motion contains an allegation that Agent's contact with the Loan Parties' management following termination of the Forbearance Period somehow evidenced a "de facto" forbearance extension and/or Debtor reliance thereon. (Mot. at 2.) Not true. As the Debtor well knows, Section 6.2 of the Credit Agreement, which remained in effect before, during and after the expiration of the Forbearance Period, expressly required each Loan Party to "permit, and cause each other Loan Party or Subsidiary to permit, at any reasonable time and with reasonable notice *(or at any time without notice if an Event of Default arises)*, Agent . . . to discuss its financial matters with its officers. . . ." (Credit Agreement, § 6.2 (emphasis added).) The section of the Credit Agreement that the Debtor cites in support of this claim, Section 6.1.14, expressly states that such provision is "[w]ithout limiting any other obligations of the Borrowers herein . . . ." (*Id.* § 6.1.14 (emphasis added).) In addition, although unnecessary, Falcon repeatedly granted Agent permission to speak directly with management after expiration of the Forbearance Period and indeed invited such discussions in the weeks leading up to the Debtor's bankruptcy filing. (Supp. Maggiore Decl. ¶ 17.)

86.    In the face of such overwhelming evidence, the Debtor's only legal argument is that under Section 15-301 of the New York General Obligations Law ("Section 15-301"), Agent "should not be allowed to invoke Section 15-301 . . . and/or any other anti-waiver, integration, or anti-modification provision in the Forbearance Agreement to assert that the Forbearance Period has expired and not [sic] amended by virtue of the parties' conduct and oral communications." (Mot. ¶ 51.) First, and most importantly, this statute in no way provides any legal basis for unwinding any exercise of proxy rights or other actions by the Lender Parties. Second, Section 15-301 in fact precludes the very argument the Debtor is making. Section 15-301 provides, in pertinent part, that "[a] written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, *cannot be changed* by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent." (Mot. ¶ 51 n.8 (citing N.Y. Gen. Oblig. Law § 15-301 (McKinney)) (emphasis added).) This is exactly what the Debtor is attempting to do here with its misapplied equitable estoppel argument and allegations of an unwritten "de facto" forbearance extension in the face of the anti-modification provisions in the Forbearance Agreement quoted above, as well as its admissions regarding the lack of any such forbearance extension.

87.    The equitable estoppel exception to Section 15-301 the Debtor relies upon is also inapplicable. According to the Motion, Agent cannot avail itself of Section 15-301 if the Debtor can show that (i) Agent "induced [the Debtor's] significant and substantial reliance upon an oral modification", and (ii) "the conduct [of Agent] on which [the Debtor] relied must not be compatible with the written [Forbearance] [A]greement." (Mot. ¶ 53 (citing *Club Haven*, 160 F. Supp. 2d at 592).) The Debtor cannot satisfy its burden with respect to either element. With respect to the first element, the many emails, Debtor admissions in the Motion and protective provisions

in the Forbearance Agreement and Forbearance Termination Notice detailed above conclusively establish that no "de facto" forbearance extension existed and that neither the Debtor nor Falcon "significant[ly] and substantial[ly]" relied thereon. (*Supra* ¶ 82.) With respect to the second element, Agent's conduct, as evidenced by the Debtor's many emails cited above pressing for a forbearance extension and acknowledging one had not been given in the weeks leading up to the December 21, 2022 proxy exercise, was plainly compatible (as opposed to incompatible) with the anti-modification and anti-course of dealing provisions in the Forbearance Agreement. Indeed, it was the Debtor's conduct during that period that was not compatible with its invocation of the equitable estoppel exception. Accordingly, the Debtor—not Agent—should be barred under Section 15-301 from arguing that Agent implicitly agreed to any "de facto" forbearance extension.

## CONCLUSION

**WHEREFORE**, Agent respectfully requests that the Court deny the Motion and grant such other relief the Court deems appropriate.

Dated: January 27, 2023
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Kara Hammond Coyle*
James P. Hughes, Jr., Esq. (No. 3102)
Michael R. Nestor, Esq. (No. 3526)
Kara Hammond Coyle, Esq. (No. 4410)
James M. Yoch, Jr., Esq. (No. 5251)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Email: jhughes@ycst.com
      mnestor@ycst.com
      kcoyle@ycst.com
      jyoch@ycst.com

-and-

**KATTEN MUCHIN ROSENMAN LLP**
Peter K. Knight, Esq. (admitted *pro hac vice*)
Terence G. Banich, Esq. (admitted *pro hac vice*)
Allison E. Yager, Esq. (admitted *pro hac vice*)

525 West Monroe Street
Chicago, IL 60661
Telephone: (312) 902-5200
Email:  peter.knight@katten.com
        terence.banich@katten.com
        allison.yager@katten.com

*Counsel for Twin Brook Capital Partners, LLP, as Agent*