## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CII PARENT, INC., | Case No. 22-11345 (LSS) |
| Debtor. | **Re: Docket Nos. 12 & 30** |

## OPINION

Before me is CII's Parent, Inc.'s ("CII" or "Debtor") Motion to Enforce the Automatic Stay[1] and Twin Brook Capital Partner LLC's ("Twin Brook") Motion to Dismiss.[2] Both motions implicate a corporate governance dispute over the proper boards of CII's non-debtor direct and indirect subsidiaries. CII asserts an underhanded exercise of proxy rights by its primary (if not only creditor) without proper notice, which deprives CII of the right and opportunity to restructure the debt owed by its entire corporate family. CII characterizes Twin Brook's actions as a "hostile takeover." Twin Brook counters that, prepetition, it properly exercised a contractual remedy on a defaulted loan when it exercised a proxy right to vote the stock pledged by CII and replace the board of directors at each of the direct and indirect subsidiaries.

The outcome of these disputes turns on interpretation of specific provisions in the prepetition loan documents. Having reviewed the documents and entertained argument

---

[1] D.I. 12 (Debtor's Motion for Entry of an Order Enforcing the Automatic Stay and Granting Related Relief).

[2] D.I. 30 (Motion of Twin Brook Capital Partners, LLC, as Agent, for an Order Dismissing or Abstaining from Hearing the Debtor's Chapter 11 Case ).

regarding the meaning of those provisions and applicable case law, I conclude that the proxies were properly exercised prepetition. I also conclude that there is no indication of postpetition lender action violative of the automatic stay. But, because the parties left certain "Contested Issues" open, I will defer, for the moment, on ruling on the Motion to Dismiss and hold a status conference to determine the next steps in this case.

**Procedural Posture**

On December 27, 2022, CII filed a voluntary petition under chapter 11 of the Bankruptcy Code in this court. Aside from the Motion to Enforce the Automatic Stay and the Motion to Dismiss, the only substantive filings made in the case are a motion to extend the time to file schedules and statements and an application to retain counsel.

On February 9, 2023, I signed an Agreed Scheduling Order[3] setting out dates by which the briefing on the two motions would be completed, consolidating the two motions into a single contested matter under Federal Rule of Bankruptcy Procedure 9014 and setting a non-evidentiary hearing on a to-be submitted stipulated record. Specifically, the Agreed Scheduling Order provides:

> 5.      The February 22 Hearing will be limited to those legal issues and arguments set forth in the Motions that, by agreement of the Parties, the Court can decide based upon a stipulated factual record (the "Stipulated Record"). All other disputed factual matters, legal issues and arguments set forth in the Motions that involve disputed material issues of fact (collectively, "Contested Issues") are preserved for the purpose described in paragraph 7(b).
>
> 6.      The Parties must meet and confer in good faith to prepare the Stipulated Record. The Stipulated Record must consist of: (a) the documents that the Court may admit into evidence without objection; and (b) a statement of uncontested material facts germane to the Motions. The Parties must file the Stipulated Record by 12:00 p.m. ET on February 20, 2023.

---

[3] D.I. 59 (Agreed Scheduling Order).

7.    The Court may, in its discretion: (a) decide either Motion solely based upon the Stipulated Record and without consideration of the Contested Issues; or (b) continue the Motions for a further evidentiary hearing to consider those Contested Issues the Parties wish to present.

On February 20, the Stipulated Record[4] was filed.  The February 22 hearing proceeded on the Stipulated Record and seven agreed-to exhibits.  The matter was taken under advisement.

**Jurisdiction**

The parties contend that I have jurisdiction over their respective motions pursuant to 11 U.S.C § 1334 and that each is core.  I agree.  Further, both Debtor and Twin Brook consent to entry of a final order by the bankruptcy court on both motions to the extent it is later determined that the court, absent the consent of the parties, cannot enter final orders or judgments with respect to the motions consistent with Article III of the Constitution.[5] Accordingly, I can enter a final judgment on the two motions.

**Background**

Debtor is a Delaware corporation.  It is a holding company that owns 100% of the equity interests of non-debtor Community Investors, Inc., which, in turn, directly or indirectly owns all the equity of the non-debtor Indirect Subsidiaries.[6]  Debtor is indirectly

---

[4] D.I. 70 (Stipulated Record Related to (I) Debtor's Motion for Entry of an Order Enforcing the Automatic Stay and Granting Related Relief and (II) Motion of Twin Brook Capital Partners, LLC, As Agent, for an Order Dismissing or Abstaining from Hearing the Debtor's Chapter 11 Case).  The parties did not submit a list of legal issues and arguments that the parties agree can be determined based on the stipulated record.  At argument, Debtor's counsel stated that the turnover arguments and equitable estoppel arguments are factual in nature so those arguments are not before me. D.I. 77 (Feb. 22, 2024 Hr'g Tr.) at 42:15-20.

[5] Stipulated Record ¶ 20.

[6] The Indirect Subsidiaries are:  Investors Acquisition Co., AssociationVoice LLC, CapSure Acquisition Co., Real Pro Holdings, Inc., dwellingLIVE, Inc., iHomefinder Inc. and AtHomeNet, Inc.

owned by Falcon Structured Equity Partners, LP ("Falcon"). Twin Brook is a direct lending finance company that provides cash-flow based financing solutions to the middle market private equity community.

Prepetition, Community Investors, as Borrower Representative, and Debtor and the Indirect Subsidiaries, as Borrowers, certain financial institutions ("Lenders") and Twin Brook as Agent, executed that certain Credit Agreement[7] dated as of May 15, 2019. The Lenders' commitment under the Credit Agreement included both a revolving loan and a term loan (collectively, "Loan").

As evidenced by that certain Guarantee and Collateral Agreement,[8] the Loan is secured by, among other things: (i) Debtor's equity interest in Community Investors and (ii) Community Investors' equity interests in the Indirect Subsidiaries (and together with (i), the "Pledged Equity"). In connection with the Loan, Debtor, Community Investors and each Indirect Subsidiary other than AtHomeNet also executed a separate document titled Irrevocable Proxy Coupled with an Interest dated May 15, 2019 ("One Page Proxy").[9]

---

[7] Ex. 1 (Credit Agreement, dated May 15, 2019 among CII Parent, Inc., a Delaware corporation, as Holdings, Community Investors, Inc., a Delaware corporation as a Borrower and the Borrower Representative, Investors Acquisition Co., a Delaware corporation, AssociationVoice LLC, a Delaware limited liability company, CapSure Acquisition Co., a Delaware corporation, Real Pro Holdings, Inc., a Delaware corporation, dwellingLIVE, Inc., a California corporation, iHomefinder Inc., a California corporation together with each other Person who becomes a Borrower hereunder by execution of a Borrower Joint Agreement or similar acknowledgment hereto, including after giving effect to the consummation of the Closing Date Acquisition, Caliber Software, Inc., a Delaware corporation as Borrowers, The Lenders Party Hereto as Lenders, and Twin Brook Capital Partners, LLC, as Agent, a Lead Arranger and Bookrunner).

[8] Ex. 2 (Guarantee and Collateral Agreement dated as of May 15, 2019 among Community Investors, Inc. and the Other Parties from Time to Time Party Hereto as Grantors, and Twin Brook Capital Partners, LLC as Agent).

[9] Ex. 3 (collectively, each executed Irrevocable Proxy Coupled with an Interest).

After identifying certain current and anticipated defaults under the Credit Agreement Twin Brook, Falcon, Debtor, Community Investors and the Indirect Subsidiaries negotiated, and on July 27, 2022 executed, that certain Forbearance Agreement.[10]

On November 16, 2022, Twin Brook delivered a Reservation of Rights Letter[11] to Falcon, Debtor, Community Investors and the Indirect Subsidiaries.

By letter dated December 21, 2022 ("Proxy Notice"[12]), Twin Brook informed Debtor, Falcon, Community Investors and the Indirect Subsidiaries that it had exercised its purported rights under the Guarantee and Collateral Agreement and the Irrevocable Proxies to (i) amend the applicable bylaws, operating agreements, and/or other corporate governance documents as necessary or desirable, to, among other things, remove certain directors and/or managers of Community Investors and the Indirect Subsidiaries; (ii) adjust the size of each board of directors and/or managers, as applicable, of Community Investors and each Indirect Subsidiary; and (iii) appoint replacement directors and/or managers for Community Investors and each Indirect Subsidiary (collectively, "Twin Brook's Actions").

Six days later, on December 27, 2022, Debtor filed for relief under chapter 11. By letter dated December 29, 2022,[13] Debtor notified Twin Brook and its counsel that CII had filed for bankruptcy resulting in the immediate imposition of the automatic stay pursuant to § 362(a) of the Code. Debtor also requested that Twin Brook confirm that it would formally

---

[10] Ex. 4 (Forbearance Agreement and Sixth Amendment to Credit Agreement).

[11] Ex. 5 (Letter from Twin Brook Capital Partners, LLC, as Agent to Community Investors, Inc., as Borrower Representative dated November 16, 2022).

[12] Ex. 6 (Letter from Twin Brook Capital Partners, LLC, as Agent to All Grantors dated December 21, 2022).

[13] Ex. 7 (Letter from Andrew K. Glenn to Drew Guyette, Chief Credit Officer dated December 29, 2022).

rescind Twin Brook's Actions.  Twin Brook refused to rescind Twin Brook's Actions and

the current board members chosen by Twin Brook continue to govern Community Investors

and each Indirect Subsidiary.

While not expressly in the Stipulated Facts, there is no disagreement that: (i) events

of default existed (as documented in the Forbearance Agreement) and continue to exist

under the Credit Agreement and (ii) subject to Debtor's equitable estoppel argument, the

agreed-upon forbearance period under the Forbearance Agreement expired on November

15, 2022 and (iii) Twin Brook exercised (or purported to exercise) its proxy rights

prepetition.  Further, CII represents that it filed this chapter 11 case to "regain control of its

operating subsidiaries."  CII contends that if Twin Brook had not been deceived, it is

"likely" that Community Investors and each of the Indirect Subsidiaries would have filed

bankruptcy petitions as well.  In this way, CII could take a "holistic" approach to a

restructuring.

**Discussion**

I.    **The Motion to Enforce the Automatic Stay**

While styled as a motion to enforce the automatic stay, the Motion to Enforce the

Automatic Stay goes well beyond that seeking, in effect, multiple mandatory injunctions.

Debtor seeks an order:

(i)    finding that Twin Brook's continuing exercise of control over the Debtor's
       corporate governance rights in [Community Investors and the Indirect
       Subsidiaries] [] violates the automatic stay, or alternatively, that Twin Brook is
       equitably estopped from exercising remedies against the Debtor under the
       circumstances;

(ii)   directing Twin Brook to (a) formally rescind the amendments of the applicable
       bylaws, operating agreements, and or other corporate governance documents
       that purported to, among other things, remove certain directors and/or
       managers, as applicable, of [Community Investors and the Indirect

Subsidiaries][], and appoint replacement directors and/or managers for [Community Investors and the Indirect Subsidiaries], (b) cease exercising control over [Community Investors and the Indirect Subsidiaries][], and (c) immediately inform management of the foregoing; and

(iii)    granting such other relief as is appropriate under the circumstances.[14]

For its part, Twin Brook extensively briefs and argues that it properly exercised the proxies prepetition per the unambiguous terms of the Guarantee and Collateral Agreement, effectively asking for a declaration to that effect. Among other things, this argument leads Twin Brook to the further conclusion that there is no stay violation because the appointment of Twin Brook as attorney-in-fact and proxy took the voting rights outside of the property of the estate.[15]

Debtor argues that Twin Brook's actions violate subsections 362(a)(3), (4) and (6) of the Code because (i) Twin Brook is exercising control over property of the estate, (ii) Twin Brook is blocking Debtor from exercising control over the boards of the non-debtor companies and thus interfering with property of the estate and (iii) Twin Brook is refusing to rescind its actions, which is an act to collect or recover on its claim.

Twin Brook counters that (i) all of its actions occurred prepetition and the mere retention of the voting power and refusal to rescind its prepetition acts are not affirmative acts in violation of the stay and (ii) Debtor fails to identify a post-petition act of Twin Brook that blocks Debtor from exercising control over property of the estate and, in any event, (iii)

---

[14]  Motion to Enforce the Automatic Stay at 4-5.

[15]  Twin Brook initially took the position that Debtor's relief required an adversary proceeding because, among other things, Debtor seeks to extend the automatic stay to non-debtors. Objection of Twin Book Capital Partners, LLC, as agent, to Debtor's Motion for Entry of Order Enforcing the Automatic Stay and Granting Related Relief (D.I. 45) ("Twin Brook Objection") at 23-24. Twin Brook waived this argument in the Agreed Scheduling Order.

the voting rights associated with the stock in Community Investors are not property of the estate.[16]

### A.    Twin Brook has not violated § 362(a)(3) or § 362(a)(4).

Both § 362(a)(3) and § 362(a)(4) prohibit post-petition acts to exercise control over property of the estate or to enforce a lien against property of the estate.[17]  Property of the estate is interpreted broadly to include all interests the debtor has in property, both tangible and intangible, legal and equitable.[18]  Federal law defines what types of property are part of the estate while state law determines what interest a debtor has in the property.[19]  Any

---

[16] Twin Brook is correct that Debtor does not have voting rights in or hold the stock of the Indirect Subsidiaries.  This opinion, therefore (and for simplicity's sake), will address Debtor's voting rights in Community Investors.  But, the analysis of Twin Brook's appointment as attorney-in-fact and proxy is the same at the Indirect Subsidiary level.

[17] 11 U.S.C. § 362 provides, in relevant part:

> a petition filed under . . . this title . . . operates as a stay, applicable to all entities, of—
>
> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;
>
> (4) any act to create, perfect, or enforce any lien against property of the estate.

[18] *United States. v. Whiting Pools, Inc.*, 462 U.S. 198, 205 (1983) ("Both the congressional goal of encouraging reorganizations and Congress' choice of methods to protect secured creditors suggest that congress intended a broad range of property to be included in the estate."); *Westmoreland Human Opportunities, Inc. v. Walsh*, 246 F.3d 233, 242 (3d Cir. 2001) (citing 5 Collier on Bankruptcy ¶ 541.08[4], at 541–49 (5th ed. Rev., King et al., eds., 1996)) ("It is also settled that the expansive nature of § 541's property definition encompasses rights and interests arising from ordinary contractual relationships.").

[19] *Westmoreland*, 246 F.3d at 242 (citing *In re O'Dowd*, 233 F.3d 197, 202 (3d Cir. 2000)).

operative documents as well as relevant state laws inform the determination.[20] A debtor's interest in property is measured as of the petition date.[21]

The parties agree that Debtor's stock in Community Investors is property of the estate. From there, they disagree. Debtor contends that the voting interest attendant to the stock is property of the estate while Twin Brook contends that, as of the petition date, it controlled the right to vote the stock.

### 1. The Plain Language of the Loan Documents

*(a) The appointment provision[22]*

In addition to a guarantee of payment and performance of the Loan and the grant of security interests and/or liens in identified property as collateral, the Guarantee and Collateral Agreement contains an immediate and irrevocable grant of voting rights to Twin Brook. In Section 7.1(a), Debtor "hereby" appoints Twin Brook as Debtor's "attorney-in-fact and proxy" to act in Debtor's "place and stead" for the purpose of taking numerous enumerated acts.[23] Among those acts are the right to vote the stock in Community Investors

---

[20] *In re Lee*, 524 B.R. 798, 802 (Bankr. S.D. Ind. 2014) (analyzing whether debtor's voting rights in a limited liability company are property of the estate by examining the relevant operating agreement and the Indiana Business Flexibility Act.).

[21] *Westmoreland*, 246 F.3d at 241 (citing 11 U.S.C. §§ 301, 541).

[22] While the parties did not analyze the Guarantee and Collateral Agreement on a holistic basis, I find it useful to recognize the structure of the agreement in ascertaining its meaning.

[23] 7.1    <u>The Agent's Appointment as Attorney-in-Fact, etc.</u>

> (a)    Each Grantor hereby irrevocably constitutes and appoints the Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact and proxy with full irrevocable power and authority in the place and stead of such Grantor and in the name of such Grantor or in its own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Agreement or take any other remedial action with respect to collateral otherwise described in this Agreement, the Credit

(and the Indirect Subsidiaries) on all matters in the manner in which Twin Brook deems advisable as well as to take remedial actions authorized under the agreement. This grant encompasses voting at shareholder meetings and by written consent.

Voting rights are specifically addressed in three subsections of the appointment provision. These three subsections which are repetitive, but not contradictory, permit Twin Brook to:

> (v)    (1) vote the Investment Property in any manner the Agent deems advisable for or against all matters submitted or which may be submitted to a vote of shareholders, partners or members, as the case may be, (2) transfer and register in its name or in the name of its nominee the whole or any part of the Investment Property, (3) receive and collect any dividend or other payment or distribution in respect of or in exchange for the Investment Property and (4) take all such other actions with respect to Investment Property authorized under Section 6.3 or 6.7 of this Agreement or otherwise authorized by this Agreement or the other Loan Documents;

> . . . .

> (vi) . . . (8) vote any right or interest with respect to any Investment Property;

> . . . .

> . . . exercise the irrevocable proxy to vote the Investment Property at any and all times, including but not limited to, at any meeting of shareholders, partners or members, as the case may be, however called, and at any adjournment thereof, or in any action by written consent, and may waive any notice otherwise required in connection therewith.[24]

---

Agreement or the other Loan Documents, and, without limiting the generality of the foregoing, each Grantor hereby gives the Agent the power and right, on behalf of such Grantor, without notice to or assent by such Grantor, to do any or all of the following, in each case, with respect to the Collateral: . . . .

[24] Guarantee and Collateral Agreement Section 7.1(a) at 25–26. "Investment Property" includes Pledged Equity. *Id.* Section 1.2 at 3.

Finally, the One-Page Proxy[25] also contains appointing language and addresses voting:

> Subject in each case to the limitations set forth in the Guarantee and Collateral Agreement (referred to below), (i) the undersigned hereby irrevocably designates and appoints Twin Brook Capital Partners, LLC as administrative agent for certain secured parties (in such capacity, the "Agent") to represent it at all annual and special meetings of the holders of the Equity Interests (as defined in the Guarantee and Collateral Agreement defined below) of **COMMUNITY INVESTORS, INC.**, a Delaware corporation (the "Company"), and (ii) the undersigned hereby authorizes and empowers Agent, to vote any and all Equity Interests owned by the undersigned or standing in its name, and do all things which the undersigned might do if present and acting itself.

This language of the One Page Proxy is not identical to that in the Guarantee and Credit Agreement, but, it, too, is not inconsistent with the agreement and is clearly meant to effect the broad proxy rights granted in the main document.[26]

While broad, Section 7.1 also contains an express limitation on Twin Brook's right to vote the Pledged Equity. Twin Brook agrees that it will not exercise its power as attorney-in-fact/proxy unless Debtor is in a continuing default:

> Anything in this <u>Section 7.1(a)</u> to the contrary notwithstanding, Agent agrees that it will not exercise any rights under the power of attorney provided for in this <u>Section 7.1(a)</u> unless an Event of Default shall have occurred and be continuing, and upon the direction of the Required Lenders.[27]

---

[25] The One Page Proxy is in substantially the form attached as Annex III to the Guarantee and Collateral Agreement. Ex. 2 Annex III.

[26] In addition to annexing a form of proxy to the Guarantee and Collateral Agreement, the agreement contemplates the presentation of a separate proxy in certain circumstances:

> IN ORDER TO FURTHER AFFECT [sic] THE TRANSFER OF RIGHTS WITH RESPECT TO PLEDGED EQUITY SET FORTH IN SECTION 6.3, SECTION 6.7 OR ANY OTHER PROVISION OF THIS AGREEMENT IN FAVOR OF THE AGENT, THE AGENT SHALL HAVE THE RIGHT, UPON THE OCCURRENCE AND DURING THE CONTINUANCE OF AN EVENT OF DEFAULT, TO PRESENT TO ANY ISSUER AN IRREVOCABLE PROXY.

Guarantee and Collateral Agreement at Section 7.1(a) at 26.

[27] Guarantee and Collateral Agreement Section 7.1(a) at 27.

Accordingly, so long as Debtor is not in default, it continues to have the privilege to exercise its voting rights (and to receive the economic benefits attendant to stock ownership).

    *(b) The remedial provisions*

    The Guarantee and Collateral Agreement also contains a remedial section detailing the actions that Twin Brook may take as to different categories of collateral in the event of a default. As it relates to the Pledged Stock and voting rights, section 6.3(b) provides that Twin Brook may exercise Debtor's voting rights as if it were the outright owner of the Pledged Stock:

> If an Event of Default shall occur and be continuing, (a) the Agent shall have the right to . . . (ii) exercise or permit its nominee to exercise, any and all rights of conversion, exchange and subscription any other rights, privileges or options pertaining to such Investment Property as if it were the absolute owner thereof (. . . and including with respect to the Pledged Equity, giving or withholding consents of stockholders, partners or members, calling special meetings of stockholders, partners or members and voting at such meetings) and otherwise act with respect to the Investment Property as if Agent were the outright owner thereof, . . . and (b) the Agent shall have the right, substantially concurrently with notice to the applicable Grantor, to (i) receive any and all cash dividends and distributions, payments or other Proceeds paid in respect of the Investment Property constituting Collateral and make application thereof to the Secured Obligations in such order as the Agent may determine, and (ii) exercise, or permit its nominee to exercise, all voting and other rights pertaining to such Investment Property as a holder of such Investment Property, with full power of substitution to do so.[28]

Consistent with the appointment section, in the remedial section Twin Brook allows Debtor to vote the Pledged Equity (and to receive distributions) if Debtor is not in default as long as Debtor does not impair Twin Brook's collateral. The remedial section also provides that Twin Brook must give Debtor notice of its intent to exercise its voting rights. Section 6.3(a) provides:

---

[28] Guarantee and Collateral Agreement Section 6.3(b).

> Unless an Event of Default shall have occurred and be continuing and the
> Agent shall have given notice to the relevant Grantor of the Agent's intent to
> exercise its corresponding rights pursuant to <u>Section 6.3(b)</u>, each Grantor shall
> be permitted to receive all cash dividends and distributions paid in respect of
> the Pledged Equity and all payments made in respect of the Pledged Notes, to
> the extent permitted in the Credit Agreement, and to exercise all voting and
> other rights with respect to the Investment Property; <u>provided</u>, that no vote
> shall be cast or other right exercised or action taken which could impair the
> Collateral or which would be inconsistent with or result in any violation of any
> provision of the Credit Agreement, this Agreement or any other Loan
> Document.

Debtor does not argue that it did not appoint Twin Brook its proxy or that Events of Default

did not exist or were not then-continuing when Twin Brook sent the Proxy Notice,

amended Debtor's bylaws and replaced directors and managers. Instead, Debtor argues that

(i) the Proxy Notice was not in accord with section 6.3(a) and (b); (ii) the appointment of

Twin Brook as proxy expired on May 15, 2022 (or seven months prior to the Proxy Notice);

and (iii) that the proxy appointment did not permit Twin Brook to act by written consent.

## 2. Delaware law[29]

Both parties rely on the Delaware Supreme Court's recent *Hawkins* decision[30] that

addresses the question of whether a purchaser is bound by an irrevocable proxy

---

[29] Like Vice Chancellor Laster noted in *Hawkins v. Daniel*, 273 A.3d 792, 810 (Del. Ch. 2022) (*"Hawkins I"*) *aff'd* 289 A.3d 631 (Del. 2023), "a potential choice of law issue lurks in the background. To determine the law that governs a proxy arrangement, a court ordinarily looks to the law of the state of incorporation of the corporation whose shares are the subject of the arrangement." But, the parties to the proxy can select another state's law if there is a "material relationship" between that law and the subject of the agreement. *Hawkins I*, 273 A.2d at 810 n. 21 (observing that the irrevocable proxy selected California law and the parties did not offer a credible reason why that law would not govern). In this case, Community Investors is incorporated in Delaware. Some of the Indirect Subsidiaries, however, are organized under the laws of other jurisdictions and both the Credit Agreement and the Guarantee and Collateral Agreement identify New York law as the governing law. Here, the focus is rightly on Community Investors because Debtor only owns the stock of Community Investors, not the Indirect Subsidiaries. Moreover, the parties have briefed Delaware law and do not suggest the law of another jurisdiction should apply. Therefore, I will follow Vice Chancellor Laster's lead and apply Delaware law.

[30] *Daniel v. Hawkins*, 289 A.3d 631 (Del. 2023) (*"Hawkins II"*).

appointment. The Supreme Court's decision, as well as the Chancery Court decision which it affirmed, provide a comprehensive history of and guide to the interpretation of irrevocable proxies. While the context is different, the basic principles are applicable here.

From a corporate governance perspective, the appointment of a proxy decouples the economic interest in the shares from the power to vote the shares.[31] If the appointment language so provides, as it does here, the appointment is immediate.[32] Such arrangements were historically viewed as suspect because of the potential misalignment of those two interests and concerns that the outcome of a proxy arrangement was at odds with the "Delaware model" of maximizing stockholder welfare and, therefore, maximizing social welfare.[33] This misalignment of interests is enhanced if the proxy is irrevocable because, unlike a revocable proxy, it "frees the holder from the 'unilateral control of the grantor.'"[34]

More recently, Delaware courts have relaxed their approach to proxy arrangements consistent with their approach to vote-buying arrangements and voting trusts.[35] "[I]nnovations in technology and finance have made it easier to separate the voting interests from the financial interests of shares."[36] Further, the Delaware Supreme Court has also

---

[31] *Hawkins I*, 273 A.3d at 808; *Hawkins II*, 289 A.3d at 648. It also creates an agency relationship (*Hawkins II*, 289 A.3d at 647–48), but neither party raised that concern in the context of these motions.

[32] *Hawkins II*, 289 A.3d at 637, 650–51 (recognizing that the irrevocable proxy (which provided that the stockholder "hereby" appoints the holder as its attorney-in-fact) was "[t]he vehicle for the immediate transfer of voting power.").

[33] *Hawkins I*, 273 A.3d at 808–09; *Hawkins II*, 289 A.3d at 645–47.

[34] *Hawkins II*, 289 A.3d at 648 (quoting *Haft v. Haft*, 671 A.2d 413, 421 (Del. Ch. 1995).

[35] *Id.*

[36] *Id.* at 646 (citing *Crown EMAK Partners LLC, v. Kurz*, 992 A.2d 377, 387–88 (citing Robert B. Thompson & Paul H. Edelman, *Corporate Voting*, 62 Vand. L. Rev. 129, 153 (2009))).

recognized scholarship that classifies interests in stock that may be transferred and

employed those classifications in its proxy analysis, specifically:

- "formal voting rights," which is the legal right to vote the shares, including the right to instruct someone else how to vote;

- "economic ownership," which are the economic returns attendant to the shares;[37] and

- "full ownership," which consists of both the "voting ownership plus direct economic ownership."[38]

The Delaware Supreme Court has also observed that "[o]ur system of record ownership

already decouples economic ownership from formal voting rights."[39]

Notwithstanding this relaxed interpretation, Delaware courts still construe proxies

narrowly. Delaware courts will not turn to extrinsic evidence to resolve any ambiguities;

---

[37] "Economic ownership" is more fully described as "the economic returns associated with shares. The ownership can be achieved directly by holding shares, or indirectly by holding a 'coupled asset,' which conveys returns that relate directly to the return on the shares. Economic ownership can either be positive—the same direction as the return on shares—or negative—the opposite direction from the shares." *Crown EMAK*, 992 A.2d at 391 (quoting Henry T.C. Hu & Bernard Black, *Empty Voting and Hidden (Morphable) Ownership: Taxonomy, Implications, and Reforms*, 61 Bus. Law. 1011, 1022 (2006)).

[38] *Id.* A shareholder who has full ownership is owed fiduciary duties and has the right to sue to enforce them; the right to inspect the company's books and records; the right to present resolutions at shareholder meetings and include resolutions in the company proxy statement under federal securities law; the right to receive dividends; appraisal rights; and the right to be paid in the event of liquidation after all other liabilities are paid off. Henry T.C. Hu & Bernard Black, *Equity and Debt Decoupling and Empty Voting II: Importance and Extensions*, 156 U. Pa. L.Rev. 625, 722 (2008). "Investors, and corporations themselves, are able to unbundle these rights and obligations." *Id.* at 626.

[39] *Crown EMAK*, 992 A.2d at 391 ("The record owner is typically at least two persons removed from the economic owner of the shares. Shares held in 'street name' are generally held 'of record' by Depository Trust Company or another securities depository, which holds the shares on behalf of another intermediary (such as the broker-dealer or bank), which holds the shares for economic owners.").

rather, an irrevocable proxy is construed in favor of the beneficial owner of the shares.[40] The court begins with the proxy's plain language, "construing the agreement as a whole and giving effect to all its provisions."[41]

*(a) Notice requirement*

Relying on Section 6.3(a) of the Guarantee and Collateral Agreement, Debtor contends that Twin Brook did not properly exercise its proxy right because it did not provide advance notice of its intent to exercise the right. Debtor observes that Twin Brook simultaneously gave Debtor notice that it was no longer permitted to vote or receive dividends and that Twin Brook had executed written consents amending operative documents, removing directors and or managers and appointing replacements. In essence, Debtor contends that the Guarantee and Collateral Agreement requires a two-step process: one, the giving of a notice of intent to exercise rights and two, the subsequent exercise of those rights.

Twin Brook argues no advance notice is necessary. It points to various provisions of the Guarantee and Collateral Agreement as well as the Credit Agreement that address advance notice and argues that Section 6.3(a) has no such requirement.[42] It concludes,

---

[40] *Hawkins II*, 289 A.3d at 648.

[41] *Hawkins I*, 273 A.3d at 810.

[42] For example, Section 5.3 of the Guarantee and Collateral Agreement requires "10 days' prior written notice" before Debtor can move inventory or equipment, change its jurisdiction of organization or name. Section 6.6 of the Guarantee and Collateral Agreement provides "[i]f any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition." Sections 2.2.2 of the Credit Agreement requires three (3) business days notice prior to borrowing and Section 2.2.3(b) permits or requires same day notice or three (3) business days notice, as specified, of conversion of loan type.

therefore, that the lack of such language in Section 6.3(a) together with the "substantially concurrently with notice" language in 6.3(b) means there is no two-step process or advance notice requirement.

By its plain language, Section 6.3(a) does not include an advance notice requirement. It merely provides for notice of intent. The notice required under Section 6.3(a) is to inform Debtor that it is no longer permitted to vote or receive distributions; it is not some implicit and unspecified advance notice or challenge period nor does it govern when Twin Brook may exercise the proxy. Rather, Section 6.3(b) serves that function.

Section 6.3(b) provides that Twin Brook "shall have the right, *substantially concurrently with notice to the applicable Grantor*" to receive dividends and proceeds of the Collateral and to "exercise, or permit its nominee to exercise, all voting and other rights pertaining to such Investment Property as a holder of such Investment Property, with full power of substitution to do so." This reference back to the notice provided in subsection (a) provides the timing of the ability to exercise the proxy: that is "substantially concurrently" with the giving of the notice of intent.[43] The Proxy Notice, therefore, provided adequate notice to Debtor of Twin Brook's intent to exercise the proxy rights as well as its exercise of those rights.

But, even if some unspecified amount of advance notice is required, the Proxy Notice served as that notice such that the voting rights are not property of the estate. The appointment of Twin Brook as attorney-in-fact and proxy vested Debtor's voting rights in Twin Brook immediately, albeit Twin Brook agreed to permit Debtor to vote the Pledged

---

[43] Concurrently means: "operating or occurring at the same time" *Concurrent*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/concurrent (last visited April 7, 2023).

Equity while not in default.[44] As the Proxy Notice was sent December 21, 2022, Debtor's ability to vote the Pledged Equity ended on that date—six (6) days prior to the filing of the petition. Thus, as of the petition date, Debtor was no longer permitted to vote the Pledged Stock. The notice—not the exercise of the proxy—is the operative event.

*(b) Durational limits*

The Loan documents, including the Guarantee and Collateral Agreement and the One Page Proxy, were executed on or as of May 15, 2019. Delaware law provides that a proxy expires three (3) years from the date of grant "unless the proxy provides for a longer period."[45] Thus, absent such language, the proxy expired on May 15, 2022, or prior to its exercise as manifest in the Proxy Notice.

The parties dispute whether the appointment language in the Guarantee and Collateral Agreement provides for a period longer than three years. Once again, applicable language is found in more than one section of the agreement. Section 7.1(a) provides, in relevant part:

> THE POWER-OF-ATTORNEY AND PROXY GRANTED HEREBY IS COUPLED WITH AN INTEREST AND SHALL BE VALID AND IRREVOCABLE UNTIL THE SECURED OBLIGATIONS HAVE BEEN PAID IN FULL (AS DEFINED IN THE CREDIT

---

[44] Guarantee and Collateral Agreement Section 7.1(a) at 24 ("Each grantor *hereby* . . . appoints the Agent . . . as its true and lawful attorney-in-fact and proxy. . . ."). Indeed, Debtor does not argue that the proxy was not immediately granted and such a position would be inconsistent with Debtor's argument that the proxy expired (*see infra*). *See also In re Town Center Flats, LLC*, 855 F.3d 721, 723 (6th Cir. 2017) ("The agreement purported to be a 'present, absolute and executed grant of the powers herein granted to Assignee,' while simultaneously granting a license to Town Center to collect and retain rents until an event of default").

[45] 8 *Del. C.* § 212(b) provides:

> Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy, but no such proxy shall be voted or acted upon after 3 years from its date, unless the proxy provides for a longer period.

AGREEMENT) . . . .SUCH APPOINTMENT OF THE AGENT AS PROXY AND ATTORNEY-IN-FACT SHALL BE VALID AND IRREVOCABLE AS PROVIDED HEREIN NOTWITHSTANDING ANY LIMITATIONS TO THE CONTRARY SET FORTH IN THE CERTIFICATE OF INCORPORATION, CERTIFICATE OF FORMATION, ARTICLES OF ORGANIZATION, BY-LAWS, LIMITED LIABILITY COMPANY AGREEMENTS OR OTHER ORGANIZATIONAL DOCUMENTS OF ANY GRANTOR OR ISSUER OR CORPORATE OR LIMITED LIABILITY COMPANY LAW, AS APPLICABLE, OF THE STATE OF DELAWARE, THE STATE OF CALIFORNIA, THE STATE OF GEORGIA, OR ANY OTHER STATE OF ORGANIZATION OF ANY GRANTOR OR ISSUER.

The One Page Proxy is more succinct:

> This proxy is an irrevocable proxy coupled with an interest. The undersigned recognizes that Agent, has a security interest in said Equity Interests to secure certain obligations incurred by the undersigned to Lenders and, to the extent permitted by law, this proxy shall continue in full force and effect until the Secured Obligations are Paid in Full notwithstanding any time limitations set forth in the bylaws or other organizational documents of the Company or the general corporation law of the State of Delaware.[46]

Debtor argues, perhaps alternatively, that (i) there is no durational language and (ii) to the extent there is, it applies to the irrevocability and, perhaps, the validity of the proxy, but not the durational limit of the proxy. Twin Brook counters that the plain language of the Guarantee and Collateral Agreement and One Page Proxy provides the durational term: the proxy lasts—or is valid—until the secured obligations are paid in full. Debtor responds that it does not know what "valid" means but that "validity" "irrevocability" and "duration" are distinct concepts, and the proxy is silent as to its duration.[47]

Debtor is correct that revocability and duration are separate concepts. Revocability addresses whether the grantor can revoke the proxy during its term, but, by itself, "the act of

---

[46] Ex. 3.

[47] D.I. 62 (Reply in Further Support of Debtor's Motion for Entry of an Order Enforcing the Automatic Stay and Granting Related Relief) ¶ 27 citing to *Hawkins I*, 273 A.3d at 816–17).

making a proxy irrevocable does not say anything about the duration of the proxy."[48]
Duration means how long the proxy arrangement lasts.[49] The duration of a proxy, by itself,
says nothing about whether it is revocable.[50]

Moreover, a grantor can create a proxy of any length, but the default period under
Delaware law is three years.[51] While duration can be expressed in terms of days, months or
years, it can also be expressed or measured more generally, such as the proxy "shall expire
on the latest date permissible under such applicable law"[52] or by events, such as the
satisfaction of a judgment.[53]

Here, the clearest expression of duration is in the One Page Proxy, which specifically
provides that the proxy "*shall continue* in full force and effect *until*" the debt is Paid in Full.
"Until" is a durational term. And the point in time when the secured obligations are paid in
full is a determinable event.[54] As it is undisputed that the Loan has not been Paid in Full,
the proxy was still in effect when Twin Brook exercised it.

---

[48] *Hawkins I*, 273 A.3d at 816.

[49] *Id.*

[50] *Id.* at 817.

[51] *Id.*

[52] *Hawkins I*, 273 A.3d at 816.

[53] *Mainiero v. Microbyx Corp.*, 699 A.2d 320, 326 (Del. Ch. 1996) (recognizing a proxy that provides that the agreement survives "until the judgement is satisfied.").

[54] Credit Agreement Section 1.1 at 21.

> "Paid in Full", "Pay in Full" or "Payment in Full" means, with respect to any Obligations, (a) the payment in full in cash of all such Obligations (other than contingent indemnification obligations to the extent no claim giving rise thereto has been asserted), (b) the termination or expiration of all of the Revolving Loan Commitments and (c) in connection with the termination or expiration of the Revolving Loan Commitment, either (i) the cancellation and return to Agent of all

Debtor argues that Twin Brook cannot rely on the One Page Proxy because it did not specifically reference it in the Proxy Notice. This argument flies against the principal that I interpret the documents as a whole. The One Page Proxy, which clearly references both the Guarantee and Collateral Agreement and the Credit Agreement is part and parcel of the Loan documentation and the pledge of the Pledged Stock. Moreover, the capitalized language in Section 7.1 quoted above also contains the durational language "until" payment in full of Debtor's obligations, with the language qualifying both the irrevocability of the proxy and its validity (i.e., its binding effect).[55] Read as a whole, therefore, the plain language of the proxy extends the term of the proxy to the time when the "secured obligations are paid in full."

This conclusion is also consistent with the entire thrust of this commercial transaction, which is that the Collateral, including the Pledged Equity, secures Debtor's repayment obligations. Prior to an Event of Default, Debtor remains the master of its fate, entitled to both vote its stock and receive the economic benefit of ownership. Once an Event of Default occurs, however, Twin Brook is entitled to protect its loan position, by, among other things, providing notice to Debtor that Debtor's ability to vote the Pledged Equity and receive distributions no longer exists. Debtor can avoid Twin Brook's exercise of remedies by curing any default (such that there is not a continuing default) or can pay the obligations in full. But, it did neither prior to the Proxy Notice.

---

Letters of Credit or (ii) the cash collateralization of all Letters of Credit (in an amount equal to one hundred and three percent (103%) of the Stated Amount of such Letters of Credit) in a manner reasonably acceptable to Agent.

[55] Valid means "legally sufficient; binding." *Valid*, Black's Law Dictionary (11th ed. 2019).

The default provision of 8 Del.C. § 212(b) is overcome; the proxy provides for a

different (and, as it turns out, longer) period.[56]

   *(c)  Actions by written consent*

Next, Debtor argues that if the court credits the durational language in the One Page

Proxy to conclude that the proxy had not expired prior to its exercise, the court may not

then look to the appointment language in the Guarantee and Collateral Agreement to

permit action by written consent.  Debtor maintains that the proxy appointment in the

Guarantee and Collateral Agreement is separate and distinct from the One Page Proxy and

that the One Page Proxy does not allow actions by written consent.  Twin Brook counters

that the One Page Proxy is to be read together with the Guarantee and Collateral

Agreement, and that, even standing alone, the One Page Proxy enabled Twin Brook to act

by written consent.[57]

I do not agree with Twin Brook that the One Page Proxy, standing alone, provides

that the Agent may act by written consent.  The One Page Proxy provides, in relevant part:

> Subject in each case to the limitations set forth in the Guarantee and Collateral
> Agreement (referred to below), (i) the undersigned hereby irrevocable
> designates and appoints Twin Brook Capital Partners, LLC as administrative
> agent for certain secured parties (in such capacity, the "Agent") to represent it
> at all annual and special meetings of the holders of the Equity Interests (as
> defined in the Guarantee and Collateral Agreement defined below) of
> COMMUNITY  INVESTORS,  INC.,  a  Delaware  corporation  (the
> Company"), and (ii) *the undersigned hereby authorizes and empowers Agent, to vote*
> *any and all Equity Interests owned by the undersigned or standing in its name*, and do
> all things which the undersigned might do if present and acting itself.
> (Emphasis added.)

---

[56] *See Mainiero*, 699 A.2d at 325 (refusing to recognize as valid a proxy that, by its terms, expired
prior to the record date.)

[57] Twin Brook Objection at 19 ("each Standalone Proxy went so far as to separate out into two
distinctly labelled clauses the independent rights of Agent to (i) represent the Debtor and other
holders of Pledged Equity at shareholder meetings *AND* (ii) vote any and all Pledged Equity owned
by the Debtor or other Loan Parties, including by written consent.").

Twin Brook argues that the italicized language is not confined to actions at an annual or special meeting, but can include written consents. Such an interpretation is a strained reading of this language. Indeed, the natural reading of the One Page Proxy is that it is intended to be used at meetings of stockholders as it specifically provides that Agent may do all things which the grantor could do if present at a shareholder meeting. This "short form" proxy is exactly the type of uncomplicated document an inspector of elections could easily interpret to determine who is entitled to vote at a shareholder meeting[58] and, as explained *supra*, this was contemplated in the Guarantee and Collateral Agreement.

This conclusion, however, is not fatal. As I have already ruled, the One Page Proxy, while a separate document is not to be read in isolation from the Guarantee and Collateral Agreement. Further, it is not a limitation on the appointment of Twin Brook as attorney-in-fact and proxy in the Guarantee and Collateral Agreement. It is simply another manifestation of the proxy.

Several sections of the Guarantee and Collateral Agreement provide that Twin Brook may exercise its proxy rights by way of written consent:

    6.3   <u>Investment Property</u>.

        (b)    If an Event of Default shall occur and be continuing, (a) the Agent shall have the right to. . . (ii) exercise . . . any other rights, privileges or options pertaining to such Investment Property as if it were the absolute owner thereof (. . . and including with respect to the Pledged Equity, giving or withholding written consents of stockholders, partners or members, calling special meetings of stockholders, partners or members and voting at such meetings) and otherwise act with respect to the Investment Property as if Agent were the outright owner thereof . . . and (b) the Agent shall have the right, substantially concurrently with notice to the applicable Grantor, to . . . (ii)

---

[58] *See e.g., Crown EMAK*, 992 A.2d at 395; *Mainero*, 699 A.2d at 327 ("Neither election inspectors nor corporate boards should be required to scrutinize additional documents offered in support of proxies. . . .").

exercise, or permit its nominee to exercise, all voting and other rights pertaining to such Investment Property as a holder of such Investment Property, with full power of substitution to do so.[59]

7.1    The Agent's Appointment as Attorney-in-Fact, etc.

(a)    Each Grantor hereby irrevocably constitutes and appoints the Agent and any officer or agent thereof . . . to do any or all of the following, in each case, with respect to the Collateral:

. . . .

(v) . . . (4) take all such other actions with respect to Investment Property authorized under Section 6.3 or 6.7 of this Agreement or otherwise authorized by this Agreement or the other Loan Documents; and

(vi) . . . (8) vote any right or interest with respect to any Investment Property;[60]

. . . .

. . . The Agent, as proxy, will be empowered and may exercise the irrevocable proxy to vote the Investment Property at any and all times, including but not limited to, at any meeting of shareholders, partners or members, as the case may be, however called, and at any adjournment thereof, or in any action by written consent, and may waive any notice otherwise required in connection therewith.[61]

The Proxy Notice accurately referenced the above sections and attached resolutions amending the constituent documents and appointing new directors. Assuming, therefore, that these actions were required to be taken prepetition to remove the voting rights from the property of the estate, Twin Brook's Actions were properly taken.

---

[59] Guarantee and Collateral Agreement Section 6.3(b).

[60] Guarantee and Collateral Agreement Section 7.1(a)(v), (vi) at 25.

[61] Guarantee and Collateral Agreement Section 7.1(a) at 26.

Debtor's argument on §§ 362(a)(3) and (a)(4) depends on the contention that Twin Brook did not properly exercise its proxy. As, I have concluded to the contrary, this is a further reason to find no violation of the stay.[62]

### B.    Twin Brook has not violated § 362(a)(6).

Next, Debtor relies on 11 U.S.C. § 362(a)(6) to show a stay violation. This subsection prohibits "any act to collect, assess or recover a claim against the debtor that arose before the commencement of the case." Section 362's application can be broad and "prohibits any action that amounts to pressure on a debtor to pay a debt subject to the automatic stay, even if there is no direct demand for payment."[63] Typical scenarios that

---

[62] This conclusion is also consistent with rulings made by other courts upholding the prepetition exercise of proxy rights in various contexts. *See In re Tominaga*, 325 B.R. 653 (Bankr. M.D. Fla. 2005) (reviewing the operative agreement and relevant state law and determining that, upon default, lender was entitled to vote shares of stock; therefore prepetition corporate resolutions replacing directors were valid and debtor was not entitled to a ruling preventing newly appointed directors from acting as such nor to resume control of corporate entities.); *In re Lake County Grapevine Nursery Operations*, 441 B.R. 653, 655 (Bankr. N.D. Cal. 2010) (recognizing that "[t]he issue here is whether a pledge of an equity interest is self-executing as to voting rights or whether state law regarding formal transfer of voting rights must be followed [and i]n the absence of a specific state law requiring further proceedings to obtain the voting rights, courts generally conclude that the occurrence of a default is sufficient to trigger the transfer of voting rights to the pledgee."). *See also In re Town Center Flats, LLC*, 855 F.3d 721 (6th Cir. 2017) (Prepetition, debtor "irrevocably, absolutely and unconditionally" transferred its right to rent as security for the repayment of a loan. The court held that the rents were not property of the estate because Michigan "treat[s] a completed assignment of rents as a change of ownership and the assignor of those rents does not retain residual property rights in the assigned rents" even though under the agreement the assignor had the ability to cure a default and start collecting rents again. *Id.* at 727. In so holding the Court of Appeals recognized the policy concern that "excluding the assigned rents from the estate would effectively foreclose Chapter 11 relief for companies like [the debtor] that own a single property and receive their sole stream of revenue from rents of that property. [citation omitted]. We recognize the concern of [debtor]—and the bankruptcy court—that single-asset real estate entities may have limited options under Chapter 11 in this situation. Michigan law, however, is clear on the matter and governs despite other policy concerns."). *Id.* at 728.

[63] *In re Malloy*, 572 B.R. 551, 556 (Bankr. E.D. Pa. 2017).

judges opine on include letters or phone calls to debtors,[64] payroll deductions, garnishments,

setoff and withholding student transcripts.[65]

Debtor argues Twin Brook is refusing to stop collection efforts because Twin Brook

continues to exercise control over Debtor's corporate governance rights in Community

Investors and the Indirect Subsidiaries and refuses to reverse its prepetition actions and

return control of corporate governance to Debtor.[66]  Debtor argues that Twin Brook is

required to take affirmative action post-bankruptcy "to stop its collection efforts, dismantle

the Twin Brook Board and return control of the operating subsidiaries to the Debtor."[67]

When pressed at argument for specific actions that Twin Brook is taking post-petition to

collect its debt, Debtor's counsel said Twin Brook is talking to the board[68] and it is blocking

---

[64] The legislative history of § 362 states: "[p]aragraph (6) prevents creditors from attempting in any way to collect a prepetition debt.  Creditors in consumer cases occasionally telephone debtors to encourage repayment in spite of bankruptcy. . . .  This provision prevents evasion of the purpose of the bankruptcy laws by sophisticated creditors."  H.R. Rep. No. 95-595, at 392.  *See* 3 Collier on Bankruptcy ¶ 362.03 (16th 2023).

[65] 3 Collier on Bankruptcy ¶ 362.03[8][a] (16th 2023).  One judge in this district has opined that a violation of subsection (a)(6) requires a post-petition affirmative act against property of the estate.  *Pardo v. Nylcare Health Plans, Inc. (In re APF Co.)*, 274 B.R. 408, 416 (Bankr. D. Del. 2001).

[66] Motion to Enforce the Automatic Stay ¶ 33.

[67] Motion to Enforce the Automatic Stay ¶ 41.

[68] Feb. 22, 2023 Hr'g Tr. 25:5-19.

> MR. GLENN:  Maybe it did; maybe it didn't.  I don't think it matters because the automatic stay analysis is: Are they doing something, are they acting or are they exercising control –
> THE COURT:  Who is the "they"?
> MR. GLENN:  Twin Brook.
> THE COURT:  Okay.  And what is Twin Brook doing today?
> MR. GLENN:  They're talking to the board, they're talking to the management every single day.
> THE COURT:  They can't talk -- a creditor can't talk -- if a creditor talks to management, is that a violation of the stay?
> MR. GLENN:  If it's an act to control.  And that's the whole point.  Okay.

Debtor from governing its subsidiaries by refusing to permit Debtor to change the board.[69]

Debtor's real grievance is that it disagrees with the direction the new board is taking and its

day-to-day decisions.

Twin Brook responds that § 362(a)(6) requires a post-petition affirmative act and that

Twin Brook's refusal to rescind its prepetition actions cannot be a violation of the stay.

Twin Brook further asserts that Debtor cannot point to any affirmative act, including any

post-petition collection efforts, taken by Twin Brook to collect on its prepetition debt. Twin

Brook argues that the Board, once in place at Community Investors, is independent and

performing its duties as a board.

Community Investors also weighed in on the Motion to Enforce the Automatic Stay

on its own behalf and on behalf of the Indirect Subsidiaries.[70] Community Investors

reminds the parties and the court that neither it nor the Indirect Subsidiaries are part of this

---

[69] Feb. 22, 2023 Hr'g Tr. 29:13-25; 30:16-21.

> THE COURT: Tell me again what's the violation of the stay. What actions is Twin Brook taking today, not what they did pre-bankruptcy -- would you agree with me that actions they took pre-bankruptcy, Twin Brook took prebankruptcy, are not violations of the stay?
> MR. GLENN: By definition, I have to.
> THE COURT: Okay. So what actions -- and you can go to your car example. I've got Denby-Peterson open in front of me. What's the action that -- to put in action, exercise, to put in action. What is the action that Twin Brook is taking today that violates the stay.
> MR. GLENN: They are blocking us from exercising control over the board.
>
> . . . .
>
> THE COURT: So the action that Twin Brook is taking that's a violation of the stay, give that to me again.
> MR. GLENN: They are blocking our ability to govern the company by changing the board, controlling management, and all of the other perquisites of being a shareholder.

[70] D.I. 44. (Response of Community Investors, Inc. and Certain of its Subsidiaries to Debtor's Motion for Entry of an Order Enforcing the Automatic Stay and Granting Related Relief).

bankruptcy case and that CII's sole asset is its direct ownership interest of 100% of the stock of Community Investors. It also asserts that neither Community Investors nor any of its management are subject to the automatic stay.[71]

While it is fair to say, as Debtor does, that Twin Brook's Actions were an attempt to collect or recover on its Loan,[72] those actions happened pre-bankruptcy. As discussed above, pre-bankruptcy Debtor appointed Twin Brook as its attorney-in-fact and proxy and the Proxy Notice solidified Twin Brook's ability to exercise the proxy. As of the petition date, therefore, Debtor did not have the right to vote the Pledged Equity.

In arguing that Debtor is currently being deprived of its right to manage/govern Community Investors and the Indirect Subsidiaries, Debtor misunderstands its rights as a stockholder of a Delaware corporation. The Delaware General Corporation Law has placed the authority to manage a corporation's day-to-day operations in the hands of directors while reserving for stockholders "the more elemental but remote power to elect directors, to alter and repeal bylaws, and to vote upon the most fundamental of corporate

---

[71] *Id.* at ¶ 4 (citing *Equity Broad. Corp. v. Shubert (In re Winstar Commc'ns. Inc.)*, 284 B.R. 40, 51 (Bankr. D. Del. 2002) (holding that a lawsuit against a non-debtor subsidiary does not violate the automatic stay, even if such lawsuit may impact the value of the stock that the parent-debtor owns, as it does not "alter the Bankruptcy estate's right, liabilities, options or freedom of action" and that "ownership of all of the outstanding stock of [the subsidiary] by the [parent-debtor] does not confer jurisdiction on the Bankruptcy Court to decide disputes involving [the subsidiary's] assets."); *Kreisler v. Goldberg*, 478 F.3d 209, 211 n.1, 215 (4th Cir. 2007) (holding that where a debtor-parent owns all of the shares of a non-debtor, the property of the non-debtor subsidiary is not property of the estate); *In re Calvert*, 135 B.R. 398, 402 (Bankr. S.D. Cal. 1991) (holding that a debtor's non-debtor subsidiary is a separate legal entity that may "act through its duly constituted board and officers, even though those actions may have an effect on the value of shares of stock held by the estates of debtors . . . .[therefore,] the automatic stay does not apply to actions of the board of the [subsidiary]. . . .")).

[72] *In re Marvel Entertainment Group, Inc.*, 209 B.R. 832, 838-39 (D. Del. 1997) (discussing the difference between stockholders exercising their corporate governance rights, which persist in bankruptcy cases, and creditors gaining control of a debtor's estate through the exercise of proxies).

transactions . . . ."[73] It is through their voting rights, not the mere fact of stock ownership, that stockholders have a say in a corporation's management. If a corporation seeks to change the balance between directors and stockholders, it may do so in its charter.[74]

Here, Debtor gave away its right to vote the Pledged Equity, and with it the right to choose the directors of Community Investors (and the Indirect Subsidiaries). Although

---

[73] Donald J. Wolfe, Jr. & Michael A. Pittenger, Corporate & Commercial Practice in the Delaware Court of Chancery § 11.01 (2d ed. 2022) (citations omitted). As the authors explain:

> Coursing near the center of many of the great controversies that shape the law of corporate governance is an unrelenting tension between the respective spheres of influence of stockholders and directors. Arising from each stockholder's equity investment in the enterprise is the understandable desire to influence the corporate policy so as to ensure the protection and enhancement of that investment. Yet considerations of practical efficiency at the heart of the corporate concept itself dictate the need for centralized decision making. The power to manage the collective capital investment for the common good is therefore routinely vested in the board. When disagreements arise between these two constituencies, it becomes the task of the corporate law to resolve them. That resolution is not to be based upon the Court's assessment as to the substantive policy that best serves the corporation's business interests, for that is a task for which the courts are ill-equipped. The judicial function is instead to ascertain that point on the decisional continuum at which the power of the investor must yield to the managerial prerogative of the board.

> The Delaware General Corporation Law, the statutory spine of Delaware's vast body of corporate jurisprudence, has sought to strike an appropriate balance in this regard by expressly vesting in the board of directors the authority to manage the daily business and affairs of the corporation, while reserving to the stockholders the more elemental power to elect directors, to alter and repeal bylaws, and to approve or disapprove the most fundamental of corporate transactions, such as mergers, sales of substantially all of the corporation's assets, charter amendments, and dissolutions. Moreover, it provides the entity with the flexibility to alter this presumptive balance of power through the inclusion of charter provisions that enhance the influence of the stockholders over corporate strategy, whether by expanding the roster of matters and transactions for which their approval is required, or by hiking the percentage of approving votes necessary to confer that approval, or by subjecting the board's power to specified internal checks and balances.

[74] Id.

Twin Brook allowed CII to vote the Pledged Equity while it was not in default, the Proxy

Notice, sent pre-bankruptcy, withdrew that permission.[75]

During colloquy with the court, counsel for CII argued that there is a fundamental

difference between a debtor owning shares of stock in a publicly traded company and

owning the equity of a wholly owned subsidiary. Counsel points out the practical impact of

100% ownership on the ability to set management priorities. While I am not insensitive to

the difference, CII points to no provision of the Delaware General Corporation Law that

makes this distinction in the rights of stockholders. Nor has CII pointed to any provision of

Community Investors' charter that gives it more rights as a stockholder to control the day-

to-day operations of its subsidiary. Accordingly, CII has no direct management rights.

What CII does have is the value of its equity in Community Investors. It still owns

the stock and has all rights attendant to ownership (except the ones it gave away), which

may include, for example, the ability to sell the stock or otherwise dispose of it. As the

stockholder, it may also be owed fiduciary duties by the directors of Community Investors,

which, if breached, may give rise to claims.[76]

---

[75] To the extent Debtor implicitly argues that simply owning the stock as of the petition date of necessity means the right to vote it and thus influence or control management, Debtor is wrong. As discussed previously, Delaware law recognizes that the right to vote the stock may be separated from the economic interest in the stock. *Hawkins II*, 289 A.3d at 663 (describing "the fundamental nature of a proxy as an instrument that divides the economic rights and voting rights that attach to share ownership.").

[76] I make no findings or conclusions of law as to whether these duties exist and if so whether they have been waived.

*Conclusion*

The purpose behind § 362, generally, is to maintain the status quo at the time of the filing of the bankruptcy case.[77] Twin Brook's Actions were taken pre-bankruptcy, not post-bankruptcy. Here, the status quo at the time of the filing of the case is maintained by denying the Motion to Enforce the Automatic Stay.

## II.    Motion to Dismiss

Twin Brook moved to dismiss CII's bankruptcy case asserting it was filed in bad faith. The parties' briefing addresses the traditional factors courts in this circuit and district use to examine that question, including (1) whether the petition serves a valid bankruptcy purpose, e.g., by preserving a going concern or maximizing the value of the debtor's estate, and (2) whether the petition is filed to obtain a tactical litigation advantage."[78] The parties also briefed the *Primestone* factors.[79]

Based on my denial of the Motion to Enforce and my determinations that Twin Brook properly exercised its authority as proxy and that the Proxy Notice ended Debtor's ability to vote the Pledged Equity, I am tempted to dismiss the case for the simple reason that CII cannot obtain the relief that it sought by filing the petition. As counsel for CII

---

[77] *APF*, 274 B.R. at 417 (creditor who refused to turnover funds seized prepetition did not violate the automatic stay as "these creditors are in effect complying with the spirit of the § 362 freeze by maintaining the seized property in the status it enjoyed pre-petition").

[78] *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119–20 (3d Cir. 2004).

[79] *In re Primestone*, 272 B.R. 554, 557 (D. Del. 2002). These factors include: "a. Single asset case; b. Few unsecured creditors; c. No ongoing business or employees; d. Petition filed on the eve of foreclosure; e. Two party dispute which can be resolved in pending state court action; f. No cash or income; g. No pressure from non-moving creditors; h. Previous bankruptcy petition; i. Prepetition conduct was improper; j. No possibility of reorganization; k. Debtor formed immediately prepetition; l. Debtor filed solely to create automatic stay; and m. Subjective intent of the debtor."

explained, CII filed the bankruptcy case to obtain a ruling from this court that it, and not

Twin Brook, can control the fate of how Community Investors and the Indirect Subsidiaries

are restructured.[80] In order to do that, CII needed me to rule that it, and not Twin Brook,

has the right to choose and/or replace the directors at Community Investors and the

Indirect Subsidiaries.

But, the parties agreed to leave open the Contested Issues, which include (at least)

the equitable estoppel and turnover arguments (*see supra* n. 4). While I am skeptical based

on a review of the filings that Debtor will be successful in pressing these arguments,

skepticism cannot replace evidence. Accordingly, I will hold in abeyance my ruling on the

Motion to Dismiss and will instead hold a status conference to discuss with the parties the

appropriate path forward.

Dated:  April 12, 2023

Laurie Selber Silverstein
United States Bankruptcy Judge

---

[80] Feb. 22 Hr'g Tr. 21:21-25.

MR. GLENN: - - . . . And what the [Debtor-appointed former] directors of the company decided was that the company was in need of restructuring. And so, ultimately, if we had known what [Twin Brook was] going to do, then the likely outcome would have been we would have filed all the cases before the Court. And that's really what we're here about is who controls whether the subsidiaries -- how the subsidiaries are restructured, what happens in that restructuring. And that's what was taken away, and that's why the automatic stay is so important going forward.